

MCC:KLM:slg:2001V00253

ORIGINAL

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

MARK GARNES,
        Plaintiff       :

                           :

        v.            :     Civil No. 1:CV-00-0700
                           :     (Caldwell, J.)

JANET RENO, et al.,
        Defendants    :

FILED
HARRISBURG, PA

MAY 2 9 2001

MARY E. D'ANDREA, C
Per _____
Deputy Clerk

**RECORD TO BRIEF IN SUPPORT OF THE DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

MARTIN C. CARLSON
United States Attorney

KATE L. MERSHIMER
Assistant U.S. Attorney
SHELLEY L. GRANT
Paralegal Specialist
217 Federal Building
225 Walnut Street
Post Office Box 11754
Harrisburg, PA 17108
717/221-4482

Dated: May 29, 2001

# INDEX

Alicia Vasquez Declaration . . . . . . . . . . . . . . . . . . . R. 1

     Attach. A       Inmate Profile. . . . . . . . . . . . . R. 4

     Attach. B       Inmate History. . . . . . . . . . . . . R. 6

Charles Fegley Declaration . . . . . . . . . . . . . . . . . . . R. 8

     Attach. A       Program Statement 5800.08E and Program
                    Statement 5800.12, para. 310, Receiving
                    and Discharge Manual. . . . . . . . . . R. 18

     Attach. B       Inmate Personal Property Record . . . . . R. 24

     Attach. C       Inmate Personal Property Record . . . . . R. 26

     Attach. D       UPS Shipping Record . . . . . . . . . . R. 28

     Attach. E       Inmate Personal Property Record . . . . . R. 30

     Attach. F       Request - Authorization to Mail
                    Inmate Package. . . . . . . . . . . . . R. 32

     Attach. G       Request - Authorization to Mail
                    Inmate Package. . . . . . . . . . . . . R. 34

United States of America v. Mark Garnes,
     No. 99-1524, USCA; Brief of Appellant . . . . . . . . . R. 35

United States of America v. Mark Garnes,
     No. 99-1524, USCA; Brief and Appendix
     for the United States. . . . . . . . . . . . . . . . . R. 59

United States of America v. Mark Garnes,
     No. 99-1524, USCA; Appellant's Reply Brief. . . . . . . R. 112

United States of America v. Mark Garnes,
     No. 99-1524, USCA; Joint Appendix for
     Defendant-Appellant Mark Garnes . . . . . . . . . . . . R. 131

United States of America v. Mark Garnes,
     No. 99-1524, USCA; Summary Order, June 29, 2000. . . . . R. 184

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MARK GARNES,<br>        Plaintiff | : | |
| | : | |
| vs. | : | Civil No. 1:CV-00-0700 |
| | : | (Caldwell, J.) |
| | : | |
| JANET RENO, et al.,<br>        Defendants | : | |

## DECLARATION OF ALICIA VASQUEZ

I, Alicia Vasquez, do hereby declare and state the
following:

1.   I am a Law Clerk for the United States Department of
     Justice, Federal Bureau of Prisons, Federal Correctional
     Complex, Allenwood, Pennsylvania.  I have been employed with
     the Bureau of Prisons since August 2000.

2.   As a Law Clerk with the Federal Bureau of Prisons, I have
     access to information maintained by the Bureau of Prisons'
     SENTRY computer system.  Additionally, I have access to
     Administrative Remedy Requests filed by inmates.

3.   I have reviewed the complaint filed by the Plaintiff, inmate
     Mark Garnes, Federal Register Number 24646-053.
     Essentially, the Plaintiff alleges that staff violated his
     right to access the court by not forwarding his legal
     property to him in August 1998.

R. 1

4.    Attached hereto as Attachment A is a true and correct copy

of the Inmate Profile information for the plaintiff printed

from the Bureau of Prisons' SENTRY computer system.    (1

page).

5.    Attached hereto as Attachment B is a true and correct copy

of the Inmate History- Quarters information for the

plaintiff printed from the Bureau of Prisons' SENTRY

computer system.    (2 pages).

I declare that any and all records attached to this

declaration are true and accurate copies of records maintained in

the ordinary course of business by the Federal Bureau of Prisons.

I further declare that the foregoing is true and correct to the

best of my knowledge and belief, and is given under penalty of

perjury pursuant to 28 U.S.C. §1746.

Executed this _10th_ day of May, 2001.

ALICIA VASQUEZ
Law Clerk
Federal Bureau of Prisons
Consolidated Legal Center - Allenwood
White Deer, Pennsylvania 17887

R.    2

Garnes v. Reno, et al.
Civil Action Number 1:CV-00-0700
Middle District of Pennsylvania

Declaration of Alicia Vasquez, Law Clerk/Honors Attorney

# Attachment A

```
  ALFDF  535.03 *              INMATE PROFILE           *     04-16-2001
PAGE 001 OF 001                                               08:39:55
          24646-053            REG
REGNO.: 24646-053             FUNCTION: PRT DOB/AGE.: 05-15-1963 / 37
NAME.: GARNES, MARK                       R/S/ETH.: B/M/O
RSP..: FTD-FORT DIX FCI                    MILEAGE.: 98 MILES
PHONE: 609-723-1100        FTS: 700-866-6000
 PROJ REL METHOD: GOOD CONDUCT TIME REL (CCCA)    FBI NO..: 450634V3
 PROJ REL DATE..: 06-03-2010                      INS NO..: N/A
 PAR ELIG DATE..: N/A                             SSN.....: 062584240
 PAR HEAR DATE..:                                 DETAINER: NO      CMC..: YES
OFFN/CHG RMKS: 21 841 POSS WITD COCAINE BASE; 300 MOS, 5 YR SUPV.
    FACL CATEGORY   - - - - -   CURRENT ASSIGNMENT - - - - - -  EFF DATE  TIME
    FTD  ADM-REL    A-DES       DESIGNATED, AT ASSIGNED FACIL  04-18-2000 1000
    FTD  COR COUNSL 5812 A-L    C. SMITH-CCC-5812 X636         04-28-2000 1106
    FTD  CASE MGT   PROG RPT    NEXT PROGRESS REPORT DUE DATE  11-23-2002 1425
    FTD  CASE MGT   RPP NEEDS   RELEASE PREP PGM NEEDS         09-01-1996 0952
    FTD  CASE MGT   V94 CVB913  V94 CURR VIOL BEFORE 91394     02-22-1996 1722
    FTD  CASE MGT   WAP-EDNY    WRIT AD PROS TO EASTERN NY     08-12-1998 1600
    FTD  CASEWORKER 5812 A-L    R. BOATWRIGHT-CSW-5812 X625    04-28-2000 1107
    FTD  CUSTODY    IN          IN CUSTODY                     01-19-1989 0603
    FTD  DRUG PGMS  DRG E COMP  DRUG EDUCATION COMPLETED       05-10-1995 0900
    FTD  DRUG PGMS  DRG I NONE  NO DRUG INTERVIEW REQUIRED     12-01-2000 1121
    FTD  EDUC INFO  ESL HAS     ENGLISH PROFICIENT             08-25-1991 1451
    FTD  EDUC INFO  GED HAS     COMPLETED GED OR HS DIPLOMA    12-20-1995 1752
    FTD  FIN RESP   COMPLT      FINANC RESP-COMPLETED          12-10-1992 1037
    FTD  LEVEL      LOW         SECURITY CLASSIFICATION LOW    03-15-2000 0926
    FTD  MED DY ST  REG DUTY    NO MEDICAL RESTR--REGULAR DUTY 11-10-1998 1845
    FTD  MED DY ST  YES F/S     CLEARED FOR FOOD SERVICE       08-30-1999 1518
    FTD  PGM REVIEW MAY         MAY PROGRAM REVIEW             05-03-2001 1648
    FTD  QUARTERS   Q02-393U    HOUSE Q/RANGE 02/BED 393U      04-28-2000 1154
    FTD  RELIGION   RASTA       RASTAFARIAN                    11-22-1999 1113
    FTD  UNIT       UNIT 5      M. CARROLL- UNIT MGR X618      04-18-2000 1000
    FTD  WAITNG LST W COMP VT   COMPUTER VT CLASS WEST         11-09-2000 1131
    FTD  WRK DETAIL WELLNESS W  WELLNESS PROGRAM - FCI WEST    05-02-2000 0001


G0000       TRANSACTION SUCCESSFULLY COMPLETED
```

R. 4

<u>Garnes v. Reno, et al.</u>
Civil Action Number 1:CV-00-0700
Middle District of Pennsylvania

Declaration of Alicia Vasquez, Law Clerk/Honors Attorney

# Attachment B

```
  ALFDF  531.01 *              INMATE HISTORY              *     04-16-2001
  PAGE 001       *              QUARTERS                   *     08:39:48

  REG NO..: 24646-053 NAME....: GARNES, MARK
  CATEGORY: QTR          FUNCTION: PRT          FORMAT:

FCL     ASSIGNMENT  DESCRIPTION                       START DATE/TIME STOP  DATE/TIME
FTD     Q02-393U    HOUSE Q/RANGE 02/BED 393U         04-28-2000 1154 CURRENT
FTD     Q02-161U    HOUSE Q/RANGE 02/BED 161U         04-28-2000 1116 04-28-2000 1154
FTD     W02-165L    HOUSE W/RANGE 02/BED 165L         04-18-2000 1826 04-28-2000 1116
FTD     U01-001L    HOUSE U/RANGE 01/BED 001L         04-18-2000 1000 04-18-2000 1826
LEW     I02-201L    HOUSE I/RANGE 02/BED 201L         04-13-2000 1758 04-18-2000 0553
LEW     R01-001L    HOUSE R/RANGE 01/BED 001L         04-13-2000 1709 04-13-2000 1758
ALM     C05-104L    HOUSE C/RANGE 05/BED 104L         02-15-2000 0817 04-13-2000 1534
ALM     C05-104U    HOUSE C/RANGE 05/BED 104U         10-21-1999 1424 02-15-2000 0817
ALM     Z01-021UAD  HOUSE Z/RANGE 01/BED 021U AD      10-01-1999 2204 10-21-1999 1424
ALM     Z01-011UAD  HOUSE Z/RANGE 01/BED 011U AD      09-10-1999 1935 10-01-1999 2204
ALM     Z01-008UAD  HOUSE Z/RANGE 01/BED 008U AD      08-20-1999 1349 09-10-1999 1935
ALM     Z01-015UAD  HOUSE Z/RANGE 01/BED 015U AD      08-19-1999 1500 08-20-1999 1349
BRO     F10-006L    HOUSE F/RANGE 10/BED 006L         01-30-1999 1400 08-19-1999 0556
BRO     4S          4 SOUTH PRE-TRIAL MALE            08-12-1998 1710 01-30-1999 1400
BRO     R&D         RECEIVING & DISCHARGE             08-12-1998 1313 08-12-1998 1710
ALM     Z01-006LAD  HOUSE Z/RANGE 01/BED 006L AD      08-06-1998 1402 08-12-1998 0642
ALM     Z01-006LAD  HOUSE Z/RANGE 01/BED 006L AD      07-16-1998 1325 08-06-1998 1402
ALM     C06-123L    HOUSE C/RANGE 06/BED 123L         06-10-1998 1114 07-16-1998 1325
ALM     3B          B SIDE OF UNT 3                   02-01-1996 0948 06-10-1998 1114
ALM     ADM DET     FCI, ALW SEG                      01-31-1996 1600 02-01-1996 0948
SCH     ADM DET     ADMINISTRATIVE DETENTION          01-30-1996 1724 01-31-1996 0754
SCH     DIS SEG     DISCIPLINARY SEGREGRATION         01-17-1996 1037 01-30-1996 1724
SCH     ADM DET     ADMINISTRATIVE DETENTION          12-22-1995 1513 01-17-1996 1037
SCH     1A          QUARTERS 1A                       06-05-1995 1439 12-22-1995 1513
SCH     R & D       RECEIVING & DISCHARGE             06-05-1995 1130 06-05-1995 1439
LEW     D-3         D-3 CELLHOUSE                     09-10-1992 1020 06-05-1995 0810
LEW     D-2         D-2 CELLHOUSE                     02-13-1992 1600 09-10-1992 1020
LEW     D-3         D-3 CELLHOUSE                     02-07-1992 1600 02-13-1992 1600
LEW     ADM DET     ADMINISTRATIVE DETENTION          10-08-1991 2135 02-07-1992 1600
LEW     D-1         D-1 CELLHOUSE                     01-31-1991 1600 10-08-1991 2135
LEW     I-1         I-1 CELLROOM                      01-17-1991 1858 01-31-1991 1600
LEW     R/D         RECEIVING & DISCHARGE             01-17-1991 1741 01-17-1991 1858
NYM     5N          FIFTH FLOOR NORTH                 11-19-1990 0515 01-17-1991 0524
NYM     R&D         RECEIVING AND DISCHARGE           11-19-1990 0054 11-19-1990 0515
OTV     UNIT 3A     3A                                10-18-1990 1905 11-19-1990 0013
OTV     ADM DET     ADMIN DETENTION                   09-14-1990 1040 10-18-1990 1905
OTV     UNIT 3A     3A                                09-14-1990 1039 09-14-1990 1040
OTV     R&D         RECEIVING AND DISCHARGE           09-14-1990 0819 09-14-1990 1039
NYM     9S DET      9-S ADMINISTRATIVE DETENTION      09-12-1990 1919 09-14-1990 0025
NYM     5N          FIFTH FLOOR NORTH                 08-10-1990 0339 09-12-1990 1919
NYM     7N          SEVENTH FLOOR NORTH               08-10-1990 0147 08-10-1990 0339



G0002        MORE PAGES TO FOLLOW . . .
```

R. 6

```
ALFDF  531.01 *              INMATE HISTORY            *      04-16-2001
PAGE 002 OF 002 *             QUARTERS                 *      08:39:48

REG NO..: 24646-053 NAME....: GARNES, MARK
CATEGORY: QTR        FUNCTION: PRT      FORMAT:
```

| FCL | ASSIGNMENT | DESCRIPTION | START DATE/TIME | STOP DATE/TIME |
|-----|-----------|-------------|-----------------|----------------|
| NYM | R&D | RECEIVING AND DISCHARGE | 08-10-1990 0038 | 08-10-1990 0147 |
| OTV | UNIT 4A | 4A | 08-01-1990 0800 | 08-10-1990 0023 |
| OTV | R&D | RECEIVING AND DISCHARGE | 08-01-1990 0554 | 08-01-1990 0800 |
| NYM | 5N | FIFTH FLOOR NORTH | 07-27-1990 2039 | 08-01-1990 0026 |
| NYM | 9N | NINTH FLOOR NORTH | 07-27-1990 0337 | 07-27-1990 2039 |
| NYM | R&D | RECEIVING AND DISCHARGE | 07-27-1990 0123 | 07-27-1990 0337 |
| OTV | UNIT 4A | 4A | 06-27-1990 0902 | 07-27-1990 0033 |
| OTV | R&D | RECEIVING AND DISCHARGE | 06-27-1990 0652 | 06-27-1990 0902 |
| NYM | 7N | SEVENTH FLOOR NORTH | 05-10-1990 0913 | 06-27-1990 0031 |
| NYM | 7S | SEVENTH FLOOR SOUTH | 04-17-1990 1014 | 05-10-1990 0913 |
| NYM | 9S SEG | 9-S DISCIPLINARY SEGREGATION | 02-13-1990 1532 | 04-17-1990 1014 |
| NYM | 9S DET | 9-S ADMINISTRATIVE DETENTION | 01-04-1990 0604 | 02-13-1990 1532 |
| NYM | R&D | RECEIVING AND DISCHARGE | 01-04-1990 0532 | 01-04-1990 0604 |
| OTV | ADM DET | ADMIN DETENTION | 12-26-1989 1031 | 01-04-1990 0139 |
| OTV | UNIT 3B | 3B | 11-15-1989 1053 | 12-26-1989 1031 |
| OTV | R&D | RECEIVING AND DISCHARGE | 11-15-1989 0725 | 11-15-1989 1053 |
| NYM | 11S | 11 SOUTH | 11-02-1989 2041 | 11-15-1989 0519 |
| NYM | 7N | SEVENTH FLOOR NORTH | 09-14-1989 1627 | 11-02-1989 2041 |
| NYM | 9S DET | 9-S ADMINISTRATIVE DETENTION | 07-28-1989 2107 | 09-14-1989 1627 |
| NYM | 5N | FIFTH FLOOR NORTH | 06-05-1989 2044 | 07-28-1989 2107 |
| NYM | 9S SEG | 9-S DISCIPLINARY SEGREGATION | 05-31-1989 1309 | 06-05-1989 2044 |
| NYM | 9S DET | 9-S ADMINISTRATIVE DETENTION | 05-23-1989 2234 | 05-31-1989 1309 |
| NYM | 7S | SEVENTH FLOOR SOUTH | 05-23-1989 2044 | 05-23-1989 2234 |
| NYM | 5N | FIFTH FLOOR NORTH | 05-01-1989 1140 | 05-23-1989 2044 |
| NYM | 9S DET | 9-S ADMINISTRATIVE DETENTION | 04-25-1989 1357 | 05-01-1989 1140 |
| NYM | 7S | SEVENTH FLOOR SOUTH | 04-25-1989 1049 | 04-25-1989 1357 |
| NYM | 9S DET | 9-S ADMINISTRATIVE DETENTION | 04-21-1989 2047 | 04-25-1989 1049 |
| NYM | 5N | FIFTH FLOOR NORTH | 04-21-1989 0857 | 04-21-1989 2047 |
| NYM | 9S DET | 9-S ADMINISTRATIVE DETENTION | 04-06-1989 1316 | 04-21-1989 0857 |
| NYM | 5N | FIFTH FLOOR NORTH | 03-28-1989 1455 | 04-06-1989 1316 |
| NYM | 9S DET | 9-S ADMINISTRATIVE DETENTION | 03-27-1989 1537 | 03-28-1989 1455 |
| NYM | 5N | FIFTH FLOOR NORTH | 01-24-1989 2119 | 03-27-1989 1537 |
| NYM | 11S | 11 SOUTH | 01-19-1989 1835 | 01-24-1989 2119 |
| NYM | R&D | RECEIVING AND DISCHARGE | 01-19-1989 0603 | 01-19-1989 1835 |
| OTV | UNIT 3B | 3B | 01-06-1989 1209 | 01-19-1989 0227 |
| OTV | R&D | RECEIVING AND DISCHARGE | 01-06-1989 0730 | 01-06-1989 1209 |
| NYM | 5N | FIFTH FLOOR NORTH | 11-28-1988 1345 | 01-06-1989 0917 |
| NYM | 9S DET | 9-S ADMINISTRATIVE DETENTION | 11-14-1988 1624 | 11-28-1988 1345 |
| NYM | 11S | 11 SOUTH | 08-12-1988 2003 | 11-14-1988 1624 |
| NYM | 9N | NINTH FLOOR NORTH | 08-11-1988 2341 | 08-12-1988 2003 |
| NYM | R&D | RECEIVING AND DISCHARGE | 08-11-1988 1934 | 08-11-1988 2341 |

```
G0000      TRANSACTION SUCCESSFULLY COMPLETED
```

R. 7

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MARK GARNES, | : | |
|      Plaintiff | : | |
| | : | |
| vs. | : | Civil No. 1:CV-00-0700 |
| | : | (Caldwell, J.) |
| | : | |
| JANET RENO, et al., | : | |
|      Defendants | : | |

### DECLARATION OF CHARLES FEGLEY

I, Charles Fegley, hereby make the following declaration:

1.    I am currently employed by the United States Department of Justice, Federal Bureau of Prisons, as an Inmate Systems Officer at F.C.I. Allenwood.  I have been employed by the Bureau of Prisons since August 1989.  I have held the position of Inmate Systems Officer at F.C.I. Allenwood since May 1993.

2.    I am aware of the allegations contained in the above-captioned complaint in which I am named as a defendant in both my individual capacity and in my official capacity.  The Plaintiff, inmate Mark Garnes, register number 24646-053, alleges that I failed to mail all of his legal materials to him while he was on writ at the Metropolitan Detention Center (M.D.C.) Brooklyn.  The Plaintiff further alleges that I am the property officer who should have mailed his legal materials to him at M.D.C. Brooklyn.

R. 8

3.   In the course of my employment, I have access to documents, files, and electronic records pertaining to federal inmates, including Inmate Personal Property Record forms and UPS mail record forms relating to inmate property mailed from F.C.I. Allenwood and retained at F.C.I. Allenwood.   In addition, I have access to Bureau of Prisons' policy, including Bureau-wide Program Statements and institution supplements relating to F.C.I. Allenwood.

4.   In connection with responding to this action, I reviewed available property records relating to the Plaintiff.   These records reveal that on August 11, 1998, I was assigned to work in the institution's Receiving and Discharge area. Specifically, my duties included processing inmates in or out of the institution; receiving and sending inmate property; preparing inmates for court appearances ("dress-outs"); and other duties as assigned.

5.   At approximately 10:00 a.m., the Plaintiff reported to Receiving and Discharge in order to pack his property since he was scheduled to depart F.C.I. Allenwood on writ to M.D.C. Brooklyn.

6.   I conducted an inventory of the Plaintiff's property in the Plaintiff's presence.  As I inventoried each item, I recorded

the item on Bureau of Prisons Form BP-383 ("Inmate Personal Property Record"). With the exception of two items (five soft cover reading books and two photo albums), all of the Plaintiff's items were marked as "stored". Since the Plaintiff was not a permanent release from the institution (he was a temporary release since he was only going out on writ), he was not allowed to bring his personal property with him. This is in accordance with established Bureau of Prisons policy (Institution Supplement ALM 5800.08 E, entitled Receiving and Discharge Manual, paragraph 5.f, and Bureau of Prisons Program Statement 5800.12, entitled Receiving and Discharge Manual, paragraph 310). I have attached a copy of this Institution Supplement and Program Statement to my declaration as Attachment A.

7. Even though the Plaintiff would have been allowed to bring "essential legal materials" with him in accordance with the Receiving and Discharge Manual, the Plaintiff elected to have this property stored. This was indicated by marking "S" for "stored" on the inventory sheet. Further, the Plaintiff verified the accuracy of this action by signing Block #10 of the inventory form. I have attached a copy of the inventory form to my declaration as Attachment B.

R. 10

8.    Contrary to the Plaintiff's assertions, I did not refuse to
      allow the Plaintiff to take his legal materials with him.   If
      the Plaintiff had requested to bring his legal materials with
      him, I would have separated those materials from the remainder
      of his property, completed a manifest for the staff members
      from the bus crew to sign (to document they received the
      material) and I would have placed a copy of the manifest in
      the Plaintiff's file.

9.     Since the Plaintiff signed the form stating that the property
      (including his legal materials) was to be stored, I packed the
      property and it was placed in storage (except for the two
      items which the Plaintiff had indicated should be mailed to an
      address he had provided).   The Plaintiff was then given a copy
      of the inventory form for his records.

10.   A further review of available records indicates that on August
      26, 1998, I received a call from the Plaintiff's Unit Manager
      at M.D.C. Brooklyn requesting that the Plaintiff's legal
      materials be forwarded to the Plaintiff at M.D.C. Brooklyn.
      Out of an abundance of caution, I mailed **all** of the
      Plaintiff's property to M.D.C. Brooklyn.   Before I mailed the
      property, I changed the inventory sheet from "S" for "stored"
      to "M" for "mailed".   I also noted in Block #8 of the
      inventory that "all property was mailed to M.D.C. Brooklyn".

R. 11

I have attached a copy of the updated inventory sheet to my declaration as Attachment C.

11. On the following day (August 27, 1998) the personal property was mailed via UPS to M.D.C. Brooklyn. I have attached a copy of the UPS shipping record to my declaration as Attachment D.

12. The UPS Shipping Record clearly indicates that three boxes were shipped to M.D.C. Brooklyn with the reference of "Garnes" and the Plaintiff's federal register number.

13. Although I do not recall the exact date, I do recall that at some point the Plaintiff's property was refused by staff at M.D.C. Brooklyn and the Plaintiff's property, or portions thereof, was returned to F.C.I. Allenwood. I was **not** involved in this refusal. Since the Plaintiff was still on writ and he would eventually return to F.C.I. Allenwood, this property was once again stored.

14. Thereafter, in mid-October 1998, I was once again contacted by staff from M.D.C. Brooklyn and I was asked to send the Plaintiff's property back to M.D.C. Brooklyn. To the best of my recollection, I was not actually involved in re-mailing the Plaintiff's property to M.D.C. Brooklyn staff. In fact, to the best of my recollection, I was not involved with handling

R. 12

the Plaintiff's property again.

15. The only other personal involvement I can recall is after the Plaintiff returned from writ, he approached me and asked me why I hadn't mailed his property to him.  I then retrieved a copy of the UPS sheet which showed that I had mailed the property to M.D.C. Brooklyn and I showed the form to the Plaintiff.  The Plaintiff stated words to the effect that he agreed that I had sent his property but that other staff (i.e. M.D.C. Brooklyn staff) didn't do their jobs.

16. In connection with responding to this action, I contacted staff at MDC Brooklyn and asked them for any records they had regarding the Plaintiff's property while he was at MDC Brooklyn on writ.  I received several forms which are each described below.

17. I received an Inmate Personal Property Record dated September 3, 1998 signed by the Plaintiff indicating that he received 18 inches of legal materials.  I have attached a copy of this record to my declaration at Attachment E.  This property form shows that on September 3, 1998 MDC Brooklyn received incoming packages of the Plaintiff's property and allowed the Plaintiff to keep the legal materials, as they are marked "K" for "keep in possession."  The remainder of the Plaintiff's property was

sent back to his designated institution, FCI Allenwood.  The notation in block 7(e) of the record states "Rest of property returned back to institution (ALM).  Inmate here on writ." The record further indicates that the other property was shipped via UPS, as the UPS tracking numbers are pasted in block 7(e).

18.  This form was signed by the Plaintiff in block 10 next to the words, "I have today reviewed the property returned to me." Section 10,which the Plaintiff signed under, reads in part, "The inmate by signing below certifies the accuracy of the inventory, except as noted on the form, relinquishing of all claim to articles listed as donated, receipt of all allowable items, and receipt of a copy of the inventory.  When the inmate claims a discrepancy in the inventory, the receiving officer shall attempt to resolve that discrepancy.  If the inmate states that there is missing or damaged property, this information should be noted under Comments."  The Plaintiff signed and dated the form indicating that he had received 18 inches of legal materials and that the remainder of his property would be shipped back to his designated institution, FCI Allenwood.  The Plaintiff initialed in block 8 indicating that no individual item he owned was worth more than one hundred dollars.

R. 14

19. In response to my request for documentation, MDC Brooklyn also sent me a "Request- Authorization to Mail Inmate Package" dated March 3, 1999. I have attached a copy of this request to my declaration at Attachment F. This form indicates that on March 3, 1998, the Plaintiff requested to have his legal materials mailed to Mr. Tyrone L. Williams in the Bronx, New York. The Plaintiff signed this request and dated it March 3, 1998.

20. In response to my request for documentation, MDC Brooklyn sent me another "Request- Authorization to Mail Inmate Package." This one is dated June 17, 1999 and is attached to my declaration as Attachment G. This form indicates that on June 17, 1999 the Plaintiff requested to have his "books, **legal material**, photos, personal papers, mail" (emphasis added) shipped to Mr. Tyrone L. Williams in the Bronx, New York. This form indicates that the property was mailed from MDC Brooklyn to the Bronx.

21. Finally, I declare that at no time did I intentionally violate any of the Plaintiff's rights. My actions were done in accordance with established Bureau of Prisons policies and existing case law.

R. 15

I declare that any and all records attached to this declaration are true and accurate copies of records maintained in the ordinary course of business by the Federal Bureau of Prisons. I further declare that the foregoing is true and correct to the best of my knowledge and belief, and is given under penalty of perjury pursuant to 28 U.S.C. §1746.

_____
CHARLES FEGLEY
Inmate Systems Officer
F.C.I. Allenwood
White Deer, Pennsylvania 17887

5/10/01
_____
DATE

R. 16

Garnes v. Reno, et al.
Civil Action Number 1:CV-00-0700
Middle District of Pennsylvania

Declaration of Charles Fegley

# Attachment A



**U. S. Department of Justice**

**Federal Bureau of Prisons**

**NUMBER:**   **ALM 5800.08E**

**DATE:**   **August 3, 1998**

**SUBJECT:**   **Receiving and Discharge Manual**

*Federal Correctional Complex*
*Federal Correctional Institution - Allenwood*
White Deer, PA 17887

# Institution Supplement

1. **PURPOSE:**   To supplement Program Statement 5800.08, Receiving and Discharge Manual. This institution supplement establishes local guidelines for receiving and discharging inmates and handling inmate personal property at FCI, Allenwood.

2. **DIRECTIVES AFFECTED:**

   A. Directives Rescinded

   Institution Supplement ALM 5800.08D, Receiving and Discharge Manual, dated April 9, 1997.

   B. Directives Referenced

   Program Statement. 5800.08, Receiving and Discharge Manual, dated June 15, 1993.

   Program Statement. 5800.10, Mail Management Manual, dated November 3, 1995.

   Program Statement 5800.07, Inmate Systems Management Manual dated December 24, 1991.

   Program Statement 5580.05, Inmate Personal Property, dated September 30, 1996.

   Institution Supplement 5580.05, Inmate Personal Property, dated December 18, 1996.

3. **STANDARDS REFERENCED:**   American Correctional Association 3rd Edition Standards for Adult Correctional Institutions:  3-4092, 3-4093, 3-4100, 3-4101, 3-4272, 3-4279, and 3-4393.

4. **RESPONSIBILITIES:** Inmate Systems personnel are responsible for the physical control of any new commitment or transfer while in the Receiving and Discharge area and are responsible for the inmate's personal property prior to its issuance or mailing. ISM personnel will be responsible for identifying new commitments as they arrive during regularly assigned hours.  A Lieutenant is

responsible for identifying and processing incoming or outgoing inmates during times when ISM personnel are not on duty. Correctional Services shall provide support, i.e., transporting inmates to and from the R&D area and performing strip searches of inmates.

## 5.    PROCEDURES:

A.  Receiving and Discharge will hold open house on Tuesdays and Thursdays from 11:30 A.M. to 12:30 P.M. in conjunction with Mail Room and Record Office open house. The inmates will enter through R&D and will be placed in a holding cell. They will be called out as ISM staff are available to assist them with their concerns. Inmate Systems staff will tour the Special Housing Unit at least once a week to answer inmate concerns.

B.  Generally, inmate movement into and out of the institution will be through the Control Center Sally-Port. The transport vehicle will be processed through the rear gate for movement with no more than five inmates. Inmates will be escorted through the outside Administration Building to Receiving and Discharge by Inmate Systems staff. After identification of each inmate is confirmed, the inmates will be escorted into Receiving and Discharge. If it is necessary for a bus to enter the institution, it will be escorted by Correctional Services staff to the circular drive of R&D.

C.  Prior to inmates arriving, the Inmate Systems Officer will shake down the holding cells in R&D. Once inside, the restraints will be removed from the inmates by the bus crew or escorting law enforcement officer. The inmates will then be searched with a hand-held metal detector and then be placed into the holding cell(s). The bus crew will be responsible for strip searching the outgoing inmates and dressing them in bus clothes.

D.  Inmate Systems staff will begin processing the incoming inmates. Inmates will be strip-searched and then searched with a hand-held metal detector. FBI fingerprint cards will be notated for scars, marks and tattoos, and the inmates will be dressed in appropriate institution clothing. Appropriate fingerprints and photos will be taken after strip-search procedures are completed. After each inmate is processed, he will be placed in a clean holding cell to await social and medical screening. After all inmates have been moved from the "dirty" holding cell to the "clean" holding cell, the "dirty" holding cell will be searched for contraband. Upon completion of the medical and social screenings, the inmates will be escorted by Correctional Services staff to the appropriate quarters.

Distribution of photo identification cards is as follows:

    2 3x5's to Lieutenants Office (1 for visiting, 1 for Lt.'s file)
    2 3x5's to Control Center (1 for detail pouch, 1 for Control file)
    1 3x5 to Record Office
    1 5x8 to Unit Officer (bedbook card)
    1 5x8 to Warden

E.  Incoming inmate personal property will be logged in the R&D property log book, recording the date received and issued, inmate name, register number, and certified number. Arrangements will be made to issue the property to the inmate as soon as possible after receipt by R&D staff.

2

F. Outgoing inmate personal property will be inventoried prior to the inmate's permanent release or transfer to another institution. Personal property for inmates transferring to another institution will be mailed via United Parcel Service. Inmates releasing from their federal sentence will be required to carry all property with them, unless they wish to mail the property at their own expense prior to the release date. Inmates who leave the institution on Interstate Agreement, Federal or State writ, or to a federal medical facility will have their property stored in R&D until they return.

6.    **ISSUING OFFICE:**  Inmate Systems

_____
Jake Mendez, Warden

3

R. 20





**U.S. Department of Justice**
Federal Bureau of Prisons

# Program Statement

| | |
|---|---|
| **OPI:** | CPD |
| **NUMBER:** | 5800.12 |
| **DATE:** | CN-01, 8/17/98 |
| **SUBJECT:** | Receiving and Discharge Manual |

1. <u>PURPOSE AND SCOPE</u>.  To establish procedures for receiving and discharging inmates and for handling inmate personal property.

The Receiving and Discharge (R&D) section of the Inmate Systems Management Department has historically maintained the responsibility for the movement of inmates and inmate property in and out of Bureau of Prisons institutions.  Procedures for R&D functions were previously contained in numerous Bureau directives.  This Manual places R&D procedures in one directive.

2. <u>PROGRAM OBJECTIVES</u>.  The expected results of this program are:

   a.  The operation of all Receiving and Discharge areas of Inmate Systems Management will be safe, secure, and uniform.

   b.  Inmates will be committed and discharged accurately and all inmate personal property will be processed without introducing contraband into the institution.

3. <u>DIRECTIVES AFFECTED</u>

   a.  <u>Directive Rescinded</u>

   PS 5800.08      Receiving and Discharge (6/15/93)

   b.  <u>Directives Referenced</u>

   PS 1210.17      Internal Affairs, Office of (8/4/97)
   PS 1232.05      Personal Computers (11/10/97)
   PS 1600.07      Occupational Safety and Environmental Health Manual (5/30/96)
   PS 2000.02      Accounting Management Manual (10/15/86)
   PS 4400.03      Property Management Manual (2/27/96)
   PS 4510.04      Contributions, Inmate (10/28/92)
   PS 5100.06      Security Designation & Custody Classification Manual (6/7/96)
   PS 5230.05      Grooming (11/4/96)

R. 21

### 310. RELEASE FOR COURT APPEARANCES (WRIT, IAD, ETC.)

Inmates removed from the institution for court proceedings shall
be permitted to retain essential legal material, appropriate
clothing for court purposes, and personal hygiene items. The
institution shall provide a set of clothing which shall allow
a neat and clean appearance in court. Inmates ordinarily shall
be permitted to take prescription eyeglasses, dentures,
prescribed medical devices, or medication. Property removed from
the institution with the inmate should normally fit in a
10 x 12 x 15 inch box. Other personal property shall be stored
as discussed elsewhere in this Manual. (See Chapter 4, Section
407, Religious Items.)

Inmates having money in their Trust Fund Accounts may be
permitted to take a reasonable amount with them, as determined by
their unit staff (ordinarily no more than $50). Staff may "close
out" the inmate's Trust Fund Account when it is known that the
inmate shall not return to the institution.

Inmates not scheduled to return from court the same day of
release must complete a Disposition of Mail While Inmate is
Released Temporarily on Writ (BP-S398), before leaving the
institution. R&D staff are responsible for ensuring this is
accomplished (see the Program Statement on Correspondence and the
Mail Management Manual for further information).

### 311. TEMPORARY TRANSFER TO A LOCAL MEDICAL FACILITY

Inmates transferring to a local medical facility ordinarily shall
be permitted to take prescription eyeglasses, dentures,
prescribed medical devices or medication. Other personal
property and funds ordinarily are not allowed.

### 312. RELEASE TO U.S. MARSHALS OR OTHER LAW ENFORCEMENT AGENT

Bureau staff must provide information regarding the inmate's
criminal and medical history as well as institutional behavior to
transporting officials. This information is critical in
maintaining custody and control of the inmate enroute to the new
destination. It also provides for the welfare of the inmate and
enhances an atmosphere of cooperation with the transporting
agency.

The Program Statements on Releasing Inmates to Transporting
Officers via Escort or Bus and Transferring Inmates to State
Agents provide additional instructions on the subject.

R. 22

Garnes v. Reno, et al.
Civil Action Number 1:CV-00-0700
Middle District of Pennsylvania

Declaration of Charles Fegley

# Attachment B

**U.S. Department of Justice**

Federal Bureau of Prisons

**Inmate Personal Property Record—**

**Institution:** _HLW_

| 1. Name | 2. Register Number: | 3. Unit: | 4. Date and Time of |
|---|---|---|---|
| Garnes, Mark | 24696-053 | 3B/5 | Inventory 8/11/9 |

5. Purpose of Inventory (check one that applies): Date and Time of Action: 8/11/96 1000

a.___ Admission  b.___ Hospital  c._X_ Writ  d.___ Transfer  e.___ Detention  f.___ Release

g.___ Incoming package  h.___ Other (specify)

6. Disposition (Disp.)
D – Donated   M – Mail   S – Storage
K – Keep in Possession
C – Contraband (Attach BP-Record-102)

7. Type of Property:

**a. Personally Owned Items**

| # | Article | Disp. |
|---|---|---|
| | Batteries | |
| | Belt | |
| | Billfold | |
| 5 | Books, reading | M |
| | hard___, soft _X_ | |
| | Books, religious | |
| | hard___, soft___ | |
| | Brassiere | |
| | Cap, Hat | S |
| | Coat | |
| | Coins | |
| | Comb | S |
| | Combination lock | S |
| | Dress | |
| | Driver's license | |
| | Earplugs | |
| 1 | Eyeglass case | S |
| | Eyeglasses | S |
| | Gloves | |
| | Hair brush/pick | |
| | Handkerchief | |
| | Jacket | |
| 1 | Jogging suit | S |
| 1 | Legal Materials | S |
| | Letters | |
| | Magazines | |
| 1 | Mirror | S |
| 1 | Nail Clippers | S |
| | Pant/slacks | S |
| | Pen, ballpoint | |
| | Pencils | |
| | Personal papers | S |
| | Photo album | M |
| | Photos | |

| # | Article | Disp. |
|---|---|---|
| | Plastic spoon, cup | |
| | Playing cards | |
| | Purse | |
| | Radio (w/earplug) | |
| | Religious medals | |
| | Ring | |
| | Shirt/blouse | |
| | Shoes | |
| | Shoes, shower | |
| | Shoes, slippers | |
| 1 | Shoes, tennis Nike | S |
| | Shorts | |
| | Skirt | |
| | Slip | |
| | Social security card | |
| 1 | Socks | S |
| | Socks, athletic | |
| | Stamps | |
| | Stockings | |
| | Sunglasses | |
| | Sweater | |
| 1 | Sweat pants | S |
| 1 | Sweat shirt | S |
| | Trophy | |
| 5 | T-Shirts | S |
| 1 | Underwear | S |
| | Watch/watch band | |
| | Wig | |
| 1 | Robe | S |
| 1 | Bowl | S |
| 1 | Tub | |
| 1 | Shakers | M |

**b. Hygiene, etc.**

| # | Article | Disp. |
|---|---|---|
| | Dental floss | |
| | Dentures | |
| 1 | Deodorant | S |
| 1 | Hair oil | S |
| | Noxzema | |
| | Powder | |
| | Razor | |
| | Razor blades | |
| | Shampoo | |
| | Shaving lotion | |
| | Skin lotion | |
| | Soap | |
| | Soap dish | |
| 1 | Toothbrush + case | S |
| 1 | Toothpaste Tide | S |
| 1 | Oil | S |
| 1 | Cologne | S |

**c. Hobbycrafts**

| # | Article | Disp. |
|---|---|---|
| 5 | Wraps | S |
| 3 | Bands | S |
| 1 | Hanger | S |
| 1 | Scissors | S |

**d. Food/Tobacco Items**

| # | Article | Disp. |
|---|---|---|
| | Canned tobacco | |
| | Chewing tobacco | |
| | Cigarettes | |
| 2 | Cigar, snuff | S |
| 2 | Coffeemate | S |
| | Cold drink mix, soda | |
| | Fruit | |
| | Honey, Hi-protein | |
| | Instant chocolate | |
| | Instant coffee | |
| | Instant tea | |
| | Pipe cleaner/filters | |
| | Pipes | |

**e. Miscellaneous** (List any damaged property and from where it was received; e.g., U.S. Marshal)

8. Items Alleged by Inmate to Have Value Over $100.00

Description of Property                                    Value Alleged by Inmate

[X] No individual item over $100.00

9. Article(s) Listed as "Mail" (M) Are to be Forwarded to (Name and Address of Consignee):

I. Williams  1139 Clay Ave #21  Bronx  10456

10. Claim Release: a. The receiving officer, as soon after receipt of the property as possible, will review the inventory with the inmate to verify its accu-
racy. Property that is stored, kept in possession of the inmate, mailed out of the institution, or donated is to be marked in the appropriate section of this
property form. The receiving officer certifies receipt, review and disposition of the property by signing below. The inmate by signing below certifies the
accuracy of the inventory, except as noted on the form, relinquishing of all claim to articles listed as donated, receipt of all allowable items, and receipt
of the inventory. When the inmate claims a discrepancy in the inventory, the receiving officer shall attempt to resolve that discrepancy. If the
inmate states that there is missing or damaged property, this information should be noted under Comments.

Signature of Receiving Officer: C. Tegley                        Date: 8/11/98  Time: 100_

Printed Name _____ property returned to me. Signature of Inmate _____ Reg. _24696-053_  8/11/98  Time: 101_

I have today reviewed release of the property, except as noted on this form, and receipt of a copy of the inventory by signing below. When the
_____ ate from the unit, detention, etc., the releasing officer is to give the inmate that property stored as a result of the inmate's
inventory, the releasing officer shall attempt to resolve that discrepancy. If the inmate states that there is missing or
_____ uld be noted under Comments.

Original – Inmate's Central _____

Date: _____ Time: _____

Signature of Inmate _____  Reg. No.: _____  Date: _____

Special Housing

<u>Garnes v. Reno, et al.</u>
Civil Action Number 1:CV-00-0700
Middle District of Pennsylvania

Declaration of Charles Fegley

# Attachment C

**U.S. Department of Justice**

Federal Bureau of Prisons

**Inmate Personal Property Record—**

**Institution:** _ALM_

| 1. Name: Barnes, Mark | 2. Register Number: 24646-053 | 3. Unit: 3B/5 | 4. Date and Time of Inventory 8/11/9 1000 |
|---|---|---|---|

5. Purpose of Inventory (check one that applies): Date and Time of Action: 8/11/98 1000
a.___ Admission  b.___ Hospital  c._X_ Writ  d.___ Transfer  e.___ Detention  f.___ Release
g.___ Incoming package  h.___ Other (specify)

6. Disposition (Disp.)
D – Donated  M – Mail  S – Storage
K – Keep in Possession
C – Contraband (Attach BP-Record-102)

7. Type of Property:

**a. Personally Owned Items**

| # | Article | Disp. |
|---|---|---|
| ___ | Batteries | ___ |
| ___ | Belt | ___ |
| ___ | Billfold | ___ |
| 2 | Books, reading Home | M |
| | hard___, soft_X_ | |
| ___ | Books, religious | |
| | hard___, soft___ | |
| ___ | Brassiere | |
| 2 | Cap, Hat | M |
| ___ | Coat | |
| ___ | Coins | |
| ___ | Comb | |
| 1 | Combination lock | M |
| ___ | Dress | |
| ___ | Driver's license | |
| ___ | Earplugs | |
| 1 | Eyeglass case | M |
| 1 | Eyeglasses | M |
| ___ | Gloves | |
| ___ | Hair brush/pick | |
| ___ | Handkerchief | |
| ___ | Jacket | |
| | Jogging suit | M |
| 2 | Legal Materials | M |
| ___ | Letters | |
| ___ | Magazines | |
| 1 | Mirror | M |
| 1 | Nail Clippers | M |
| ___ | Pant/slacks | |
| 2 | Pen, ballpoint | M |
| 1 | Pencils | M |
| ___ | Personal papers | |
| 2 | Photo album Home | M |
| ___ | Photos | |

| # | Article | Disp. |
|---|---|---|
| ___ | Plastic spoon, cup | ___ |
| ___ | Playing cards | |
| ___ | Purse | |
| ___ | Radio (w/earplug) | |
| ___ | Religious medals | |
| ___ | Ring | |
| ___ | Shirt/blouse | |
| ___ | Shoes | |
| ___ | Shoes, shower | |
| ___ | Shoes, slippers | |
| 1 | Shoes, tennis Nike | M |
| 2 | Shorts | M |
| ___ | Skirt | |
| ___ | Slip | |
| ___ | Social security card | |
| 2 | Socks | M |
| 1 | Socks, athletic | M |
| ___ | Stamps | |
| ___ | Stockings | |
| ___ | Sunglasses | |
| ___ | Sweater | |
| 1 | Sweat pants | M |
| 1 | Sweat shirt | M |
| ___ | Trophy | |
| 1 | T-Shirts | M |
| 1 | Underwear | M |
| ___ | Watch/watch band | |
| ___ | Wig | |
| 1 | Robe | M |
| 1 | Bowl | M |
| 1 | Jug | M |
| 1 | Shakers | M |

**b. Hygiene, etc.**

| # | Article | Disp. |
|---|---|---|
| ___ | Dental floss | ___ |
| ___ | Dentures | |
| 1 | Deodorant | M |
| 2 | Hair oil | M |
| ___ | Noxzema | |
| ___ | Powder | |
| ___ | Razor | |
| ___ | Razor blades | |
| ___ | Shampoo | |
| ___ | Shaving lotion | |
| ___ | Skin lotion | |
| ___ | Soap | |
| ___ | Soap dish | |
| 1 | Toothbrush +case | M |
| ___ | Toothpaste | |
| 2 | Tide | M |
| 1 | oil | M |
| 1 | Cologne | M |

**d. Food/Tobacco Items**

| # | Article | Disp. |
|---|---|---|
| ___ | Canned tobacco | ___ |
| ___ | Chewing tobacco | |
| ___ | Cigarettes | |
| ___ | Cigars, snuff | |
| ___ | Coffeemate | |
| ___ | Cold drink mix, soda | |
| ___ | Fruit | |
| ___ | Honey, Hi-protein | |
| ___ | Instant chocolate | |
| ___ | Instant coffee | |
| ___ | Instant tea | |
| ___ | Pipe cleaner/filters | |
| ___ | Pipes | |

**c. Hobbycrafts**

| # | Article | Disp. |
|---|---|---|
| 8 | Wraps | M |
| 3 | Bands | M |
| 1 | Heater | M |
| 1 | Scissors | M |

**e. Miscellaneous** (List any damaged property and from where it was received: e.g., U.S. Marshal)

8. Items Alleged by Inmate to Have Value Over $100.00
Description of Property: N.S.D  8/26/94 All Property Mailed to MDC Brooklyn Per Request (Mr Baggot)

Value Alleged by Inmate

[X] No individual item over $100.00

9. Article(s) Listed as "Mail" (M) Are to be Forwarded to (Name and Address of Consignee):
1. J. Williams   1139 Clay Ave #21   Bronx 10456

10. Claim Release: a. The receiving officer, as soon after receipt of the property as possible, will review the inventory with the inmate to verify its accuracy. Property that is stored, kept in possession of the inmate, mailed out of the institution, or donated is to be marked in the appropriate section of this inventory form. The receiving officer certifies receipt, review and disposition of the property by signing below. The inmate by signing below certifies the accuracy of the inventory, except as noted on the form, relinquishing of all claim to articles listed as donated, receipt of all allowable items, and receipt of a copy of the inventory. When the inmate claims a discrepancy in the inventory, the receiving officer will attempt to resolve that discrepancy. If the inmate states that there is missing or damaged property, this information should be noted under Comments.
Comments

Printed Name/Signature of Receiving Officer: _C. J. Fealey_  Date: 8/11/98  Time: 100

I have today reviewed the property returned to me. Signature of Inmate _____ Reg. No. 24646-053  Date: 8/11/98  Time: 1015

b. Upon release of the inmate from the unit, detention, etc., the releasing officer is to give the inmate that property stored as a result of the inmate's housing. The inmate certifies release of the property, except as noted on this form, and receipt of a copy of the inventory by signing below. When the inmate claims a discrepancy in the inventory, the releasing officer shall attempt to resolve that discrepancy. If the inmate states that there is missing or damaged property, this information should be noted under Comments.
Comments

Printed Name/Signature of Releasing Officer: _____  Date: _____ Time: _____

I have today reviewed the property returned to me. Signature of Inmate _____  Reg. No.: _____ Date: _____ Time: _____

Original — Inmate's Central File; CC: Inmate, R & D, Special Housing

R- 26

BP-383(58)

Garnes v. Reno, et al.
Civil Action Number 1:CV-00-0700
Middle District of Pennsylvania

Declaration of Charles Fegley

# Attachment D

| Company Name and Address | UPS Account Number | | Shipping Record | UPS Shipping Record No |
|---|---|---|---|---|
| F C I ALLENWOOD | **902-W96** | | | 001 7682425 84 |
| P O BX 2500 FED CORRECTIONAL I | Shipment Date | | | |
| WHITE DEER PA 17887 | MM 03 | DD 27 | YY 98 | 1Z 902 W96 03 1003 336 |

**Shipping Record**

| Please Print Full Name and Address for Each Shipment Directly from Address Labels on Packages. | **3** Service Level | **4** Package Information | **5** Additional Services | **6** When Using a Different Tracking Label, Stick Portion of That Label Below, Covering Printed |
|---|---|---|---|---|

Receiver's Name and Address   -or-   If Same, Mark ➡ Same Address as Previous Page

MAC NY

☐ Next Day Air / WW Express
☐ 2nd Day Air / WW Expedited
☐ 3 Day Select
☐ Standard to Canada
☐ Ground
☐ Other

Weight 48   Letter

Tracking Number
1Z 902 W96 03 1003 336 2

☐ Delivery Confirmation
☑ Delivery Confirm. Signature Required
☐ Saturday Delivery
☐ Additional Handling
☐ Hazardous Material
☐ Call Tag
☐ Other

**7** ☐ Collect Billing ☐ 3rd Party   Collect / 3rd Party UPS Account No

**8** Reference Number (Optional)
GARNES

City RROOKLYN   State NY   Postal/ZIP Code 11232   Country

Other Information
24646-053

---

Receiver's Name and Address   -or-   If Same, Mark ➡ Same Address as Previous Entry

☐ Residential Delivery

☐ Next Day Air / WW Express
☐ 2nd Day Air / WW Expedited
☐ 3 Day Select
☐ Standard to Canada
☐ Ground
☐ Other

Weight 46   Letter

Tracking Number
1Z 902 W96 03 1003 337 1

☐ Delivery Confirmation
☑ Delivery Confirm. Signature Required
☐ Saturday Delivery
☐ Additional Handling
☐ Hazardous Material
☐ Call Tag
☐ Other

☐ Collect Billing ☐ 3rd Party   Collect / 3rd Party UPS Account No

Reference Number (Optional)

City   State   Postal/ZIP Code   Country

Other Information

---

Receiver's Name and Address   -or-   If Same, Mark ➡ Same Address as Previous Entry

☐ Residential Delivery

☐ Next Day Air / WW Express
☐ 2nd Day Air / WW Expedited
☐ 3 Day Select
☐ Standard to Canada
☐ Ground
☐ Other

Weight 16   Letter

Tracking Number
1Z 902 W96 03 1003 338 0

☐ Delivery Confirmation
☑ Delivery Confirm. Signature Required
☐ Saturday Delivery
☐ Additional Handling
☐ Hazardous Material
☐ Call Tag
☐ Other

☐ Collect Billing ☐ 3rd Party   Collect / 3rd Party UPS Account No

Reference Number (Optional)

City   State   Postal/ZIP Code   Country

Other Information

---

Receiver's Name and Address   -or-   If Same, Mark ➡ Same Address as Previous Entry

☐ Residential Delivery

☐ Next Day Air / WW Express
☐ 2nd Day Air / WW Expedited
☐ 3 Day Select
☐ Standard to Canada
☐ Ground
☐ Other

Weight 17   Letter

Tracking Number
1Z 902 W96 03 1003 339 9

☐ Delivery Confirmation
☑ Delivery Confirm. Signature Required
☐ Saturday Delivery
☐ Additional Handling
☐ Hazardous Material
☐ Call Tag
☐ Other

☐ Collect Billing ☐ 3rd Party   Collect / 3rd Party UPS Account No

Reference Number (Optional)

City NY   State NY   Postal/ZIP Code 10032   Country

Other Information

---

Mark box ONLY if shipment is continued on next page.

All shipments are subject to the terms and conditions contained in the UPS tariff, which is maintained at local UPS offices. In addition, an explanation of UPS's responsibility for loss or damage and C.O.D. packages is printed on the reverse side of the customer copy of this document.

| Received for UPS by | Pickup Time | Total Packages | Total Call Tags | No. of |
|---|---|---|---|---|

Part 2- Customer

R. 28

Garnes v. Reno, et al.
Civil Action Number 1:CV-00-0700
Middle District of Pennsylvania

Declaration of Charles Fegley

# Attachment E

05/09/2001 13:44 FAX 718 840 5003          ISM MDC BROOKLYN                    ☒006

U.S. Department of Justice                          Inmate Personal Property Record—
Federal Bureau of Prisons                           Institution: MDC BRO

| 1. Name: BARNES, MARK | 2. Register Number: 24646-053 | 3. Unit: 35 | 4. Date and Time of Inventory 7/3/98 12 |
|---|---|---|---|

5. Purpose of Inventory (check one that applies): Date and Time of Action: 9/3/98 12:00
a.__ Admission   b.__ Hospital   c.__ Writ   d.__ Transfer   e.__ Detention   f.__ Release
g.✓ Incoming package   h.__ Other (specify)

6. Disposition (Disp.)
D – Donated   M – Mail   S – Storage.
K – Keep in Possession
C – Contraband (Attach BP-Record-102)

7. Type of Property:

a. Personally Owned Items

| # | Article | Disp. |
|---|---|---|
| | Batteries | __ |
| | Belt | __ |
| | Billfold | __ |
| | Books, reading hard___, soft___ | __ |
| | Books, religious hard___, soft___ | __ |
| | Brassiere | __ |
| | Cap, Hat | __ |
| | Coat | __ |
| | Coins | __ |
| | Comb | __ |
| | Combination lock | __ |
| | Dress | __ |
| | Driver's license | __ |
| | Earplugs | __ |
| | Eyeglass case | __ |
| | Eyeglasses | __ |
| | Gloves | __ |
| | Hair brush/pick | __ |
| | Handkerchief | __ |
| | Jacket | __ |
| | Jogging suit | __ |
| 18 | Legal Materials | K |
| | Letters | __ |
| | Magazines | __ |
| | Mirror | __ |
| | Nail Clippers | __ |
| | Pant/slacks | __ |
| | Pen, ballpoint | __ |
| | Pencils | __ |
| | Personal papers | __ |
| | Photo album | __ |
| | Photos | __ |

| # | Article | Disp. |
|---|---|---|
| | Plastic spoon, cup | __ |
| | Playing cards | __ |
| | Purse | __ |
| | Radio (w/earplug) | __ |
| | Religious medals | __ |
| | Ring | __ |
| | Shirt/blouse | __ |
| | Shoes | __ |
| | Shoes, shower | __ |
| | Shoes, slippers | __ |
| | Shoes, tennis | __ |
| | Shorts | __ |
| | Skirt | __ |
| | Slip | __ |
| | Social security card | __ |
| | Socks | __ |
| | Socks, athletic | __ |
| | Stamps | __ |
| | Stockings | __ |
| | Sunglasses | __ |
| | Sweater | __ |
| | Sweat pants | __ |
| | Sweat shirt | __ |
| | Trophy | __ |
| | T-Shirts | __ |
| | Underwear | __ |
| | Watch/watch band | __ |
| | Wig | __ |

b. Hygiene, etc.

| # | Article | Disp. |
|---|---|---|
| | Dental floss | __ |
| | Dentures | __ |
| | Deodorant | __ |
| | Hair oil | __ |
| | Noxzema | __ |
| | Powder | __ |
| | Razor | __ |
| | Razor blades | __ |
| | Shampoo | __ |
| | Shaving lotion | __ |
| | Skin lotion | __ |
| | Soap | __ |
| | Soap dish | __ |
| | Toothbrush | __ |
| | Toothpaste | __ |

c. Hobbycrafts

| # | Article | Disp. |
|---|---|---|

d. Food/Tobacco Items

| # | Article | Disp. |
|---|---|---|
| | Canned tobacco | __ |
| | Chewing tobacco | __ |
| | Cigarettes | __ |
| | Cigars, snuff | __ |
| | Coffee | __ |
| | Cold drink mix, soda | __ |
| | Fruit | __ |
| | Honey, Hi-protein | __ |
| | Instant chocolate | __ |
| | Instant coffee | __ |
| | Instant tea | __ |
| | Pipe cleaner/filters | __ |
| | Pipes | __ |

e. Miscellaneous (List any damaged property and from where it was received; e.g., U.S. Marshal)
Rest of Property Remitted back to institution (ALM).

| ENTRY | UPS | 1Z 9XX 379 03 1008 861 1 |
|---|---|---|
| ENTRY | UPS | 1Z 9XX 379 03 1008 862 0 |

Inmate here on writ.

8. Items Alleged by Inmate to Have Value Over $100.00
Description of Property

MB [initials]   No individual item over $100.00                          Value Alleged by Inmate

9. Article(s) Listed as "Mail" (M) Are to be Forwarded to (Name and Address of Consignee):     R. 30

10. Claim Release: a. The receiving officer, as soon after receipt of the property as possible, will review the inventory with the inmate to verify its accuracy. Property that is stored, kept in possession of the inmate, mailed out of the institution, or donated is to be marked in the appropriate section of this inventory form. The receiving officer certifies receipt, review and disposition of the property by signing below. The inmate by signing below certifies the accuracy of the inventory, except as noted on the form, relinquishing of all claim to articles listed as donated, receipt of all allowable items, and receipt of a copy of the inventory. When the inmate claims a discrepancy in the inventory, the receiving officer shall attempt to resolve that discrepancy. If the inmate states that there is missing or damaged property, this information should be noted under Comments.

Comments

Printed Name/Signature of Receiving Officer: _____   Date: 9/3/98   Time: 12:00

I have today reviewed the property returned to me. Signature of Inmate: _____ Reg. No. 24646-053   Date: 9/3/98   Time: __

b. Upon release of the inmate from the unit, detention, etc., the releasing officer is to give the inmate that property stored as a result of the inmate's housing. The inmate certifies release of the property, except as noted on this form, and receipt of a copy of the inventory by signing below. When the inmate claims a discrepancy in the inventory, the releasing officer shall attempt to resolve that discrepancy. If the inmate states that there is missing or damaged property, this information should be noted under Comments.

Comments

Printed Name/Signature of Releasing Officer: _____   Date: __   Time: __

I have today reviewed the property returned to me. Signature of Inmate: _____ Reg. No. __   Date: __   Time: __

<u>Garnes v. Reno, et al.</u>
Civil Action Number 1:CV-00-0700
Middle District of Pennsylvania

Declaration of Charles Fegley

# Attachment F

MAY-16-01 WED 11:57 AM   ALLENWOOD LEGAL SERVICES   FAX NO. 17175476458        P.02
05/16/2001 11:20 FAX 718 840 5●●   ISM MDC BROOKLYN                          ☑001/001

**U.S. DEPARTMENT OF JUSTICE**            REQUEST — AUTHORIZATION        *8*
Federal Bureau of Prisons                 TO MAIL INMATE PACKAGE

| | | | |
|---|---|---|---|
| Name of Inmate GARNES MARK | Register No. 24646-053 | | Institution MDC. Brooklyn |
| Item(s) Legal Materials | | Value $ 100.00 | |

<table>
<tr><td rowspan="8">REQUEST</td><td colspan="4">I am requesting that the above items be sent from the Institution to the address specified. The item(s) are my personal property. Total value is as shown above. I understand that if I insure the property, the USPS will only indemnify the ACTUAL value of the property up to the amount of insurance purchased. I will provide sufficient postage stamps to cover the cost of mailing and all services requested. I have completed the mailing label below.</td></tr>
<tr><td>Insure?  YES (NO)</td><td>Certify?  YES (NO)</td><td>Register?  YES (NO)</td><td>Return Receipt?  YES (NO)</td></tr>
<tr><td colspan="4">Inmate Signature: Mark Garnes                 Date: 3.4.99</td></tr>
</table>

<table>
<tr><td rowspan="4">APPROVAL</td><td>The above inmate is authorized to ship the item(s) shown.</td><td></td></tr>
<tr><td>Signature of Authorized Staff:                    [stamp MARINA STA. BROOKLYN N.Y. MAR 10 1999]</td><td>Date: 3/6/99</td></tr>
<tr><td>Property indicated above was packed and sealed in the inmates presence</td><td></td></tr>
<tr><td>Signature of Authorized Staff:</td><td>Date: 3/6/99</td></tr>
</table>

<table>
<tr><td rowspan="5">PROCESSING</td><td colspan="2">Property indicated above was received and mailed on the date indicated. The following services were provided as requested above: (circle as appropriate)</td></tr>
<tr><td>INSURED    CERTIFIED    REGISTERED-Number assigned</td><td>N/A</td></tr>
<tr><td>RETURN RECEIPT REQUESTED - YES    NO   Total Stamps Provided = $</td><td>8.91</td></tr>
<tr><td>Mail Officer signature:</td><td>Date 3/10/99</td></tr>
<tr><td colspan="2">After mailing send copies of this form to : Original Mail Room, Copy – Inmate, R&D, Central File</td></tr>
</table>

USP LVN                                                         BP-329(48) February 196

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

FROM: Mark Garnes 24646053
      Name

      100 29th Street
      Box or Street Address

      Brooklyn, N.Y. 11232
      City, State and ZIP Code

                                          Postage Stamps
                                          Here

                                          R. 32

TO: Mr. Tyrone L. Williams

    P O Box 398

    Bronx N.Y. 10467-0398

Garnes v. Reno, et al.
Civil Action Number 1:CV-00-0700
Middle District of Pennsylvania

Declaration of Charles Fegley

# Attachment G

05/09/2001 13:40 FAX 718 840 5003          ISM MDC BROOKLYN                                    ☒002

**U.S. DEPARTMENT OF JUSTICE**                        **REQUEST — AUTHORIZATION**
Federal Bureau of Prisons                              **TO MAIL INMATE PACKAGE**

| Name of Inmate | Register No. | Institution |
| --- | --- | --- |
| GARNES, MARK | 24646-053 | MDC-Brooklyn |

Item(s)                                                                         Value
Books, Legal Material, Photos, Personal Papers, Mail                            $50.00

**REQUEST**

I am requesting that the above items be sent from the Institution to the address specified. The item(s) are my personal property. Total value is as shown above. I understand that if I insure the property, the USPS will only indemnify the ACTUAL value of the property up to the amount of insurance purchased. I will provide sufficient postage stamps to cover the cost of mailing and all services requested. I have completed the mailing label, below.

Insure?   YES  (NO)      Certify?   YES  (NO)      Register?   YES  (NO)      Return Receipt?   YES  (NO)

Inmate Signature: Mark Garnes                                          Date: 6-17-99

**APPROVAL**

The above inmate is authorized to ship the item(s) shown.

Signature of Authorized Staff: [signature]                            Date: 6-17-99

Property indicated above was packed and sealed in the inmates presence.

Signature of Authorized Staff: [signature]                            Date: 6-17-99

**PROCESSING**

Property indicated above was received and mailed on the date indicated. The following services were provided as requested above: (circle as appropriate)

**INSURED        CERTIFIED        REGISTERED** — Number assigned _____

**RETURN RECEIPT REQUESTED — YES.   NO**   Total Stamps Provided = $ _____

Mail Officer signature: _____                              Date

After mailing send copies of this form to : Original Mail Room, Copy – Inmate, R&D, Central File

USP LVN                                                               BP-429(58) February 1___

---

FROM: MARK GARNES
           Name

100 29th Steet (24646-053)
           Box or Street Address                              R. 34

Brooklyn, N.Y. 11232
           City, State and ZIP Code          TO: Mr. Tyrone L. Williams

                                                  P.O. Box 398

                                                  Bronx, N.Y. 10467-0398

Postage Stamps
Here

IN THE UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

No. 99-1524

UNITED STATES OF AMERICA,

Appellee,

v.

Mark Garnes,

Defendant-Appellant.

Brief of Appellant

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NEW YORK

Mark A. Garnes
Pro Se Litigant
Reg. No. 24646-053
P.O. Box 2000-3B
FCI-Allenwood Med.
White Deer, Pa.
17887

# TABLE OF CONTENTS

Table of Authorities.................................i

Cases..........................................ii, iii

Statutes.......................................iii, iv

Jurisdiction Statement..........................v.

Issues Presented.........................2,4,7,11,14

1.  Whether the District Court erred
    By not dismissing remaining counts
    Due to Prejudicial Spillover....................4

2.  Whether the District Court erred
    By not hearing appellant's
    Ineffective Assistance of Counsel
    Claims......................................7,11

3.  Whether the District Court erred
    By imposing one point enhancement...............14

Statement of the Case...........................1.

Argument........................................4.

Point I.........................................4.

Point II......................................7,11

Point III.......................................14

Conclusion......................................15

i

# TABLE OF AUTHORITIES

## CASES

Bailey v. United States, ---U.S.---, 116 S. Ct.
       501, 133 L. Ed. 2d 472 (1995)..................1, 4

Bonilla-Romero v. United States, 933 F. 2d
       86 (1st Cir. 1991)............................8

Brookhart v. Janis, 394 U.S. 1, 86 S. Ct.
       1245, 16 L. Ed. 2d 314 (1966)................10

Brown v. Rice, 693 F.S. 397 (W.D.N.C. 1988)............13

Estelle v. Smith, 451 U.S. 454, 68 L. Ed 2d
       359, 101 S. Ct. 1866 (1981)..................13

Haines v. Kerner, 404 U.S. 519, 520, 92 S. Ct.
       594, 595, 30 L. Ed. 2d 652...................15

Jackson v. Virginia, 443 U.S. 307, 319,
       61 L. Ed. 2d 560 (1979).....................11

Johnson v. Cowley, 40 F. 3d 341, 344
       (10th Cir. 1994).............................8

Porter v. Wainwright, 805 F. 2d 930, 935-936
       (11th Cir. 1986).............................15

Strickland v. Washington, 466 U.S. 688, 104
       S. Ct. 2052, 80 L. Ed. 2d 674 (1984).........12, 13

United States v. Apfel, 97 F. 3d 1074, 1076
       (8th Cir. 1996)..............................13

United States v. Barnes, 890 F. 2d 545
       (1st Cir. 1989)..............................11

United States v. Bennett, 100 F. 2d 1106
       (3rd Cir. 1996)..............................11

United States Ex Rel. Cruz v. LaValle, 448 F.
       2d 671, 679 (2d Cir. 1971)...................9

United States v. Gaudin, ---U.S.---, 115 S. Ct.
       2310, 2320, 132 L. Ed. 2d 444 (1995).........7, 8

United States v. Gilliam, 994 F. 2d 92, 102
       (2d Cir. 1992)...............................10

United States v. Jackson, 968 F. 2d 158, 162
       (2d Cir. 1992)...............................10

United States v. James, 78 F. 3d 855 (3d
       Cir. 1996)...................................11

R. 37

# TABLE OF AUTHORITIES

## CASES

### Cont.

United States v. James, 78 F. 3d 855 (3d
    Cir. 1996).........................11

United States v. Lawrence, 48 F. 2d 1559,
    1566 (11th Cir. 1995).........................9

United States v. Lopez, 898 F. 2d 1505
    1512 (11th Cir. 1990).........................15

United States v. Lyons, 898 F. 2d 210, 213-215
    1st Cir. 1990).........................9

United States v. Mohel, 604 F. 2d 748 (2d
    Cir. 1979).........................9

United States v. Moore, 968 F. 2d 216, 2240
    225 (2d Cir. 1992).........................15

United States v. Novod, 927 F. 2d 726, 728
    2d Cir. 1991).........................5

United States v. Palacio, 4 F. 3d 151 (2d
    Cir. 1993).........................11

United States v. Poole, 832 F. 2d 561 (11th
    Cir. 1987).........................9

United States v. Pugliese, 805 F. 2d 1117,
    1124 (2d Cir. 1986).........................13

United States v. Pyatt, 725 F.S. 885, 887
    (E.D.N.Y. 1989).........................14, 15

United States v. Shonubi, 998 F. 2d 84, 88-
    89 (2d. Cir. 1993).........................12

United States v. Stephen, 609 F. 2d 230 (5th
    Cir. 1980).........................9

United States v. Tucker, 404 U.S. 443, 30 L.
    Ed. 2d 592, 92 S.Ct. 589 (1972).........................15

United States v. Vebuliunas, 76 F. 3d 1283,
    1294 (2d Cir. 1996).........................6

## STATUTES

18 U.S.C. § 924(c)(1).........................1, 4

18 U.S.C. § 3559(a).........................14

21 U.S.C. § 841(a).........................1

R. 38

# STATUTES
## Cont.

21 U.S.C. § 846...........................................1, 12

28 U.S.C. § 2255..........................................1, 12

Federal Rules of Criminal Procedures, Rule 11..........8

United States Constitution,
        Sixth Amendment............................8, 9, 10

U.S.S.G. § 1B1.9..........................................15

U.S.S.G. § 2D1.1(b)(1)....................................1

U.S.S.G. § 4A1.1(c).......................................14

U.S.S.G. § 4A1.2.(c)(1) and (2)...........................14

U.S.S.G. § Amendment 487..................................11

R. 39

## JURISDICTION STATEMENT

This is an appeal pursuant to Federal Rules of
Appellate Procedures, Rule 4(b) and 18 U.S.C. § 3742 (a)(1),
from a <u>final judgment of conviction imposed upon resentence</u>
<u>after the original sentence</u> of 352 months has been vacated in
the Eastern District of New York.   In which, the original
sentence was 120 months for count one, conspiracy to distribute
heroin, 21 U.S.C. § 846; 292 months for count three, possession
with the intent to distribute in excess of fifty grams of
cocaine base, 21 U.S.C. § 841(a); and 60 months for use and/or
carrying a firearm during a drug trafficking crime, 18 U.S.C.
§ 924(c)(1), to run consecutive to counts one and three,
whereas, counts oneand three are concurrent.

Upon resentencing, the Honorable United States District
Judge, Hon. Edward R. Korman, departed five years from the new
sentence of 360 months due to the two point enhancement per
U.S.S.G. § 2D1.1.(b)(1), eight months per 18 U.S.C. §924(c)(1)
and fifty-two months for postconviction rehabilitation.

Appellant is currently serving his sentence of 300
months.

v

R. 40

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

————————————————X

United States of America,⁻

         Appellee,

    v.            :       No. 99-1524

Mark Garnes,

         Appellant.

————————————————X

## STATEMENT OF THE CASE

On August 11th, 1988, the appellant was arrested for
violation of narcotic offenses (21 U.S.C. § 846, Conspiracy
to distribute Heroin, Count 1; 21 U.S.C. § 841(1), Possession
with the intent to distribute in excess of 50 grams of Cocaine
Base, Count 3) and a firearm offense 18 U.S.C. § 924(c)(1).
The appellant thereafter was convicted of all offenses therein
the indictment on November 2nd, 1989, by jury trial.  Appellant
was sentenced to 120 months for count one; 292 months for count
three; sentences concurrent; and 60 months consecutive for count
four, the firearm offense.  Appellant's direct appeal was denied
on June 16th, 1991.

Subsequently, appellant filed a 28 U.S.C. § 2255 ("2255")
on August 30th, 1996.  The district court on March 18th, 1998,
by Order, vacated counts one and three for resentencing only.
Count four was vacated based upon **Bailey v. United States**, ---
U.S. ---, 116 S. Ct. 501, 133 L. Ed. 2d 472 (1995).  On July
30th, 1999, resentencing was imposed, in which the appellant was
enhanced two (2) points on count one per U.S.S.G. § 2D1.1(b)(1).

1

**R. 41**

Appellant filed the Notice of Appeal, pro se, on August 13th,
1999.   In which, appellant here now appeals the district court's
Order and Judgment of Conviction.

## ISSUES PRESENTED

### 1. WHETHER THE DISTRICT COURT ERRED BY NOT DISMISSING REMAINING COUNTS DUE TO PREJUDICIAL SPILLOVER

### 2. WHETHER THE DISTRICT COURT ERRED BY NOT HEARING APPELLANT'S INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS

### 3. WHETHER THE DISTRICT COURT ERRED BY IMPOSING ONE POINT ENHANCEMENT

## STATEMENT OF FACTS

Appellant here contends that upon the district court
vacating count four, the remaining counts, counts one and
three were subject to "Prejudicial Spillover."   The evidence
pertaining to the vacated count.   However, the district court's
instructions to the jury noted should the defendant be found
guilty of count four, then the defendant should also be found
guilty of counts one and three.   Vice versa.   **T.T. 544-545**
The trial evidence was persausive for conviction on all counts.
Evidence in relation to the vacated offense was only from the
testimony of co-defendant/government witness Ms. Viola Nichols
and the consensual search of appellant's residence.   **T.T.97,421**
There was no evidence congruent, indicating that appellant 'used
and/or carried' a firearm daily during any drug trafficking
activity.

Furthermore, the indictment precisely states that appellant

2

R. 42

was in possession of a firearm on August 11th, 1988, not prior
to as the government witness testimony implies without any
corroborating evidence.    Upon arrest, appellant was not in
personal possession of a firearm.   **T.T. 342**

The jury convicted based upon the evidence.   Appellant
here maintains that the jury was without an option to demarcate
the evidence for deliberation, attributing facts to individual
offenses due to the district court's instructions.

Here now, count four has been vacated, resulting in the
spillover to the remaining counts, in which, appellant has been
prejudiced.

Appellant next contends that the district court failed to
grant an evidentiary hearing to appellant's claims of ineffective
assistance of counsel, the record is clear and obvious to
counsel's deficient performances.

Trial counsel conceded to the government's proposal to
stipulate the testimony of an expert chemist, who was to
determine the substances of counts one and three.   **T.T.439-443**

Trial counsel failed to dispute the facts therein the
PSR, that "1326 vials contained an **unknown substance** and 40
splastic bags contained an **unknown substance.**    To which, the
stipulations counsel conceded were disputable for sentencing
purposes.   Counsel's stipulations precluded appellant the right
to confront and cross-examine the chemist to the elements of the
substances of counts one and three.   Counsel also failed to
address these issues in his letter of objections to the district
court.   **PSR 4(12); Letter of Objection**

3

R. 43

Furthermore, trial counsel failed to contest the quantity of heroin therein count one.   The evidence during the trial, specifically the wiretaps, delineated the quantity distributed from February 1988 til August 1988.   Counsel failed to dispute the 2.2 kilograms therein the PSR, when a fact finding hearing could have determined the quantity from the evidence produced, government witness, Ms. Viola Nichols and the wiretaps.

The final issue appellant contends is that the one point enhancement imposed per Criminal History Category was improper. In which, the payment of a twenty-five dollar fine does not constitute a "term of imprisonment" as prescribed by Congress and the United States Sentencing Commission.

Appellant was arrested for "Unlawful Possession of Marijuana", a twenty-five dollar fine was an option to three days in jail.   Appellant contends that in accord to the statutes, each option is considered an infraction.   Whereas, it is clear that Congress and the Commission agree that such is an infraction.

## ARGUMENT
### POINT  I

**THE PREJUDICIAL SPILLOVER FROM THE VACATED
COUNT WARRANTS DISMISSAL OR A
NEW TRIAL ON THE REMAINING COUNTS**

Appellant contends that as a result of count four (18 U.S. C. § 924(c)(1)) being vacated, the remaining counts, one and three should be dismissed or a new trial granted due to the "Prejudicial Spillover" of the remaining counts.

The district court on July 30th, 1999, vacated the firearm count based upon Bailey v. United States, 116 S.Ct. 501 (1995).

R. 44

The evidence pertaining to the firearm count was of such to incite the jury's decision coupled with the district court's instructions on the remaining counts.

The probativeness of testimony given by Ms. Nichols was imprecise to the firearm being carried. Ms. Nichols was unable to determine nor was an attempt made to detemine the type(s) of firearm appellant carried, with respect to the government's exhibits. **T.T.**111-113 Counsel's Rule 29 Motion to the firearm count was dismissed, the district court suggestively inferred that the remaining counts should be dismissed before denying___ motion. **T.T. 443-444**

The government's exhibits, 56A - 90A (wiretaps) delineate the conspiracy activities, with no mention to a firearm. Also, Ms. Nichols states she does not know much about guns. **T.T.**111-113 Considerably, a firearm exposed to a witness should be recognizable on account for identification in the future.

In <u>United States v. Jones</u>, 16 F. 3d 487, 493 (2d Cir. 1994), "Retroactive Misjoinder" arises where a joinder of multiple counts was proper initially, but later developments - such as a district court's dismissal of some counts for lack of evidence or an appellate count's reversal of less than all convictions - render the initial joinder improper.

<u>Jones</u> further notes that appellant must show 'compelling prejudice', to invoke "Retroactive Misjoinder." **Id. at 493**

For "Retroactive Misjoinder" to withstand, herein the instant case, appellant must show 'compelling prejudice.' **United Staets v. Novod**, 927 F.2d 726, 728 (2d Cir. 1991) Prejudicial spillover from evidence used to obtain a conviction subsequently reversed on appeal may constitute compelling prejudice. **Id.**

5

**R. 45**

at 728, quoting <u>United States v. Vebuliunas</u>, 76 F. 3d 1283,
1294 (2d Cir. 1996).

The Second Circuit in <u>Vebuliunas</u>, established a three part
test in considering whether a defendant ascetains "Prejudicial
Spillover."   **Id. at 1294**   The three factors prescribed are:
We first examine the evidence introduced in support of the
vacated count to see if it 'was of such an 'inflammatory' nature
that it 'would have tended to incite or arouse the jury into
convicting the defendant on the remaining counts.   Second, we
must compare the evidence and facts pertaining to the dismissed
count with that pertaining to the remaining counts and examine
the degree of overlap and similarity between the two.   Finally,
we must make a general assessment of the strength of the
government's case on the remaining counts.   **Id. at 1294**

Indeed, a firearm has the potential for violence,
presented to a jury, possible persuasion to convict.   Coupled with
the instructions to the jury, herein the instant case.   The
government's witness, Ms. Nichols testimony was persuasive for
the jury to convict.   However, the absence of this evidence,
the firearm count, minus Ms. Nichols testimony to the vacated
count held in abeyance, the jury's verdict is uncertain.
**Jones at 493**   With consideration to count three (cocaine base)
being stipulated (to be discussed in next issue) and the elements
not proven.   The outcome may differ from what the record reflects.

The evidence was significantly overwhelming to count one.
Counts three (cocaine base) and the vacated firearm count were
not heavily embossed.   Given the jury instructions disallowed
demarcation of the counts, the evidence was seemingly cemented

6

R. 46

'subject in connection' for conviction.  **T.T.48,544-545**

Appellant here meets the relevant three factor test that warrants "Prejudicial Spillover" resulting from the vacated count.   In which, dismissal or a new trial on the remainng counts may be rendered.

POINT II

THE TRIAL COURT ERRED BY FAILING
TO DETERMINE COUNSEL'S DEFICIENT
PERFORMANCES

(A) Counsel was ineffective for
    Stipulating to insufficient
    Evidence;

Appellant contends that counsel's performances were deficient, in that, counsel's deficiencies prejudiced appellant's trial and sentencing proceedings.

The record clearly reflects in pertinent part that counsel stipulated to disputable evidence, in which, the chemist could have determined the elements pertaining to counts one and three.

The substance of count one was heroin, the substance of count three was cocaine base.   The PSR noted that "1326 vials and 40 splastic bags contained **unknown substances**.   These evidentiary stipulations precluded the introduction of evidence significant for the jury's findings on the elements of the offense.   Counsel's stipulations deprived appellant of his constitutional right to confront and cross-examine the chemist. A valid stipulation relieves the prosecution of producing other evidence, it does not relieve the prosecution of the burden of proving every element of the crime beyond a reasonable doubt. United States v. Gaudin, ---U.S.___, 115 S.Ct. 2310, 2320, 132

R. 47

L. Ed. 2d 444 (1995)

Appellant contends that he was not advised by trial counsel as to the format and procedures to be followed at his trial with regards to the stipulations. It is further maintained that appellant did not sign a waiver nor acknowledged on the record, that he waived his Sixth Amendment right to challenge the evidence counsel stipulated. Moreover, appellant contends that he did not have any understanding as to the implications of the stipulations.

Appellant argues it was incumbent upon the court to determine whether he 'knowingly and voluntarily' agreed to the stipulations before allowing them to go to the jury. Johnson v. Cowley, 40 F. 3d 341, 344 (10th Cir. 1994).

In Brookhart v. Janis, 394 U.S. 1, 86 S.Ct. 1245, 16 L. Ed. 2d 314 (1966), the Supreme Court held that where a defendant enters a not guilty plea and asserts his right to trial, trial counsel cannot agree to proceed in a manner that is tantamount to a guilty plea, unless the defendant makes a knowing and intelligent waiver of his right to trial. See also Bonilla-Romero v. United States, 933 F. 2d 86 (1st Cir. 1991) If a stipulation is to all elements necessary for conviction, significant compliance with Rule 11 is required.

The appellant here in the instant case made it clear to the court that he was pleading not guilty. Appellant declined the initial plea offer and all verbal plea offers thereafter.

Several circuits have exercised partial colluquies to demonstrate that the defendant 'knowingly and voluntarily' waived his right. The record reflecting the admissions orally

8

R. 48

or written to the stipulations.  United States v. Gilliam, 994
F. 2d 97, 102 (2d Cir. 1993), although Gilliam aims at the
defendant's proposal for the government to concede to his
stipulation, the record is clear of Gilliam knowingly and
voluntarily agreeing to stipulate should the government concede.
See also United States v. Mohel, 604 F. 2d 748 (2d Cir. 1979);
United States v. Lyons, 898 F. 2d 210, 213-215 (1st Cir. 1990).

Here in the instant case, the record is silent to an
inquiry to determine apellant conceding knowingly and
voluntarily to counsel's stipulations.

Counsel may not stipulate to essentially all of the
elements of an offense without consent of the client.    Trial
counsel may ordinarily stipulate to matters easily proved as a
matter of trial tactics.   United States v. Poole, 832 F. 2d
561 (11th Cir. 1987).

The court in United States v. Stephen, 609 F. 2d 230 (5th
Cir. 1980), addressed whether trial counsel could waive a
client's 6th Amendment confrontation rights by stipulating to
the use of a transcript of a prior trial involving co-
defendants without obtaining the consent of the client.    The
Court held that trial counsel may waive his client's 6th
Amendment right to confrontation by entering into evidentiary
stipulations so long as (1) the defendant does not object to
the procedure, and (2) thedecision was part of a legitimate
trial tactic or part of a prudent trial strategy.   Id. at 232

The Second Circuit has recognized that counsel's trial
strategy must be binding.   United States Ex Rel. Cruz v.
LaVallee, 448 F. 2d 671, 679 (2d Cir. 1971)   In order for a

9

R. 49

waiver to be effective, it must be an "intentional relinquishment or abandonment of a known right or privilege. <u>Mitchell v. Hoke</u>, 745 F.S. 874, 878 (E.D.N.Y. 1990)  Appellant notes a most recent case in the Tenth Circuit, where counsel's stipulation was signed by the defendant and counsel.   In which, counsel did not violate defendant's rights. <u>Hawkins v. Hannigan</u>, 185 F. 3d 1146, 1154 (10th Cir. 1999)

Counsel violated appellant's Sixth Amendment rights to effective assistance of counsel, in part, that in criminal prosecutions, the accused shall have the right to confront witnesses against him. . . . unless that right is waived. <u>Brookhart v. Janis</u>, 384 U.S. 1   The elements of the stipulations were not proven pertaining to count three.   The preponderance of the evidence is a duty upon the court to ensure the government carries this burden by presenting reliable and specific evidence. <u>United States v. Lawrence</u>, 48 F. 3d 1559, 1566 (11th Cir. 1995).

Counsel's evidentiary stipulations resulted in appellant receiving a more harsh sentence.   Considering counsel would have objected to the PSR, the sentence would be less.

District judges are forced to rely on the expert testimony of chemists who specialize in drug analysis in order to determine the identity of a substance. <u>United States v. Jackson</u>, 968 F. 2d 158, 162 (2d Cir. 1992)   The standard applicable to sufficiency has been oft repeated, viewing the evidence in the light most favorable to the government, the defendant must demonstrate that no rational trier of fact could have found the essential elements of the crime charged beyond

**R. 50**

a reasonable doubt.   Jackson v. Virginia, 443 U.S. 307, 319

61 L. Ed. 2d 560 (1979)   The stipulations did not prove the

elements of the substance being cocaine base.   With regard to

the jury being obliged to hear the testimony of the chemist, it

is plausible the testimony would contain the validity of

appellant's argument, that the substance stipulated was not

cocaine base pertaining to the 1326 vials and 40 splastic bags.

Counsel's legal skills were deficient, in that, counsel

failed to address the court to the results of the stipulations

being disputable.

Questions as to whether the mixture found was cocaine

base and its specific weight were factual findings for the

judge at sentencing.   The jury need only have found that these

three chunks seized contained some mixture of cocaine as defined

in Schedule II.   United Staes v. Barnes, 890 F. 2d 545 (1st

Cir. 1989).   The Third Circuit considered the testimony of

Dr. John David Alvin of the properties and percentages that

distinguishes cocaine and cocaine base.   United States v. James,

78 F. 3d 851, 855 (3rd Cir. 1996) noted that an evidentiary

hearing was required to determine cocaine base was crack as

the Sentencing Guidelines defined cocaine base as crack.

See United States Sentencing Guidelines' Amendment 487.   Also,

United States v. Palacio, 4 F. 3d 151 (2d Cir. 1993)

### (B) Counsel was ineffective for
### Not contesting the quantity

Appellant further contends that counsel's performances

were deficient.   Counsel failed to contest the quantity of

11

heroin attributed to appellant.    The PSR notes that 2.2

kilograms of heroin was distributed from Feburary 1988 til

August 1988.    The evidence of the amount distributed can be

gleaned from the government's evidence, specifically the

wiretap exhibits 56A - 90A, also, government witness, Ms.

Viola Nichols' testimony corroborating the wiretaps.

In United States v. Shonubi, 998 F. 2d 84, 88-89 (2d

Cir. 1993), the Court held that case law uniformly requires

specific evidence----e.g , drug records, admissions or live

testimony---to calculate drug quantities for sentencing

purposes.    The Court exemplifies that a 'course of conduct',

is when a defendant engages over time in an identifiable pattern

of criminal conduct.  Id. at 89   The wiretap evidence depicts

appellant's routine pattern attributed to count one (21 U.S.C.

§ 846 - Conspiracy to distribute heroin).

Appellant maintains that appoximately six ounces of

heroin was distributed to government witness Ms. Viola

Nichols in the noted time period.    Counsel failed to establish

these grounds before the sentencing court.

Counsel's representation was deficient, and the

deficient performances prejudiced appellant's case.

A claim of ineffective assistance of counsel [under §

2255] must be scrutinized under the two-part test of

Strickland v. Washington. 466 U.S. 668, 104 S.Ct. 2052, 80 L.

Ed. 2d 674 (1984).  In order to prevail on a claim of ineffective

assistance of counsel, a convicted defendant must prove both

that his counsel's representation was deficient and that the

deficient performance prejudiced the defendant's case.    The

12

R. 52

first part of the test is met when the defendant shows that counsel 'failed to exercise the customary skills and diligence that a reasonably competent attorney would [have] exhibit[ed] under similar circumstances.'   The second part is met when the defendant shows that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.   **United States v. Apfel**, **97 F. 3d 1074, 1076 (8th Cir. 1996)**

Appellant argues that counsel had a duty to advocate on his behalf, moreover, he had a duty to consult with appellant and keep appellant informed of the developments in the course of the prosecution.  **Strickland 466 U.S. 668**   Counsel's stipulations violated appellant's rights to confront, cross-examine the expert witness and impeded appellant's due process rights at sentencing.   A criminal defendant has the right to the assistance of counsel at all critical stages of the proceedings against him, or whenever his substantial rights may be affected.  **Estelle v. Smith**, 451 U.S. 454, 469-471, 101 S.Ct. **1866, 68 L. Ed. 2d 359 (1981)**   Counsel's failure to consult with appellant regarding these fundamental decisions were, as determined in **Brown v. Rice**, 693 F.S. 397 (W.D.N.C. 1988), in error.

It is well documented that a district court has an obligation to assure itself that the information upon which it relies in sentencing defendants is both reliable and accurate. **United States v. Pugliese**, 805 F. 2d 1117, 1124 (2d Cir. 1986) Counsel failed to address the issues noted, in which, the court sentencing appellant accordingly.

R. 53

Whether appellant is entitled to relief on these
grounds is contingent upon whether trial counsel effectively
challenged the government's evidence regarding counts one and
three, which resulted in appellant receiving a lenghtier
sentence, currently being served.

### POINT III
The One Point Enhancement
Imposed on Appellant's
Criminal History was
Improper

Appellant contends that the district court improperly
imposed a one point enhancement to appellant's Criminal History
for payment of a twenty-five dollar fine for "Unlawful
Possession of Marijuana", per U.S.S.G. § 4A1.1(c). Payment
of a fine is not considered a 'term of imprisonment' prescribed
by U.S.S.G. § 4A1.2(b). Although U.S.S.G. § 4A1.2(c)(1) and
(2) describe sentences counted and excluded, without listing
"Unlawful Possession of Marijuana" as an offense or a possible
nexus to consider, nearest possibility would be 'Public
Intoxication' upon exclusion. However, U.S.S.G. 4A1.2(c)(1)
states (A) the sentence was a term of probation of at least
one year or a term of imprisonment of at least thirty days or
(B) the prior offense was similar to an offense: NOTED

Appellant had the option of paying the fine or to be
confined for three days. Appellant opt for the payment of
the fine. Congress precisely noted that an infraction was
not more than five days or less or if no imprisonment is
authorized, as an infraction. Federal Criminal Codes and
Rules, 18 U.S.C. § 3559(a). See also United States v. Pyatt,

14

R. 54

725 F.S. 887 (E.D.N.Y. 1989). Because the violation at
bar does not authorize imprisonment, it is classified as an
infraction.

Moreover, an 'infraction' is defined in Application Note
1 of the Guidelines' Section 1B1.9 as **any** offense for which the
maximum authorized term of imprisonment is not more than five
days. United States v. Moore, 968 F. 2d 224, 225 (2d Cir.
1992).

The sole interest of the defendant in sentencing is the
right not to be sentenced on the basis of inaccurate or
unreliable information. United States v. Lopez, 898 F. 2d
1505, 1512 (11th Cir. 1990). The United States Supreme Court
has made clear that there is a due process right to be sentenced
on the basis of accurate information. United States v. Tucker,
404 U.S. 443, 30 L. Ed. 2d 592, 92 S. Ct. 589 (1972). On a
claim of ineffective assistance of counsel, an evidentiary
hearing should be held if, on the record, more than one
inference can be raised as for the reasons of counsel's actions.
Porter v. Wainwright, 805 F. 2d 930, 935-936 (11th Cir. 1986).

The district court failed to hear the issues herein noted,
an evidentiary hearing would clearly support Appellant's claims.

Appellant here states that he is a Pro Se Litigant and
should be held to less stringent standards, in which, the appeal
here should be construed more liberatlly. Haines v. Kerner, 404
U.S. 519, 520, 92 S. Ct. 594, 595, 30 L. Ed. 2d 652 (1972).

## CONCLUSION

For the reasons set forth above, these matters should
be remanded and appellant granted dismissal of the remaining

R. 55

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

————————————————————X

United States of America,    :

        Appellee,    :

               :

      v.    :    **CERTIFICATE OF SERVICE**

               :    99-1524

Mark Garnes,    :

        Appellant.    :

————————————————————X

    I, Mark Garnes, pro se, hereby certify under the penalty
of perjury that on the 31st day of January, 2000, I served by
United States Mail, certified, the original and ten (10) copies
of Appellant's Brief and Joint Appendix to the Deputy Clerk of
the Court of Appeals for the Second Circuit and one copy to the
Assistant United States Attorney, the two being the following:

Mrs. S. Washington-Goeloe
Deputy Clerk
United States Court of Appeals
For the Second Circuit
United States Courthouse
40 Foley Square
New York, New York     10007

Mr. Andrew J. Frisch
Assistant United States
Attorney
Eastern District of
New York
147 Pierrepont Street
Brooklyn, New York 11201

DATED: January 31st, 2000
White Deer, Pennsylvania

Mark A. Garnes - Pro Se
Reg. No. 24646-053
P.O. Box 2000-3B
FCI-Allenwood Med.
White Deer, Pa.   17887

R. 56

Mark A. Garnes
Reg. No. 24646-053
P.O. Box 2000-3B
FCI Allenwood Med.
White Deer, Pa.
                17887


April 14th, 2000


Mrs. S. Washington-Goeloe
Deputy Clerk
United States Court of Appeals
For the Second Circuit
United States Courthouse
40 Foley Square
New York, New York      10007

**RE: United States v. Mark Garnes  99-1524**

Dear Mrs. Washington-Goeloe:

    I submit the enclosed Appellant Reply Brief for review by the Honorable Justices therein the Court of Appeals.

    Respectfully, I respect to know who are the Honorable Justices hearing this matter?

    Thanking you in advance for your time, attention, and assistance to the withheld.

Respectfully yours,

Mark A. Garnes

R. 57

Mark A. Garnes
Reg. No. 24646-053
P.O. Box 2000-3B
FCI Allenwood Med.
White Deer, Pa.
17887

April 14th, 2000

Mrs. S. Washington-Goeloe
Deputy Clerk
United States Court of Appeals
For the Second Circuit
United States Courthouse
40 Foley Square
New York, New York        10007

RE: United States v. Mark Garnes 99-1524

Dear Mrs. Washington-Goeloe:

I, the above noted comes forth to notify the Honorable Court that I have been transferred to the following facility:

LSCI Fort Dix
P.O. Box 38
Fort Dix, New Jersey
08640

Thanking you in advance for your time, attention, and assistance to the withheld.

Respectfully yours,

Mark A. Garnes

R. 58

# 99-1524

*To be submitted*

# United States Court of Appeals

### For the Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

—against—

AMOS, C.O. #1535, LOUISE COLEMAN, CAROL CRAFT, MARTHA
CRAFT, CHAR T. DAVIS, MAN SING ENG, HOWARD MASON,
BRIAN GIBBS, CLAUDIA MASON, IDA NICHOLS, JOANNE
MCCLINTON NICHOLS, VIOLA NICHOLS, JOSEPH ROGERS,
KAROLYN TYSON, WILSON SKINNER, MARCIA NICHOLS
WILLIAMS, PARIS WILLIAMS,

*Defendants,*

MARK GARNES,

*Defendant-Appellant.*

On Appeal From The United States District Court
For The Eastern District of New York

## BRIEF AND APPENDIX FOR THE UNITED STATES

LORETTA E. LYNCH,
*United States Attorney,*
*Eastern District of New York.*

EMILY BERGER,
ANDREW FRISCH,
*Assistant United States Attorneys,*
*Of Counsel.*

R. 59

To be argued by
ANDREW J. FRISCH

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

Docket No. 99-1524

UNITED STATES OF AMERICA,

Appellee,

- against -

AMOS, C.O. #1535, LOUISE COLEMAN, CAROL CRAFT,
MARTHA CRAFT, CHAR T. DAVIS, MAN SING ENG,
HOWARD MASON, BRIAN GIBBS, CLAUDIA MASON, IDA NICHOLS,
JOANNE MCCLINTON NICHOLS, VIOLA NICHOLS, JOSEPH ROGERS,
KAROLYN TYSON, WILSON SKINNER, MARCIA NICHOLS WILLIAMS,
PARIS WILLIAMS,

Defendants,

MARK GARNES,

Defendant-Appellant.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

BRIEF AND APPENDIX FOR THE UNITED STATES

LORETTA E. LYNCH,
United States Attorney,
Eastern District of New York.

EMILY BERGER,
ANDREW J. FRISCH,
Assistant United States Attorneys,
(Of Counsel).

R. 60

i

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . ii

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . 4

    A. Overview Of The Case And
       Procedural History . . . . . . . . . . . . . . . 4

    B. The Evidence At Trial . . . . . . . . . . . . . . 7

       a.    Nichols's Role In The Organization . . . . . . 7

       b.    Nichols's Contacts With Garnes . . . . . . . . 8

       c.    The Los Angeles Airport Stop . . . . . . . . . 9

       d.    The Jewelry Purchase . . . . . . . . . . . . 10

       e.    The Search . . . . . . . . . . . . . . . . . 10

       f.    The Defense Case . . . . . . . . . . . . . . 11

ARGUMENT:

    POINT ONE -    GARNES'S CLAIM THAT THE COURT
                  SHOULD HAVE DISMISSED THE DRUG
                  COUNTS BASED ON PREJUDICIAL
                  SPILLOVER WAS WAIVED IN THE
                  DISTRICT COURT AND IS WITHOUT
                  MERIT . . . . . . . . . . . . . . . . . 12

    POINT TWO -    GARNES'S CLAIM OF INEFFECTIVE
                  ASSISTANCE OF COUNSEL IS PRO-
                  CEDURALLY BARRED AND WITHOUT
                  MERIT . . . . . . . . . . . . . . . . . 15

    POINT THREE - GARNES'S CHALLENGE TO HIS CRIMINAL
                  HISTORY CATEGORY IS PROCEDURALLY
                  BARRED AND WITHOUT MERIT . . . . . . . . 18

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . 19

## TABLE OF AUTHORITIES

Page

CASES:

Billy-Eko v. United States, 8 F.3d 111 (2d Cir.
  1993) . . . . . . . . . . . . . . . . . . . . . . . . . . .    15

Douglas v. United States, 13 F.3d 43 (2d Cir.
  1993) . . . . . . . . . . . . . . . . . . . . . . . . . . .    12

Rosario v. United States, 164 F.3d 729 (2d Cir.
  1998), cert. denied, 526 U.S. 1033 (1999) . . . . . . . . .    13

Strickland v. Washington, 466 U.S. 668 (1984) . . . . . . .    16

Treistman v. United States, 124 F.3d 361 (2d Cir.
  1997) . . . . . . . . . . . . . . . . . . . . . . . . . . .    18

United States v. Becerra, 97 F.3d 669 (2d Cir. 1996),
  cert. denied, 519 U.S. 437 (1997) . . . . . . . . . . . . .    13

United States v. Plitman, 194 F.3d 59 (2d Cir.
  1999) . . . . . . . . . . . . . . . . . . . . . . . . . . .    16

United States v. Reiter, 897 F.2d 639, 645 (2d Cir.),
  cert. denied, 498 U.S. 817 (1990) . . . . . . . . . . . . .    16

United States v. Rooney, 37 F.3d 847 (2d Cir.
  1994) . . . . . . . . . . . . . . . . . . . . . . . . . . .  12-13

United States v. Vegas, 27 F.3d 773, 778 (2d Cir.),
  cert. denied, 513 U.S. 911 (1994) . . . . . . . . . . . . .    13


STATUTES:

18 U.S.C. § 924(c) . . . . . . . . . . . . . . . . . . . . .    12


OTHER AUTHORITIES:

U.S.S.G. § 2D1.1 . . . . . . . . . . . . . . . . . . . . . .    17

U.S.S.G. § 4A1.1 . . . . . . . . . . . . . . . . . . . . . .    18

U.S.S.G. § 4A1.1(c) . . . . . . . . . . . . . . . . . . . . .    18

U.S.S.G. § 4A1.2(a)(1) . . . . . . . . . . . . . . . . . . .    18

U.S.S.G. § 4A1.2(c) . . . . . . . . . . . . . . . . . . . . .    18

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

Docket No. 99-1524

UNITED STATES OF AMERICA,

Appellee,

- against -

AMOS, C.O. #1535, LOUISE COLEMAN, CAROL CRAFT,
MARTHA CRAFT, CHAR T. DAVIS, MAN SING ENG,
HOWARD MASON, BRIAN GIBBS, CLAUDIA MASON, IDA NICHOLS,
JOANNE MCCLINTON NICHOLS, VIOLA NICHOLS, JOSEPH ROGERS,
KAROLYN TYSON, WILSON SKINNER, MARCIA NICHOLS WILLIAMS,
PARIS WILLIAMS,

Defendants,

MARK GARNES,

Defendant-Appellant.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

BRIEF FOR THE UNITED STATES

PRELIMINARY STATEMENT

Mark Garnes appeals from a July 30, 1999 amended judgment
entered in the United States District Court for the Eastern District
of New York (Korman, J.).  After granting in part and denying in
part Garnes's petition for a writ of habeas corpus under 28 U.S.C.

R. 63

§ 2255, the district court resentenced Garnes on that date.

Garnes resentencing arose from his conviction after a jury trial of conspiracy to distribute heroin in violation of 21 U.S.C. § 846, possession of cocaine base with intent to distribute in violation of 21 U.S.C. § 841(a)(1)(A)(iii), and using and carrying firearms during and in relation to drug trafficking crimes in violation of 18 U.S.C. § 924(c). On January 4, 1991, Garnes was sentenced to 292 months incarceration to be followed by a consecutive term of five years imprisonment on the firearms count, five years of supervised release, and a $150 special assessment. This Court affirmed the conviction in an unpublished order. United States v. Garnes, No. 91-1041 (2d Cir. June 14, 1991).

In his petition Garnes argued in part that Bailey v. United States, 516 U.S. 137 (1995), required vacatur of his firearms conviction. By order dated March 26, 1998, the district court vacated the firearms conviction based on Bailey and United States v. Vasquez, 85 F.3d 59 (2d Cir. 1996), and vacated the other counts of conviction for the purpose of resentencing only. On July 30, 1999, Garnes was resentenced to 300 months incarceration, which he is serving, a five-year period of supervised release, and a special assessment of $150.

On appeal, Garnes claims that the district court should have dismissed the drug counts when it dismissed the firearm count, because of spillover prejudice from evidence at trial concerning the firearms; he was denied effective assistance of counsel at trial and sentencing; and the district court erroneously calculated his

3

criminal history category.

As demonstrated below, these claims are meritless, and the amended judgment of the district court, which granted in part and denied in part Garnes's petition should be affirmed.

4

## STATEMENT OF FACTS

A.    Overview Of The Case
      And Procedural History

Garnes was convicted for his role in a Brooklyn-based street-level narcotics organization headed by Garnes's half-brother, Brian Gibbs.   Garnes regularly delivered cut heroin to Viola Nichols, a cooperating defendant and one of Gibbs's workers, for packaging and thereafter Garnes transported packaged heroin, which he stored at his Brooklyn apartment, to retail drug spots operated by Gibbs's organization.

The evidence at trial included Nichols's testimony about Garnes's role in the operation, wiretaps of telephone conversations in which Garnes and others discussed their drug business, testimony from a detective who stopped Garnes at the Los Angeles International Airport ("LAX") and seized $32,000 in cash from him, and evidence seized during a search of Garnes's apartment.  Evidence of Garnes's connection to firearms was established through firearms seized during the search, and Nichols's testimony that Garnes always carried a gun when he brought or retrieved drugs from her house.

On direct appeal, Garnes claimed, among other things, that he was denied effective assistance of counsel at trial because his lawyer elicited from an agent that Garnes's girlfriend said that the seized guns and drugs belonged to Garnes.  On June 14, 1991, this Court affirmed Garnes's conviction.  United States v. Garnes, No.

R. 66

91-1041 (2d Cir. June 14, 1991) (GA 25-27).[1]

On August 30, 1996, Garnes filed a <u>pro</u> <u>se</u> petition pursuant to 28 U.S.C. § 2255, claiming <u>inter alia</u> that: the evidence that he used or carried a firearm was insufficient; his trial counsel was ineffective in stipulating to various facts including the testimony of a government chemist about her analysis of seized narcotics, in failing to contest drug quantity at sentencing, and in failing to contest the legality of court-ordered wiretaps; and the district court erroneously calculated his criminal history category.

The government argued that Garnes's claims were without merit, except that vacatur of the firearms count was required by <u>Bailey</u>, 516 U.S. 137, and <u>Vasquez</u>, 85 F.3d 59. <u>Bailey</u> held that evidence of active employment of a firearm is required to show use of a firearm under 18 U.S.C. § 924(c), which prohibits the use or carrying of a firearm in connection with a drug trafficking crime. <u>Vasquez</u> held that a pre-<u>Bailey</u> erroneous jury instruction on use of a firearm does not require reversal if the evidence showed that the defendant necessarily carried the firearm in question. Reversal would be required, however, if there was evidence at trial of multiple firearms at different locations, and it was not clear upon which firearm the jury predicated its verdict. The evidence at Garnes's trial included the firearms seized from Garnes's apartment

---

[1]    Numbers in parenthesis preceded by "A" refer to Garnes's appendix, those preceded by "T" refer to the trial transcript and those preceded by "GA" refer to the government's appendix.    In addition the presentence report and addenda are submitted to the Court separately, under seal.

6

and Nichols's testimony about Garnes's carrying firearms. Reversal of the firearms count was required because it was not clear on which firearm the jury predicated its verdict.

By order dated March 26, 1998, the district court vacated the firearms count. The district court vacated the other counts of conviction for the purpose of resentencing only and directed the Probation Department to prepare an updated presentence report reflecting a two-level enhancement for possession of a firearm under U.S.S.G. § 2D1.1(b)(1). Garnes's initial sentence had not included that enhancement because it instead included the mandatory consecutive five-year term of imprisonment imposed under Section 924(c). The Department determined that Garnes's applicable range with the enhancement under U.S.S.G. §2D1.1(b)(1) was 360 months to life. This was a longer period than the 352-month sentence (292 months for the drug counts and 60 months for the firearms conviction) that had been imposed initially. (See generally PSR Addendum).

On July 30, 1999, Garnes was resentenced with the assistance of newly-appointed counsel. Garnes sought a downward departure based on his extraordinary rehabilitation while incarcerated. The government opposed. But it indicated that it might be proper to make a slight downward departure so that Garnes could be sentenced to the same 352 months to which he was initially sentenced. The district court first downwardly departed to 352 months. The court granted Garnes a further downward departure and imposed a sentence of 300 months, finding that Garnes had "shown

R. 68

7

some effort at rehabilitation."  (A 46).

B.    The Evidence At Trial

The evidence at trial is summarized to the extent it is
relevant to Garnes's claim of spillover prejudice.[2]  The
government's case consisted of Nichols's testimony about Garnes's
role in Gibbs's drug operation, corroborated by approximately 34
conversations intercepted from a court-authorized wiretap on her
home telephone and searches of Garnes and his apartment.  One
witness testified on Garnes's behalf that she never saw him
associated with drugs.

a.    Nichols's Role In The Organization

Viola Nichols met Brian Gibbs in January 1988, after her
release from New York State prison.  Gibbs was by then a close
associate of Lorenzo Nichols.  When Viola Nichols met Gibbs, he was
operating a retail drug operation in Brooklyn, along with Garnes and
others, including Herman Brothers, a/k/a "Herms."  Nichols asked
Gibbs for a job in his operation and, after obtaining approval from
Lorenzo Nichols, Gibbs gave Nichols a job packaging heroin.  (T 87-
88).

In late January 1988, Gibbs delivered a quantity of heroin
to Nichols at her home, along with packaging paraphernalia,
including baggies, rubber bands, and rubber stamps bearing Gibbs'

---

[2]    A longer summary is contained in the government's brief
on appeal, made part of the government appendix.  (See GA 7-19).

R. 69

"brand names," one of which was "Hit Man."  (T 89-90).  Thereafter,
Nichols worked packaging heroin for Gibbs several times a week,
until July 1988.  During that period, Garnes generally delivered the
heroin to Nichols and picked it up from her, although Herman
Brothers sometimes made deliveries.  In addition, Garnes generally
paid Nichols for her work, at rates ranging from $600 to $300 per
ounce of heroin.  (T 89-94, 104, 108).

    b.   <u>Nichols's Contacts With Garnes</u>

     Viola Nichols was in almost daily contact with Garnes
between February and late July 1988.  They spoke frequently by
telephone, often several times a day, and he often visited her
house, usually arriving in a Volvo or on a motorcycle, to deliver
drugs or money.  (T 100-03).  On other occasions, Garnes visited
Nichols's house to socialize with Linda Rodway, a Queens woman who
sometimes helped Nichols bag heroin.  (T 105-06).

    During their numerous conversations, Garnes and Nichols
discussed aspects of Gibbs's operation.  Garnes told Nichols that
the heroin was sold in Brooklyn and that he was responsible for
supplying the "spots."  Garnes told Nichols that, to simplify that
task, he kept a supply of narcotics in his Brooklyn apartment, where
he lived with a girlfriend, Carmen Ayala.  (T 93-94, 96).  When
Nichols asked Garnes one day about a large quantity of crack that
he was carrying, he explained that he and Gibbs also sold crack.
(T 96-97).  Whenever Garnes came to Nichols's home to deliver or
pick up narcotics, he carried a gun; Nichols saw him with different

9

guns on different occasions.  (T 97, 111-13).

In a number of wiretapped conversations Garnes, Nichols, Gibbs and others discussed their drug business, sometimes in a Pig-Latin type slang.  (T 113-14).  In many of those conversations, Garnes called Gibbs and others from Nichols's home; other times, Nichols and Garnes spoke by telephone.  Those conversations corroborated Nichols's testimony concerning Garnes's role in Gibbs's organization.  For example, on March 18, 1988, Nichols told Garnes in Pig-Latin that she needed a rubber stamp of the sort used to stamp "brand names" on packages of heroin.  Garnes replied, "Es-yay, es-yay, ou-yay onna-gay it-gay on-way. [Yes, yes, you gonna get one.]  OK?"  (T 135).

Garnes also frequently discussed Nichols's "job" over her telephone.  Those conversations demonstrated Garnes's familiarity and participation in the drug trafficking.  (See, e.g., T 153, 158-59, 175).

Nichols stopped working for Gibbs and Garnes in July 1988, after they accused her of tampering with some of their heroin. Nichols discussed the situation with Garnes in several recorded conversations which again demonstrated Garnes's familiarity and participation in the drug trafficking.  (See, e.g., T 197-98).

c.  The Los Angeles Airport Stop

Los Angeles County Deputy Sheriff Robert Mallon was assigned to a drug and currency task force at LAX.  He stopped Garnes and two companions there on June 9, 1988.  After Garnes

R. 71

produced an identification card and airline ticket in different names, Deputy Mallon asked Garnes whether he was carrying any large sums of cash or drugs. When Garnes replied that he was not, Deputy Mallon asked for and received permission to search Garnes' shoulder bag. Inside the bag, Deputy Mallon found $31,295, mostly in small bills. (T 321-23).[3]

### d.    The Jewelry Purchase

Manhattan jeweler Peter Marsten testified that, in the second week of June 1988, Garnes purchased custom-made jewelry from him for $4,825. After an initial down payment, Garnes told Marsten that "he had a problem that he said happened in L.A. that he wouldn't be able to pay me so quickly." (T 218).

### e.    The Search

Several intercepted telephone calls indicated that Garnes lived at an apartment at 2727 Surf Avenue, Brooklyn (the "Apartment"), with Carmen Ayala. For example, on June 10, 1988, Garnes, from Nichols' home, called Ayala at the Apartment. Garnes told Ayala that he had to take care of some things, "then I'm coming home." Moreover, the identification card Garnes produced at LAX listed Garnes' address as 2727 West 28th Street, Brooklyn, New York. (T 321). That is another address for the building at 2727 Surf

---

[3]    Garnes told Viola Nichols about the currency seizure (T 110-11), and, in a wiretapped conversation on June 16, 1988, Nichols discussed the seizure with Gibbs, who said that "Country" had "fucked up a lot of motherfucking paper [money]" (T 177-78).

Avenue. (T 353).

On August 11, 1988, FBI Special Agent Charles Gianturco led a team of FBI agents and New York City Police Officers to the Apartment to execute a warrant for Garnes's arrest. After obtaining consent to search the Apartment from Carmen Ayala, agents seized five fully or partially loaded firearms and ammunition from a bedroom closet, and a loaded handgun, ammunition, heroin and 1,326 vials of crack from a kitchen cabinet.

### f. The Defense Case

Garnes called one witness, Linda Rodway. Rodway, who had been riding a motorcycle with Garnes at the time of his arrest on August 11, 1988 (T 337-39), testified that she met Garnes at Viola Nichols's house in March 1988, and she and Garnes began dating (T 447). Rodway said that she frequently went to Nichols's home and smoked cocaine, while Nichols smoked crack; Rodway also helped Nichols bag heroin. (T 452). While at Nichols's home, Rodway frequently saw numerous people whom she knew to be drug dealers, including Gibbs. (T 457-58). Although Garnes also was a frequent visitor to Nichols's home, sometimes in the company of Gibbs, Rodway never saw Garnes with drugs. (T 448, 458).

ARGUMENT

POINT ONE

GARNES'S CLAIM THAT THE COURT SHOULD HAVE DISMISSED
THE DRUG COUNTS BASED ON PREJUDICIAL SPILLOVER WAS
WAIVED IN THE DISTRICT COURT AND IS WITHOUT MERIT

Garnes claims on appeal that the district court should
have vacated the two drug counts for which he was convicted, when
it vacated Garnes's conviction under 18 U.S.C. § 924(c), because of
prejudicial spillover from evidence concerning the firearms.
Garnes's claim is procedurally barred and is without merit.

Garnes did not claim in his petition in the district court
that the two drug counts should be vacated because of prejudicial
spillover.  There appears to be no evidence in the record that the
government, Judge Korman or Garnes's appointed lawyer at
resentencing ever addressed themselves to the issue.  By failing to
raise the point earlier, Garnes waived the argument for direct
appeal.  E.g. Douglas v. United States, 13 F.3d 43, 46 (2d Cir.
1993).

The claim is also without merit.  In United States v.
Rooney, 37 F.3d 847, 855 (2d Cir. 1994), this Court set forth the
standard for determining whether prejudicial spillover from a
dismissed count requires remaining convictions to be upset:

> First, we examine whether the evidence on the
> reversed count would have tended to incite or
> arouse the jury into convicting the defendant
> on the remaining counts. . . .
>
> Second, it is appropriate to look to the

13

> similarities and differences between the
> evidence on the reversed count and the
> remaining counts. Courts have concluded that
> where the reversed and the remaining counts
> arise out of similar facts, and the evidence
> introduced would have been admissible as to
> both, the defendant has suffered no prejudice.

United States v. Rooney, 37 F.3d at 855 (citations omitted). It is

also "routine when examining potential prejudice" to look at the

"strength of the government's case." Id. at 856.

Garnes does not meet the Rooney test for at least two

separate reasons. First, the firearms were admissible evidence on

the drug charges. This Court has "repeatedly approved the admission

of firearms as evidence of narcotics conspiracies, because drug

dealers commonly keep firearms on their premises as tools of the

trade." United States v. Becerra, 97 F.3d 669, 671 (2d Cir. 1996)

(quoting United States v. Vegas, 27 F.3d 773, 778 (2d Cir.), cert.

denied, 513 U.S. 911 (1994)), cert. denied, 519 U.S. 437 (1997);

Rosario v. United States, 164 F.3d 729, 735 (2d Cir. 1998), cert.

denied, 526 U.S. 1033 (1999). Garnes's firearms were especially

compelling evidence on the drug counts because they helped prove

Garnes's role in the operation: a drug dealer like Garnes, whose

role was to transport narcotics to and from locations in New York

City, would reasonably be expected to keep and carry guns for

protection. Thus, the evidence of the guns was admissible even

without a gun charge.

Second, the evidence against Garnes on the drug counts was

overwhelming. Nichols testified in detail about Garnes's role in

the drug conspiracy, the jury heard intercepted telephone

14

conversations in which Garnes unmistakably discussed his role in the drug conspiracy, heroin and 1,326 vials of crack were seized from his apartment, and $32,000 in cash was seized from him at LAX. Given the strength of the case against Garnes, it is inconceivable that the jury would have returned a different verdict but for admission of the firearms.

15

POINT TWO

GARNES'S CLAIM OF INEFFECTIVE ASSISTANCE OF
COUNSEL IS PROCEDURALLY BARRED AND WITHOUT MERIT

Garnes claims that his counsel was ineffective in stipulating to testimony by the expert chemist and not contesting drug quantity at sentencing.  Much of Garnes's claim is barred and all of it is without merit.

This Court requires a defendant to raise an ineffective assistance claim on direct appeal when he is represented by new counsel on appeal, and the claim can be decided on the then-extant record.  If the defendant does not timely raise the claim, he waives it.  Billy-Eko v. United States, 8 F.3d 111, 114-16 (2d Cir. 1993).

Here, Garnes was represented by new counsel by the time of sentencing and raised ineffective assistance of trial counsel on direct appeal.  Notably, however, Garnes argued in support of that claim only that his lawyer erred by eliciting from Carmen Ayala that the seized guns and drugs belonged to Garnes.  Garnes did not explain in his petition in the district court or on this appeal why he failed to argue that his trial lawyer was ineffective by stipulating to testimony by the chemist, even though Garnes was represented by new counsel.  Under Billy-Eko, Garnes cannot raise the claim now.

Moreover, that claim and Garnes's other claim of ineffective assistance are without merit.  Garnes complains about counsel's decision to stipulate to the chemist's testimony (see GA 4-6) without explaining why it was a mistake for counsel to

R. 77

stipulate or how Garnes was prejudiced by the stipulation. Thus, he has not shown that "his attorney's conduct fell below an objective standard of reasonableness, and that but for his attorney's unprofessional errors, the result of the proceeding would have been different." <u>United States v. Reiter</u>, 897 F.2d 639, 645 (2d Cir.), <u>cert. denied</u>, 498 U.S. 817 (1990) (citation omitted); <u>Strickland v. Washington</u>, 466 U.S. 668, 687-88, 694 (1984).

Moreover, this Court recently held that "defense counsel may waive a defendant's Sixth Amendment right to confrontation where the decision is 'one of trial tactics or strategy that might be considered sound.'" <u>United States v. Plitman</u>, 194 F.3d 59, 64 (2d Cir. 1999). The <u>Plitman</u> Court held that defense counsel made a valid decision to stipulate to the admission of hearsay testimony damaging to the defendant, because the stipulation potentially limited the amount of prejudicial testimony. <u>Id</u>. Here, the stipulation simply reported the results of scientific tests, which tests Garnes does not claim he challenges. Moreover, the stipulation avoided having a witness highlight the drugs during testimony.

Equally unavailing is Garnes's claim that counsel was ineffective in failing to contest the amount of drugs at sentencing. Garnes's argument focuses upon the fact that certain substances were initially classified as "unknown." (<u>See</u> Br. at 7). Notably these substances were of unknown chemical composition only for a short time, when found in Garnes's apartment. They became known as heroin and crack, as soon as chemically tested. Thus, it is no surprise

17

that the attorney who represented Garnes at his initial sentencing
and on appeal did not challenge the drug quantity for which Garnes
was found accountable under  U.S.S.G. § 2D1.1.  Notably, even now,
Garnes does not explain why he waited five years to argue that
counsel erred by not challenging drug quantity or how he was
prejudiced by any such error.

POINT THREE

GARNES'S CHALLENGE TO HIS CRIMINAL HISTORY
CATEGORY IS PROCEDURALLY BARRED AND WITHOUT MERIT

Garnes claims that his criminal history score under U.S.S.G. § 4A1.1 should not have included one point for a 1986 arrest for possession of marijuana. Notably Garnes did not raise this claim on direct appeal, does not allege any change in the law since his appeal and, indeed, did not raise the claim in connection with his resentencing.[4] Thus Garnes has waived the claim. See Treistman v. United States, 124 F.3d 361, 369 n.8 (2d Cir. 1997).

Moreover, the claim is without merit. Garnes received a point because he was sentenced in 1986 to pay a $25 fine for unlawfully possessing marijuana. That fine qualified as a prior sentence under U.S.S.G. § 4A1.2(a)(1) and 4A1.1(c). In addition, while unlawfully possessing marijuana is neither a felony nor a misdemeanor under New York State law, it is not among the petty offenses excluded from calculation of criminal history category under the Guidelines, U.S.S.G. § 4A1.2(c). Thus, Garnes was properly assessed the point.

---

[4] The criminal history point was not discussed at Garnes's 1991 sentencing. However, defense counsel referred at sentencing to a letter he had submitted "concerning the criminal history category." (A 31). The government has not been able to locate that letter to determine whether Garnes's current claim was raised.

19

CONCLUSION

      For the foregoing reasons, the amended judgment of the district court, which granted in part and denied in part Garnes's petition pursuant to 28 U.S.C. § 2255 should be affirmed.

Dated:  Brooklyn, New York
        April 3, 2000

                      Respectfully submitted,

                      LORETTA E. LYNCH,
                      United States Attorney,
                      Eastern District of New York.

EMILY BERGER,
ANDREW J. FRISCH;
Assistant United States Attorneys,
      (Of Counsel).

R. 81

A P P E N D I X

# TABLE OF CONTENTS

                                                            Page

Introduction At Trial Of Stipulations . . . . . . . . . . . GA  1

Government Brief on Direct Appeal . . . . . . . . . . . . . GA  7

Summary Order Affirming Direct Appeal . . . . . . . . . . . GA 25

R. 83

6 A    1

401

FILED

IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D. N.Y.

★    1989    ★

P.M._____
TIME A.M._____

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - -    X

UNITED STATES OF AMERICA,    :    CR-88-00496(S-4)

    Plaintiff,    :

    -against-    :

                            United States Courthouse
                            Brooklyn, New York

MARK GARNES,
a/k/a "Country",    :

                            November 2, 1989
    Defendant.    :    10:15 o'clock p.m.

- - - - - - - - - - -    X

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE EDWARD R. KORMAN
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:    ANDREW J. MALONEY
                        United States Attorney
                        BY:  LESLIE R. CALDWELL
                        Assistant United States Attorney
                        225 Cadman Plaza East
                        Brooklyn, New York

For the Defendant:    EDWARD P. JENKS, ESQ.

Court Reporter:    Gene Rudolph
                        225 Cadman Plaza East
                        Brooklyn, New York
                        718-330-7687

Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

GR    OCR    CSR    CM    R. 84

6A   2

1   THE COURT:  Obviously it is not irrelevant.

2   MS. CALDWELL:  It is not cumulative.

3   THE COURT:  It is not necessary.

4   MS. CALDWELL:  What is Your Honor's ruling?

5   THE COURT:  I am not allowing any of it.  Let's go.

6   (In open court.)

7   MS. CALDWELL:  Your Honor, in light of your ruling, we

8   have just some stipulations to read into the record.

9   THE COURT:  Go ahead.

10   MS. CALDWELL:  The first one is marked as Government

11   Exhibit 92.  Government Exhibit 92 reads as follows:

12   It is hereby stipulated and agreed by and among the

13   undersigned counsel for all parties that if Any Siegel were

14   called to testify at the trial of this case, she would testify

15   as follows:

16   She is employed as sales coordinator of the MobileComm

17   Company, a company which leases beepers and other paging

18   devices.  As sales coordinator, Ms. Siegel is a custodian of

19   records of the MobileComm Company.

20   She's examined the records of the MobileComm Company

21   relating to subscriber information for beeper number

22   (212) 277-5689.  Those records include Government Exhibit 91

23   and are kept in the course of the MobileComm Company's

24   regularly conducted business and it is the regular practice of

25   the MobileComm Company to keep those records.

GA    3

1    Those business records marked as Government Exhibit 91

2    reflect the following.

3    Between June 3, 1988 and October 18, 1988, the beeper

4    corresponding to telephone number (212) 277-5689 was leased to

5    Tony Garnes, 2727 West 28th Street, Brooklyn, New York.

6    The government offers Exhibits 91 and 92 in evidence.

7    MR. JENKS:  No objection.

8    THE COURT:  91 and 92 are in evidence.

9    (So marked.)

10    MS. CALDWELL:  The next stipulation reads as follows:

11    It is hereby stipulated and agreed by and among the

12    undersigned counsel for all parties that if Maryann Garner were

13    called to testify at the trial of above case she would testify

14    as follows:

15    She is employed in the Security Department of the New

16    York Telephone Company and is a custodian of records of the New

17    York Telephone Company.

18    She has examined records of the New York Telephone

19    Company relating to subscriber information for telephone

20    numbers (718) 265-2008, (718) 265-3026, (718) 827-8244 and

21    (718) 322-5127.

22    Those records are kept in the course of the New York

23    Telephone Company's regularly conducted business and it is the

24    regular practice of the New York Telephone Company to keep

25    those records.

441

6A       A

1      Those business records reflect the following.

2      During the period of February through June, 1988,

3   telephone number (718) 265-2008, was subscribed to Carmen

4   Ayala, 2727 Surf Avenue, apartment 528, Brooklyn, New York.

5      During the period June through August, 1988, telephone

6   number (718) 265-3026 was subscribed to Carmen Ayala, 2727 Surf

7   Avenue, apartment 528, Brooklyn, New York.

8      During the period February through August, 1988,

9   telephone number (718) 827-8244 was subscribed to G. Barfield

10   and billed to D. Gibbs, both at 1266 Sutter Avenue, apartment

11   4-B, Brooklyn, New York.

12      During the period February through August, 1988,

13   telephone number (718) 322-5127 was subscribed to Miriam

14   Rodway, 111-32  146th Street, Jamaica, Queens, New York.

15      Your Honor, I offer Government Exhibit 93 at this

16   time.

17      MR. JENKS:  No objection.

18      THE COURT:  93 in evidence.

19      (So marked.)

20      MS. CALDWELL:  The next stipulation relates to the

21   narcotics and reads as follows:

22      It is hereby stipulated and agreed by and among the

23   undersigned counsel for all parties that if Mohini Motwani were

24   called to testify at the trial of the above case she would

25   testify as follows.

6 A  442

1    She's a chemist with the New York City Police

2 Department laboratory.

3    On or about August 25, 1988, she performed laboratory

4 analyses of the contents of Government Exhibits 1, 2, 3, 4, 5

5 and 6. Based on her analyses, Ms. Motwani reached the

6 following conclusions.

7    Government Exhibit 1 consists of eight hundred vials,

8 each of which contains cocaine base, also known as crack.

9    The net weight of Government Exhibit 1 is two and a

10 half ounces, plus 16 grains.

11    Government Exhibit 2 consists of 526 vials, each of

12 which contains cocaine base, also known as crack. The net

13 weight of Government Exhibit 2 is 1 and 5/8 ounces plus 18

14 grains.

15    Government Exhibit 3 consists of one bag, which

16 contains cocaine base, also known as crack. Net weight of

17 Government Exhibit 3 is one ounce plus 51 grains.

18    Government Exhibit 4 consists of 31 vials, each of

19 which contains cocaine base, also known as crack. The net

20 weight of Government Exhibit 4 is 52 grains.

21    Government Exhibit 5 consists of 201 vials, each of

22 which contains cocaine base, also known as crack. The net

23 weight of Government Exhibit 5 is 5/8 of an ounce plus 20

24 grains.

25    Government Exhibit 6 consists of two hundred

6 A     8                                    443

1    envelopes, each of which contains heroin.  The net weight of

2    Government Exhibit 6 is 1/8 ounce plus 5 grains.

3          And finally, Government Exhibit 13 consists of 120

4    envelopes packed in rice.  The 120 envelopes contain heroin.

5    Net weight is the -- excuse me, is the weight of the substance

6    analyzed exclusive of the packaging.

7          The government rests.

8          I will offer, I'm sorry, I will offer 94 into

9    evidence.

10          MR. JENKS:  No objection.

11          THE COURT:  94 in evidence.

12          (So marked.)

13          MR. JENKS:  May we approach, Your Honor?

14          THE COURT:  Yes.

15          (Side bar follows.)

16          MR. JENKS:  Your Honor, it might be a good point at

17   this time to take a quick two minute recess.  I am going to

18   call one short witness and that should be it.

19          Also, with respect to the last count against Garnes in

20   the indictment, I'd ask for a Rule 29 judgment of acquittal on

21   using the gun during and in relation to a narcotic trafficking

22   crime.

23          The only testimony we've had about a gun anywhere has

24   been from Viola Nichols.

25          THE COURT:  What does that mean?  I don't understand.

GR          OCR      CSR      CM              R. 89



91-1041

United States Court of Appeals

For the Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

—against—

LORENZO NICHOLS, HOWARD MASON, LOUISE
COLEMAN, AMOS COLEMAN, VIOLA CLARKE,
JOANNE MCCLENDIN NICHOLS, IDA NICHOLS,
MARICA NICHOLS WILLIAMS, MARTHA CRAFT,
CAROL CRAFT, CLAUDIA MASON, WILSTER SEN-
NER, KAROLYN JASON, MARK GARNES, BARRY
WILLIAMS, MAN SING ENG, BAFAN CRAIG, JOSEPH
ROGERS, CHARL DAVIS,

*Defendants,*

—and—

THOMAS GARNES,

*Defendant-Appellant.*

On Appeal from the United States District Court
For The Eastern District of New York

BRIEF FOR THE UNITED STATES

ANDREW J. MALONEY,
*United States Attorney,*
*Eastern District of New York.*

EMILY BERGER,
HENRY J. KACISTEK,
*Assistant United States Attorneys.*

R. 90

# TABLE OF CONTENTS

|  | PAGE |
|---|---|
| TABLE OF AUTHORITIES | ii |
| PRELIMINARY STATEMENT | 2 |
| STATEMENT OF FACTS | 3 |
| A. Introduction | 3 |
| B. The Suppression Hearing and the District Court's Ruling | 3 |
| 1. The Government's Evidence | 4 |
| 2. Garnes' Evidence | 7 |
| 3. The Court's Ruling | 8 |
| C. The Trial | 9 |
| 1. The Government's Evidence | 9 |
| a. Nichols' Role in the Organization | 10 |
| b. Nichols' Contacts with Garnes | 10 |
| c. The Los Angeles Airport Stop | 13 |
| d. The Jewelry Purchase | 13 |
| e. The Search | 14 |
| 2. The Defense Case | 16 |
| 3. The Court's Charge | 17 |
| D. The Post-Trial Motions | 17 |
| ARGUMENT: | |
| POINT ONE—THE DISTRICT COURT PROPERLY DENIED GARNES' MOTION TO SUPPRESS | 19 |

PAGE

POINT TWO—GARNES RECEIVED EFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL. . . . . . . . . . . . . . . 25

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . 28

TABLE OF AUTHORITIES

Cases:

Coolidge v. New Hampshire, 403 U.S. 443 (1971). . 24, 25

Murray v. Carrier, 477 U.S. 478 (1986). . . . . . . . . . . 26

Schneckloth v. Bustamonte, 412 U.S. 218 (1973). . . . . . . . . . . . . . . . . . . . . . 21, 22, 24

Strickland v. Washington, 466 U.S. 668 (1984). . . . . 26

United States v. Arango-Correa, 851 F.2d 54 (2d Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

United States v. Boston, 508 F.2d 1171 (2d Cir. 1974), cert. denied, 421 U.S. 1001 (1975) . . . . . 23

United States v. Crespo, 834 F.2d 267 (2d Cir. 1987), cert. denied, 485 U.S. 1007 (1988) . . . . . . . . . 24

United States v. DiTommaso, 817 F.2d 201 (2d Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . 26

United States v. Ebner, 782 F.2d 1120 (2d Cir. 1986) 27

United States v. Gay, 774 F.2d 368 (10th Cir. 1985) 23

United States v. Gonzales, 842 F.2d 748 (5th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . 23

United States v. Mast, 735 F.2d 745 (2d Cir. 1984. 20

United States v. Mendenhall, 446 U.S. 554 (1980). . 23

United States v. Puglisi, 790 F.2d 240 (2d Cir.), cert. denied, 479 U.S. 827 (1986). . . . . . . . . . 20-22

PAGE

United States v. Ramirez-Cifuentes, 682 F.2d 337 (2d Cir. 1982). . . . . . . . . . . . . . . . . . . . . . 20

United States v. Reiter, 897 F.2d 639 (2d Cir.), cert. denied, 111 S. Ct. 59 (1990). . . . . . . . . 26, 28

United States v. Sanchez, 635 F.2d 47 (2d Cir. 1980). . . . . . . . . . . . . . . . . . . . . . 21, 22, 24

United States v. Tussa, 816 F.2d 58 (2d Cir. 1987). 27

United States v. Zapata-Tamallo, 833 F.2d 25 (2d Cir. 1987). . . . . . . . . . . . . . . . . . . . . . 20

iii

GA     10

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

### Docket No. 91-1041

UNITED STATES OF AMERICA,

*Appellee,*

—against—

LORENZO NICHOLS, HOWARD MASON, LOUISE COLE-
MAN, AMOS COLEMAN, VIOLA NICHOLS, JOANNE
MCCLINTON NICHOLS, IDA NICHOLS, MARICA NICHOLS
WILLIAMS, MARTHA CRAFT, CAROL CRAFT, CLAUDIA
MASON, WILSON SKINNER, KAROLYN TYSON, MARK
GARNES, PARIS WILLIAMS, MAN SING ENG, BRIAN
GIBBS, JOSEPH ROGERS, CHAR T. DAVIS,

*Defendants,*

MARK GARNES,

*Defendant-Appellant.*

On Appeal From The United States District Court
For The Eastern District of New York

## BRIEF FOR THE APPELLEE

R. 93

## PRELIMINARY STATEMENT

Mark Garnes, a/k/a "Country," appeals from a judgment entered in the United States District Court for the Eastern District of New York (Korman, J.), following his conviction at a jury trial. Garnes was convicted of conspiracy to distribute heroin, in violation of 21 U.S.C. § 846, possession of cocaine base with intent to distribute, in violation of 21 U.S.C. § 841(a)(1)(A)(iii), and using and carrying firearms during and in relation to drug trafficking crimes, in violation of 18 U.S.C. § 924(c). He was sentenced on January 4, 1991 to a total of 292 months imprisonment on the narcotics counts, to be followed by a consecutive term of five years imprisonment on the firearms count and a five-year period of supervised release. The district court also imposed the mandatory $150 special assessment. Garnes is serving his sentence.

Garnes appeals his conviction on two grounds. First, he argues that the district court improperly denied his pretrial motion to suppress evidence seized during a consent search of his Brooklyn, New York apartment. Specifically, Garnes claims that the circumstances under which consent was obtained—immediately following a security sweep of the apartment by armed agents who did not indicate that consent could be refused—rendered it involuntary. Second, Garnes claims that he received ineffective assistance of counsel at trial, because his trial counsel elicited damaging testimony on cross-examination of a government witness. Although the testimony was stricken and the court twice told the jury to disregard it, Garnes claims that the jury nevertheless must have considered the testimony in voting to convict.

For the reasons that follow, Garnes' arguments should be rejected.

## STATEMENT OF FACTS

### A.    Introduction

Garnes' trial centered on his role in a Brooklyn-based street-level narcotics organization headed by Garnes' half-brother, Brian Gibbs, a/k/a "Glaze." The evidence at trial established that, between February and August 1988, Gibbs' organization regularly obtained multi-ounce quantities of heroin from Queens drug dealer Lorenzo "Fat Cat" Nichols. After buying the heroin, members of Gibbs' gang arranged to have the drug cut, packaged, and sold at retail sale points in Brooklyn. The gang also dealt in crack, which it obtained from sources other than Nichols' organization.

Garnes' conviction arose from his involvement in Gibbs' operation. Specifically, through wiretap evidence, the testimony of a co-conspirator, and evidence seized during searches of Garnes and his apartment, the government established that Garnes regularly delivered cut heroin on to one of Gibbs' workers, Lorenzo Nichols' sister and government witness Viola Nichols, for packaging. Garnes also picked up packaged heroin from Viola Nichols, paid her, and delivered packaged heroin, which he stored at his Brooklyn apartment, to retail drug spots operated by Gibbs' organization. While engaged in those activities, Garnes regularly carried firearms.

### B.    The Suppression Hearing and the District Court's Ruling

Prior to trial, Garnes moved to suppress: (i) evidence seized during a search of his apartment at 2727 Surf Avenue, Brooklyn, New York, pursuant to the consent of his girlfriend, Carmen Ayala; (ii) cash and other evidence

GA    12

seized during a stop of Garnes at the Los Angeles International Airport; and (iii) evidence seized from Garnes during a search incident to his arrest. Because Garnes raises only the first issue on appeal, we limit our discussion to the evidence and rulings on that issue.

## 1. The Government's Evidence

FBI Special Agent Charles Gianturco testified that, on August 11, 1988, he led a team of FBI agents and New York City Police Officers to Garnes' apartment at 2727 Surf Avenue, Brooklyn, New York (the "Apartment") to execute a warrant for Garnes' arrest. At approximately 6 A.M., Agent Gianturco and eight others positioned themselves outside the Apartment door. All of the men carried weapons, including one shotgun, and wore clothing identifying them as law enforcement personnel. (H. 6-8).[1]

Once the agents were in position, an agent stationed outside the building telephoned the Apartment, and reported to Agent Gianturco that a woman had answered the phone, saying that Garnes was not in. As soon as Agent Gianturco got that information, he knocked loudly on the Apartment door, announced himself as FBI, and told the occupant to "open the door." (H. 9-10). Within seconds, a woman later identified as Garnes' girlfriend Carmen Ayala opened the door, clad in sleepwear. Agent Gianturco asked Ayala whether Garnes was inside, and she replied that he was not. At that point, Agent Gianturco and the others had their weapons drawn and pointed toward the floor. (H. 11). Following Ayala's reply, all eight agents entered the Apartment, and all but Agent Gianturco swept through the Apartment looking

---

1 Citations in the form "H. ____" are to pages of the transcript of the suppression hearing.

4

for Garnes in "those particular areas where he could hide." (H. 11). Neither Garnes nor any of the items later seized from the Apartment were found during the sweep, which took approximately two minutes. (H. 12). By the time the sweep was completed, all the agents had holstered their weapons. (H. 14).

While the other agents were looking for Garnes, Agent Gianturco holstered his gun and accompanied Ayala and her five year-old child into the living room area, telling Ayala, "why don't you come in here and let the agents check and make sure that [Garnes] isn't in." (H. 13-14, 16). After Ayala and her child were seated together, unrestrained, on a couch, Agent Gianturco told Ayala that he had a warrant for Garnes' arrest, but had no warrant for her. Agent Gianturco asked Ayala whether she knew Garnes' whereabouts, and she replied that he usually got home at around 6 or 6:15 A.M. She also said that she had called Garnes' brother's home at around 3 A.M., but that Garnes had not been there. (H. 15). At some point, Agent Gianturco asked Ayala whether there were any guns or drugs in the Apartment, and Ayala replied that there were. (H. 13). Agent Gianturco then asked Ayala whether he could have her permission to search the Apartment, and she said, "yes." (H. 13).

After agreeing to allow a search, Ayala said that there were guns in the bedroom, and led Agent Gianturco there. Once there, Ayala pointed to a closet and said that the guns were "up there." Agent Gianturco directed other agents to search the closet, and asked Ayala whether there were any more guns or drugs in the Apartment. (H. 17-18). Ayala replied, "yes, in the kitchen," and led Agent Gianturco to that room. Once there, she pointed to a cabinet and said, "there is some in there." At that point, Agent Gianturco directed other agents to

5

search the cabinet, and returned to the living room with Ayala. (H. 17-18).

Agents seized five fully or partially loaded firearms and ammunition from the bedroom closet, and a loaded handgun, ammunition, heroin and crack from the kitchen cabinet. (H. 18-19). No items were seized from any other area of the Apartment, although other areas were searched. (H. 19). The search took approximately one hour, and the agents were inside the Apartment for a total of approximately one and a half to two hours. (H. 19-20).

While the search was underway, Ayala telephoned her mother and asked her to come to the Apartment, which she did. After the mother arrived, she told Agent Gianturco that Ayala recently had received psychiatric treatment and had been physically abused by Garnes. (H. 21).

During the time that the agents were at the Apartment, they had no physical contact with Ayala or her child, nor was Ayala ever restrained in any way. Agent Gianturco was the only one who asked Ayala any questions, and he spoke in a conversational tone. (H. 15). Although Agent Gianturco at one point advised Ayala that he could "put the guns and drugs on her if he wanted to," and discussed the possibility of her arrest by phone with a prosecutor and another agent, those conversations took place following the search. Prior to the search, Agent Gianturco did not threaten Ayala with arrest, nor did he make any promises of lenity toward her or Garnes. (H. 30-31, 44-45).

During the entire time agents were there, Ayala was calm and cooperative and did not cry or behave in an unusually emotional or inappropriate manner. (H. 16). Similarly, she did not appear to be under the influence of

drugs or suffering from any physical or intellectual disability. (H. 21-22, 44). Following the search, the agents left the Apartment, without arresting Ayala. (H. 20).

## 2. Garnes' Evidence

Garnes called Ayala, who testified that she and Garnes had lived together at the Apartment for three years. (H. 109). At approximately 6 A.M. on August 11, 1988, Ayala heard a knock on the Apartment door, and heard someone say, "FBI, open the door right now." She grabbed a robe and opened the door, and approximately ten agents entered the Apartment, with guns drawn and at their sides, pointing downward. As Ayala opened the door, one agent asked whether Garnes was inside, and said that they had a warrant for his arrest. When Ayala asked what the warrant was for, the agent "said something about murder." (H. 101-02).

Immediately after the agents entered the Apartment, they went into its various rooms, "looking for Mark first," then "searching the house." (H. 101, 112-13). As the other agents searched, one agent told Ayala to go into the living room, because he wanted to talk to her; once there, Ayala sat with the agent at a table, while Ayala's daughter sat on a nearby couch. The agent did not push, strike or handcuff Ayala, nor did he threaten her with his gun. (H. 101-08).

While seated at the table, the agent asked Ayala where Garnes was, and she replied that she did not know, and had been trying to contact him. The agent asked whether there were any guns or drugs in the Apartment, and Ayala replied that she did not know of any. (H. 103-04). The agent never asked Ayala for permission to search the Apartment; instead, the agents started searching, after first "looking for Mark," immediately following

R.

8

their arrival in the Apartment. (H. 104-05, 112-13). At one point about 15 minutes into the search, Ayala went to the bathroom, and saw agents searching the other rooms of the Apartment. (H. 113). After the agents found the guns and drugs, the agent who had spoken with Ayala in the living room took her to the bedroom and kitchen, and showed her where the items had been found. (H. 105). At some point, the agent told Ayala that if she cooperated, she would not be arrested. (H. 106).

Ayala, who testified that she had a tenth grade education, also testified that she had been hospitalized for psychiatric reasons three years earlier, and regularly took a medication that "calms her nerves;" however, she had not taken any on August 11, 1988. (H. 97, 107-08).

### 3. The Court's Ruling

Following Ayala's testimony, the court suggested to her that "it might be more helpful to [Garnes] if you told the truth than if you lie," but Ayala insisted that she had testified truthfully. (H. 123). After Ayala was excused, the court stated that Ayala's testimony was "largely incredible" and rejected her claim that she never consented to the search. (H. 155-56). The court then stated:

> I don't have her testimony as to why she consented to the search. That is ... her testimony was that she never consented. So I don't have—which I don't accept either. So to that I don't have anybody telling me, I consented, but I did it because, you know I was afraid. I mean I—I basically almost have to find or fill in that blank that is not provided by the person whose [consent] was allegedly obtained in an improper way ... I mean if she came in, and if I

9

believed her, and said in effect, I was scared. There were all of these circumstances, which I don't have to go into now, I just felt that I had to consent, and if that were the testimony and I believed it, I would grant the motion. But, you know, I don't have that. And in part I don't have the basis on which to fill it in.

(H. 156).

The Court went on to note that the issue was not "whether [Ayala] was making some sort of a waiver of her rights, but ... was her consent the product of coercion by explicit or implicit means, by implied threat or covert force." (H. 157). After expressly crediting the testimony of Agent Gianturco, the court denied Garnes' motion, finding that Ayala, who was uneducated but "street smart," "readily agreed" to allow the search, possibly because she understood that she was incriminating Garnes, rather than herself. (H. 157-58).

### C. The Trial[2]

### 1. The Government's Evidence

The government's evidence came from several sources. First, an accomplice, Viola Nichols, testified and offered direct evidence of Mark Garnes' participation in Gibbs' drug operation. Nichols' testimony was corroborated by approximately 34 conversations intercepted during a

---

[2] Garnes was first tried in September 1989; however, that trial ended in a mistrial as a result of press reports regarding Gibbs and Garnes' heroin supplier, Lorenzo "Fat Cat" Nichols. After Garnes moved unsuccessfully to bar a retrial on double jeopardy grounds, he was tried again and convicted. All citations in the form "T.___" refer to proceedings at the second trial.

court-authorized wiretap on her home telephone, and searches of Garnes and his apartment.

### a. Nichols' Role in the Organization

Viola Nichols met Brian Gibbs in January 1988, following her release from New York State prison. At that time, Gibbs already was a close associate of Lorenzo Nichols, whom Gibbs had met while incarcerated. By the time Viola Nichols met Gibbs, he was operating a retail drug operation in Brooklyn, along with Garnes and others, including Herman Brothers, a/k/a "Herms." Nichols asked Gibbs for a job in his operation and, after obtaining approval from Lorenzo Nichols, Gibbs agreed to give Nichols a job packaging heroin. (T. 87-88).

In late January 1988, Gibbs delivered a quantity of heroin to Nichols at her Jamaica, Queens home, along with packaging paraphernalia, including baggies, rubber bands, and rubber stamps bearing Gibbs' "brand names," one of which was "Hit Man." (T. 89-90). After Gibbs left, Nichols contacted a neighborhood drug dealer, who showed her how to package the heroin. Thereafter, Nichols worked packaging heroin for Gibbs several times a week, until July 1988. During that period, heroin was generally delivered to Nichols and picked up by Garnes, although Herman Brothers sometimes also made deliveries. In addition, Garnes generally paid Nichols for her work, at rates ranging from $600 to $300 per ounce of heroin. (T. 89-94; 104, 108).

### b. Nichols' Contacts with Garnes

Viola Nichols was in almost daily contact with Garnes between February and late July 1988. They spoke frequently by telephone, often several times a day, and he often visited her house, usually arriving in a Volvo or on a motorcycle, to deliver drugs or money. (T. 100-103). On other occasions, Garnes visited Nichols' house to socialize with Linda Rodway, a Queens woman who sometimes helped Nichols bag heroin. (T. 105-06).

During their numerous conversations, Garnes and Nichols discussed various aspects of Gibbs' operation. Garnes told Nichols that the heroin was sold in Brooklyn and that he was responsible for supplying the "spots." To simplify that task, Garnes told Nichols, he kept a supply of narcotics in his Brooklyn apartment, where he lived with a girlfriend, Carmen Ayala. (T. 93-94, 96). When Nichols asked Garnes one day about a large quantity of crack that he was carrying, he explained that he and Gibbs also sold crack. (T. 96-97). Also, whenever Garnes came to Nichols' home to deliver or pick up narcotics, he carried a gun; Nichols saw him with different guns on different occasions. (T. 97, 111-13).

Garnes was intercepted in a number of wiretapped conversations in which he, Nichols, Gibbs and others discussed their drug business, sometimes in a Pig-Latin type slang. (T. 113-14). In many of those conversations, Garnes called Gibbs and others from Nichols' home; other times, Nichols and Garnes spoke by phone. Those conversations corroborated Nichols' testimony concerning Garnes' role in Gibbs' organization. For example, on March 18, 1988, Nichols told Garnes in Pig-Latin that she needed a rubber stamp of the sort used to stamp "brand names" on packages of heroin. Garnes replied, "Es-yay, es-yay, ou-yay onna-gay it-gay on-way. OK? [Yes, yes, you gonna get one.]". (GA. 2, T. 135).[3]

Garnes also frequently discussed Nichols' "job" over her phone. For example, on June 3, 1988, Garnes, who

---

3 Citations in the form "GA" are to the Government's Appendix submitted with this brief. Citations in the form "AA" are to the Appendix submitted by appellant Garnes.

12

was at Nichols' home, telephoned Gibbs and told him that Nichols was demanding $750 for work that she had done. Gibbs asked Garnes whether Nichols, who was bagging heroin at the time of the call, had "finished." After Garnes when she finished, I'll see her," Gibbs said, "Tell her when she finished, I'll see her." Garnes then told Nichols, "When you finish that thing, we'll see you." (GA. 6, T. 153).

On the night of June 3, 1988, Garnes, who was still at Nichols' house, discussed the heroin she was bagging. After Nichols said, "I'm gonna tell you something. After I do this right here . . ," Garnes replied, "You're gonna do the rest." Nichols responded, "Oh, I know I am. I'm gonna do it tonight. But this on the table. If I bag . . . a thousand dollars and I put the rest of it in bags . . ." Garnes replied, "Then you can do 'em tomorrow." (GA. 8-9, T. 158-59).

At one point in June 1988, the Gibbs organization had difficulty obtaining heroin from its sources. Nichols discussed the problems several times with with Gibbs and Garnes. For example, on June 16, 1988, Nichols asked Garnes, "Shit, why don't you all buy some from somewhere?" When Garnes failed to reply, Nichols volunteered to go "uptown" to pick up drugs, saying, "I ain't never scared to go pick up no, no drugs. I used to go pick up ten, twenty damn keys." (GA. 19-20, T. 175).

Nichols stopped working for Gibbs and Garnes in July 1988, after they accused of her of tampering with some of their heroin. Nichols discussed the situation with both Gibbs and Garnes in several recorded conversations. For example, on July 26, 1988, Nichols asked Garnes whether she was going to be "wi-zerking [working]." Garnes replied that it was up to Gibbs, then complained that their drugs were not selling, and that Gibbs

13

still got shit piled up. The same shit you gave us. The shit's fucked up. Nobody wants it," Nichols replied, "Picture me gonna do something like that. I ain't gonna cut off the . . . hand that feed me." (GA. 41-42, T. 197-98).[4]

### c.   The Los Angeles Airport Stop

Los Angeles County Deputy Sheriff Robert Mallon, who was assigned to a drug and currency task force at the Los Angeles International Airport, testified that he stopped Garnes and two companions there on June 9, 1988. After Garnes produced an identification card and airline ticket in different names, Deputy Mallon asked Garnes whether he was carrying any large sums of cash or drugs.[5] When Garnes replied that he was not, Deputy Mallon asked for and received permission to search Garnes' shoulder bag. Inside the bag, Deputy Mallon found $31,295, mostly in small bills. (T. 321-23).[6]

### d.   The Jewelry Purchase

Manhattan jeweler Peter Marsten testified that, in the second week of June 1988, Garnes purchased custom-made jewelry from him for a total of $4,825. Garnes paid for the jewelry in cash. However, after an initial down

[4] In addition to the calls linking Garnes to drug trafficking, there were also several calls indicating that he lived in the 2727 Surf Avenue apartment with Carmen Ayala. For example, on June 10, 1988, Garnes, who was at Nichols' home, called Ayala at the Apartment. Garnes told Ayala that he had to take care of some things, "then I'm coming home." (GA.15).

[5] The identification card listed Garnes' address as 2727 West 28th Street, Brooklyn, New York. (T. 321). That is another address for the building at 2727 Surf Avenue. (T. 353).

[6] Garnes told Viola Nichols about the currency seizure (T. 110-11), and, in a wiretapped conversation on June 16, 1988, Nichols discussed the seizure with Gibbs, who said that "Country" had "fucked up a lot of motherfucking paper [money]." (GA. 23, T. 177-78).

14

payment, he told Marsten that "he had a problem that he said happened in L.A. that he wouldn't be able to pay me so quickly." (T. 218).

### e. The Search

FBI Special Agent Charles Gianturco testified regarding the search of the Apartment. Agent Gianturco's testimony was substantially the same as that at the suppression hearing, except that he did not testify on direct examination about statements made to him by Garnes' girlfriend, Carmen Ayala. On cross-examination, however, Garnes' counsel elicited the following testimony:

Q: Now, you testified too that in the course of your investigation while you were in the apartment, Carmen Ayala said that the guns and drugs belonged to Mark Garnes, is that what she said?

A: Correct.

Q: She orally told you that, correct?

A: Yes.

Q: You have been an FBI agent 12 years?

A: Correct.

Q: Did it ever dawn on you to write it down in writing and have her sign a statement that the guns and drugs in that apartment belonged to Mark Garnes?

(T. 373).

7 In addition, FBI Special Agent Kevin Morrissey testified that some of the heroin seized was inside packets stamped "Hit Man." (T. 392).

15

After counsel asked Agent Gianturco several more times whether it would have been good practice to obtain a written statement from Ayala regarding Garnes' ownership of the drugs and guns (T. 374-75), counsel attempted to impeach Ayala's reliability by eliciting testimony regarding her alleged psychiatric problems. (T. 875). At that point, the court held a sidebar, at which the following exchange took place:

THE COURT: I want to be sure I heard correctly during the direct examination. Did he testify that she told him that the guns belonged to Mark Garnes?

MS. CALDWELL: No, he did not.

THE COURT: That's what I thought.

MS. CALDWELL: He testified to that in the suppression hearing.

THE COURT: I know.

MR. JENKS: We both [counsel and Garnes] thought she said the guns and drugs belonged to Garnes.

THE COURT: Did she say that?

MS. CALDWELL: She did but he did not say that today.

MR. JENKS: Not today. We both thought that he did. That's why we are asking the questions.

(T. 376).

Following that exchange, the court asked defense counsel how he wished to proceed and counsel replied that he preferred to let the matter drop. (T. 379-80). The court then directed the government not to mention

Agent Gianturco's reference to Ayala's statement in its summation. (T. 379).

The following day, the court struck a portion of Agent Gianturco's testimony, telling the jury:

Ladies and gentlemen, before we begin . . . Agent Gianturco testified with respect to conversations, certain conversations that he had with Carmen Ayala, who occupied the apartment where he went to make the arrest of the defendant. Those conversations are not relevant to this case and I am striking that testimony and you should disregard any testimony about any conversation that Agent Gianturco had with Carmen Ayala relating to the consent to search or anything else. It is irrelevant. Strike it. Don't consider it in reaching a verdict in this case.

(T. 409).

## 2. The Defense Case

Garnes called one witness, Linda Rodway. Rodway, who had been riding a motorcycle with Garnes at the time of his arrest on August 11, 1988 (T. 387-39), testified that she met Garnes at Viola Nichols' house in March 1988, and they began dating. (T. 447). Rodway said that she frequently went to Nichols' home and smoked cocaine, while Nichols smoked crack; Rodway also helped Nichols bag heroin. (T. 452). While at Nichols' home, Rodway frequently saw numerous people whom she knew to be drug dealers, including Gibbs. (T. 457-58). Although Garnes also was a frequent visitor to Nichols' home, sometimes in the company of Gibbs, Rodway never saw Garnes with drugs. (T. 448, 458).

## 3. The Court's Charge

During its charge, the court referred again to the fact that it had stricken a portion of Agent Gianturco's testimony. In its general charge regarding what type of evidence the jury could consider, the court told the jury that it could not consider evidence that had been stricken. The court said:

In that regard, I call your attention to the fact that I struck certain testimony of Agent Gianturco relating to conversations that he had with Carmen Ayala at the time the arrest warrant was sought to be executed. You should disregard that testimony and pay no attention whatever to it in reaching your verdict.

(T. 526).

## D. The Post-Trial Motions

Following his conviction, Garnes moved for a new trial on the ground that he was denied effective assistance of counsel as a result of his attorney's questions to Agent Gianturco. Garnes claimed, as he does here, that Agent Gianturco's testimony was devastating, as it provided a crucial link, about which there otherwise allegedly was a reasonable doubt, between Garnes and the contraband found in his apartment.

Following argument, the court denied Garnes' motion, ruling that:

I'm going to deny that motion as I have indicated, Mr. Garnes, I think he represented you competently. There was that one incident at the trial which probably

GA    19

18

falls into the realm of incompetence, but I don't think that it would have made the slightest bit of difference in the jury's verdict. If I did, I would set aside the verdict. The evidence was so overwhelming that it would have taken a miracle to have resulted in a not guilty verdict in this case.

(AA. 33).

Garnes also moved for a new trial on the ground that his motion to suppress the evidence seized from the Apartment should have been granted. Garnes' arguments were virtually identical to those raised here. Specifically, he claimed that given Ayala's age, her lack of education, her alleged psychiatric problems, the time of day, and the fact that she consented to a search following a security sweep—which she might have confused with a search—by armed agents, her consent was merely "acquiescence in the face of authority," and was void. Indeed, Garnes claimed, as he does again here, that "any reasonable person under these circumstances would believe that his or her consent was irrelevant, as the agents were going to continue their search whatever she said." (GA. 45-46).

The district court denied Garnes' motion, first stating that, although Ayala had falsely denied giving consent, it nonetheless was required to consider the possible effect of the agents' conduct on her psychological state. (AA. 28). After noting that the "question is whether she believed if she said no they would have gone ahead and searched anyway," the district court noted that the agents expressly told her that the purpose of the security sweep was to look for Garnes. Moreover, Ayala's own testimony that the agents went "looking for Mark first" indicated that she understood that the sweep had a lim-

19

ited purpose. Given the circumstances, the district court held:

I find that the government has met its burden of establishing that the consent was voluntary, as the Supreme Court has used that term. As I indicated in my earlier opinion there was no force, coercion, no one threatened her. Although they entered with guns drawn, the testimony of the agent and Carmen Ayala both confirmed that the guns were not pointed. They were pointed downward. They told her that they were going to look through the apartment for Mark Garnes, they did not search or seize any physical evidence before she consented, they asked for her consent to search, she readily gave it, and I find that her consent was not simply an acquiescence to authority in the sense that the Supreme Court has used that term. . . .

(AA. 32-33).

# ARGUMENT

## POINT ONE

### THE DISTRICT COURT PROPERLY DENIED GARNES' MOTION TO SUPPRESS

Garnes challenges the district court's finding that Ayala's consent to search was voluntary. He contends that Ayala's consent was merely acquiescence in the face of authority, because it came after a security sweep by armed agents, when "any reasonable person . . . would believe that his or her consent was irrelevant, as the

R. 102

20

gents were going to continue their search whatever she [s]aid." (Br. at 21). Garnes points to additional factors which he claims negate the finding of voluntariness, namely Ayala's alleged psychiatric problems, her limited education and the fact that she was not told that she could refuse consent. Garnes' argument is unsupported by the record and is wrong.

As an initial matter, Garnes' arguments are identical to those raised and rejected below. This Court must, of course, uphold the district court's factual findings so long as they were not clearly erroneous. United States v. Puglisi, 790 F.2d 240, 244 (2d Cir.), cert. denied, 479 U.S. 827 (1986); United States v. Mast, 735 F.2d 745, 749 (2d Cir. 1984); United States v. Ramirez-Cifuentes, 682 F.2d 337, 344 (2d Cir. 1982). Moreover, when, as in this case, the district court's factual findings rest largely upon its assessment of the credibility of the witnesses who testified at the suppression hearing, this Court's review is even more circumscribed. United States v. Zapata-Tamallo, 833 F.2d 25, 27 (2d Cir. 1987); United States v. Puglisi, 790 F.2d at 243.

In this case, the record fully supports the district court's finding that, notwithstanding Ayala's testimony to the contrary, she "readily agreed" to allow a search of the Apartment; indeed, Garnes implicitly concedes the fact of Ayala's consent. The record also firmly supports the district court's other conclusion, that Ayala's consent was voluntary, rather than a product of coercive police conduct.

It is well-established that a valid search of a premises may be made without either a warrant or probable cause if a person in control of the premises voluntarily consents. Schneckloth v. Bustamonte, 412 U.S. 218, 248 (1973). The government has the burden of showing by a

21

preponderance of the evidence that the consent was "voluntarily given, and not the result of duress or coercion, express or implied." Id.; accord, United States v. Arango-Correa, 851 F.2d 54, 57 (2d Cir. 1988). The test of voluntariness is whether the consent was the product of an essentially free and unconstrained choice by its maker [citation omitted], and is a question of fact to be determined from all of the surrounding circumstances." Arango-Correa, 851 F.2d at 57.

In examining the "totality of the circumstances," the district court must determine from the evidence all the circumstances surrounding the consent, assess the psychological impact of those circumstances on the consenting party, and evaluate the legal significance of the party's reactions. Schneckloth, 412 U.S. at 226. Accord, United States v. Sanchez, 635 F.2d 47, 61 (2d Cir. 1980). Indeed, even when the consenting party has deliberately given false testimony denying consent, the court nonetheless should consider the possibility that the circumstances "may have led [the party] to believe that the officers had the right and intention to search [her] apartment even if [s]he did not consent." Sanchez, 635 F.2d at 47.

Factors to be considered in assessing the voluntariness of consent include whether and for how long the consenting individual was in custody at the time of consent; the nature and duration of any pre-consent interrogation; the behavior of law enforcement agents prior to obtaining consent, including whether guns were drawn or the consenting individual was frisked, threatened or promised leniency; whether the consenting individual was advised of the option to refuse consent; whether the consent was obtained in a public or private area; the consenting individual's physical and mental condition at the time of the consent; the individual's age, intelligence, level of educa-

R. 103

tion and prior experience with the law; and any assistance provided in connection with the search. *See, e.g., Schneckloth v. Bustamonte*, 412 U.S. at 226; *Arango-Correa*, 851 F.2d at 67; *Puglisi*, 790 F.2d at 243. No one factor is dispositive; indeed, courts have found consents voluntary despite the presence of one or more factors that might indicate involuntariness. *See* cases cited at p. 26, *infra.*

Applying this, it is clear that the district court was correct in finding Ayala's consent voluntary. Notably, despite Ayala's false testimony denying consent, the court nonetheless expressly and thoroughly considered all the circumstances surrounding the consent to determine whether they "may have led [Ayala] to believe that the [agents] had the right and intention to search [her] apartment even if [s]he did not consent." *Sanchez*, 635 F.2d at 47. After correctly finding that the "question is whether she believed if she said no they would have gone ahead and searched anyway," the district court noted that the agents behaved professionally throughout their encounter with Ayala, and that:

> there was no force, coercion, no one threatened her. Although they entered with guns drawn, the testimony of the agent and Carmen Ayala both confirmed that the guns were not pointed. They were pointed downward.

(AA. 32-33).

Significantly, the agents also expressly told Ayala that the purpose of the security sweep was to look for Garnes. Moreover, Ayala's own testimony that she agents went "looking for Mark first" indicated that she understood that the sweep had a limited purpose. Once the security sweep was completed, Ayala and her child

remained unrestrained and Ayala was told that the agents had no warrant for her arrest. In addition, Ayala assisted the agents in their search, leading them to all the guns and drugs in the apartment. Finally, during the entire time the agents were there—which did not exceed two hours—Ayala appeared calm, cooperative and to fully understand what was occurring. Given these factual findings, grounded in the court's assessment of credibility, the district court was plainly not clearly erroneous in concluding that Ayala's consent was voluntary.

The finding of voluntariness is not undermined by Ayala's lack of education and Garnes' claim that she had "deep psychiatric problems" and used prescription drugs. Although Garnes argues that, due to these factors Ayala could not have been expected "to intuit the vagueries of Fourth Amendment law and understand that the initial two-minute search was merely a 'sweep' of areas where a person might be secreted, and that any more intimate search required her consent" (Br. at 21), consents have been found voluntary notwithstanding that the consenting party was uneducated, *e.g., United States v. Mendenhall*, 446 U.S. 554, 558 (1980) (plurality opinion) (22 year-old with 11th grade education capable of valid consent); *United States v. Gonzales*, 842 F.2d 748, 755 (5th Cir. 1988) (defendant with sixth grade education who had no trouble communicating with police capable of valid consent); or was in a possibly vulnerable subjective state, *e.g., United States v. Boston*, 508 F.2d 1171, 1178-79 (2d Cir. 1974), *cert. denied*, 421 U.S. 1001 (1975) (defendant's girlfriend validly consented to search of her apartment although alone with children and clad only in robe when confronted in early morning by four armed agents); *United States v. Gay*, 774 F.2d 368, 377 (10th Cir. 1985) (consent valid when defendant mentally aware and answered questions, despite intoxication).

In any event, the district court expressly considered Ayala's level of intelligence and tenth grade education, concluding that, although uneducated, Ayala was "street smart" and "not dumb" (H.157), and was "perfectly capable of understanding what was going on." (AA. 25). As to Ayala's alleged "deep psychiatric problems" and use of prescription drugs, Garnes' exaggerated description of those conditions and his claim that either affected Ayala's ability to consent to a search have no basis in the record. Indeed, the only evidence of any psychiatric problem was Ayala's mother's statement to Agent Gianturco, and Ayala's own testimony, that she had been treated three years earlier, partly as a result of physical abuse by Garnes. Similarly, although Ayala said that she took prescription medicine, she had taken none on the day of the search, and behaved normally throughout her encounter with the agents.

Nor is it dispositive that Ayala was not told that she could refuse consent. *E.g., Schneckloth*, 412 U.S. at 248-49 (consent valid although person was not advised of the option to refuse consent); *United States v. Crespo*, 834 F.2d 267, 271 (2d Cir. 1987), *cert. denied*, 485 U.S. 1007 (1988) (consent valid although defendant first arrested, frisked and handcuffed, and never advised of right to refuse).

In sum, given the absence of coercive police tactics that Ayala could "reasonably [have] viewed as the exercise of authority" to search, or credible testimony indicating that she believed that she had no choice other than to consent, *Sanchez*, 635 F.2d at 61, Garnes cannot seriously contend that the district court's ruling was clearly erroneous. *See Schneckloth*, 412 U.S. at 247. *Compare Coolidge v. New Hampshire*, 403 U.S. 443, 488 (1971) (exclusionary rule inapplicable to items voluntarily delivered to police by defendant's wife, unless "some type of

unconstitutional police conduct occurred"). Indeed, under these circumstances, the opposite conclusion would have been clear error. As the district court suggested, Ayala's consent may have been the product of many factors, including her understanding that she was incriminating Garnes, rather than herself. As the Supreme Court has recognized:

> [t]here no doubt always exist forces pushing [a] spouse to cooperate with the police. Among these are the simple but often powerful convention of openness and honesty, the fears that secretive behavior will intensify suspicion, and uncertainty as to what course is most likely to be helpful to the absent spouse. But there is nothing constitutionally suspect in the existence, without more, of these incentives to full disclosure or active cooperation with the police.

*Coolidge v. New Hampshire*, 403 U.S. at 488.

## POINT TWO

## GARNES RECEIVED EFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL

Although Garnes apparently concedes that his counsel's performance was otherwise competent (Br. at 29), he claims that a single error during cross-examination of Agent Gianturco was sufficient to "undermine confidence in the outcome" of the trial. (Br. at 30). According to Garnes, the testimony elicited—that Ayala indicated that the drugs and guns in the apartment belonged to Garnes—supplied a crucial link between Garnes and the Apartment, which was otherwise weak or missing. Also, Garnes claims that the district court's order striking the

26

evidence and the court's charge were a "cure . . . worse than the disease," serving merely to highlight Agent Gianturco's testimony. (Br. at 28-30). Garnes' argument is without merit.

To obtain reversal of his conviction, Garnes must show both that "his attorney's conduct fell below an objective standard of reasonableness [citation omitted], and that but for his attorney's unprofessional errors, the result of the proceeding would have been different." *United States v. Reiter*, 897 F.2d 639, 645 (2d Cir.), *cert. denied*, 111 S. Ct. 59 (1990). *Accord, e.g., Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984). The right to effective assistance of counsel "may in a particular case be violated by even an isolated error of counsel if that error is sufficiently egregious and prejudicial." *Murray v. Carrier*, 477 U.S. 478, 496 (1986) (Stevens, J., concurring).

As the district court found and Garnes apparently acknowledges on appeal, counsel's overall representation was entirely competent. Counsel employed a private investigator to assist him, moved before trial for suppression of evidence, vigorously cross-examined government witnesses, made appropriate and timely objections, and presented the jury with alternative theories of the case in summation. Also, as the district court pointed out, Garnes' counsel "attempted to do what any competent lawyer does in the face of . . . overwhelming evidence which is to possibly negotiate a plea." (AA. 35).

In addition, although counsel admittedly made an error in eliciting the testimony from the agent, the single error was not so egregious and prejudicial as to be "of constitutional dimension." *United States v. DiTommaso*, 817 F.2d 201, 216 (2d Cir. 1987). First, the district court struck the testimony and twice directed the jury to disre-

27

gard it. Garnes is wrong to claim that it was "naive, at best" to think that the jury would follow the court's instructions. (Br. at 30). This Court has repeatedly stated that, in the absence of proof to the contrary, juries are presumed to follow the court's instructions. *E.g., United States v. Tussa*, 816 F.2d 58, 68 (2d Cir. 1987); *United States v. Ebner*, 782 F.2d 1120, 1126 (2d Cir. 1986). Garnes presents no such proof here.

Second, even assuming *arguendo* that counsel's error constituted ineffective assistance, the error was harmless. As the district court found, counsel's error did not make "the slightest bit of difference in the jury's verdict," as "the evidence was so overwhelming that it would have taken a miracle to have resulted in a not guilty verdict in this case." (AA. 33). While Garnes glosses over the government's proof, casually referring to the accomplice's "dubious (to put it mildly) integrity and reliability" and the absurd possibility that the taped conversations may have involved someone other than Garnes (Br. at 29), even a cursory examination of the record shows that the district court correctly described the proof of Garnes' involvement in drug trafficking as overwhelming. In addition to Viola Nichols' testimony, Garnes himself was overheard in numerous wiretapped conversations discussing drugs in explicit terms. Also, Garnes had or spent more than $36,000 in cash during a two-week period in June 1988. Finally, large quantities of crack, heroin and firearms were found inside Garnes' apartment, whose only other occupants were Carmen Ayala and a five-year old child.

More to the point, contrary to Garnes' assertions, Agent Gianturco's testimony did not supply an otherwise weak or missing link between Garnes and the drugs and guns in the Apartment. First, the heroin seized there bore a brand name that Viola Nichols testified was used

SA   23

R. 106

ЄA    24

28

by Gibbs' organization, "Hit Man." Garnes was identified as a member of that organization. Also, and more damning, Garnes carried an identification card bearing his name and photograph, and the address of the Apartment, both when he was stopped at the Los Angeles Airport and at the time of his arrest. Finally and even more compelling, Garnes was overheard in wiretapped conversations speaking to Ayala about plans to "come home" to the Apartment after finishing other business.

In short, given this evidence, there was virtually no doubt of Garnes' guilt of all the charges in the indictment, and "no view of the desireable and pristine image of law requires a second . . . trial where the *outcome would unquestionably be the same.*" *United States v. Reiter*, 897 F.2d at 645 (emphasis in original) (citation omitted).

## CONCLUSION

**For the foregoing reasons, Garnes' conviction should be affirmed.**

Dated:    Brooklyn, New York
          May 8, 1991

Respectfully submitted,

ANDREW J. MALONEY,
*United States Attorney,*
*Eastern District of New York.*

EMILY BERGER,
LESLIE R. CALDWELL,
*Assistant United States Attorneys,*
    *Of Counsel.*

R. 107

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED THAT ALL PARTIES REQUIRED TO BE SERVED HAVE BEEN SERVED COPIES OF THE BRIEF FOR THE UNITED STATES BY MAIL ON MAY 13, 1991.

Richard Ware Levitt, Esq.
148 East 78th Street
New York, New York

/s/ MATTHEW E. FISHBEIN
MATTHEW E. FISHBEIN
Chief, Appeals Division

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

At a stated Term of the United States Court of Appeals for the Second Circuit, held at the United States Courthouse in the City of New York, on the    14th    day of    June    , one thousand nine hundred and ninety-one.

PRESENT:  HONORABLE WILFRED FEINBERG,
          HONORABLE JON O. NEWMAN,
          HONORABLE RALPH K. WINTER,
               Circuit Judges.

- - - - - - - - - - - - -
UNITED STATES OF AMERICA,
          Appellee,

     v.                                        91-1041

MARK GARNES,
     Defendant-Appellant.
- - - - - - - - - - - - -

UNITED STATES COURT OF APPEALS
FILED
JUN 14 1991
ELAINE B. GOLDSMITH, CLERK
SECOND CIRCUIT

O R D E R

Mark Garnes appeals from the January 4, 1991, judgment of the District Court for the Eastern District of New York (Edward R. Korman, Judge) convicting him after a jury trial of conspiracy to distribute heroin, in violation of 21 U.S.C. § 846 (1988), possession of cocaine base with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) (1988), and using and carrying firearms during and in relation to drug trafficking crimes, in violation of 18 U.S.C. § 924(c)(1) (1988). Garnes contends on appeal that drugs and guns from an apartment shared with his girlfriend were seized in violation of the Fourth Amendment and that he received ineffective assistance of counsel because his attorney elicited damaging testimony linking him to the seized contraband.

The District Court's determination that Garnes' girlfriend, Carmen Ayala, voluntarily consented to the search of the apartment finds support in the record. A team of nine FBI agents and police

Case 1:00-cv-00700-WWC-PT   Document 23   Filed 05/29/2001   Page 111 of 191

U.S.A. v. Garnes
Docket No. 91-1041

officers had gone to Garnes' apartment at 6 a.m. to execute a warrant
for Garnes' arrest and, when Ayala indicated that he was not in,
searched the apartment, with weapons drawn and pointed at the floor,
in "those particular areas where he could hide."  While the others
searched the apartment, Agent Gianturco, after holstering his gun, told
Ayala that the others were searching to "make sure that [Garnes] isn't
in" and that their arrest warrant did not extend to her.  Gianturco
then asked whether there were guns or drugs in the apartment and
whether they could search for them. Ayala replied, "yes." At no point
was Ayala physically restrained.  At the suppression hearing, Ayala
expressed the understanding that the agents and officers "went looking
for Mark first."  Under these circumstances, the District Court was
entitled to find that Ayala understood the difference between the
agents' and officers' authority to search for Garnes and their request
to search for the guns and drugs.  Their failure specifically to inform
Ayala that she could refuse their request does not invalidate her
consent.

     Garnes' contention that he was denied effective assistance
of counsel also lacks merit.  In cross-examining Gianturco, Garnes'
attorney elicited the testimony that Ayala had told the officers that
the guns and drugs belonged to Garnes.  He asked about her statement
in the mistaken belief that Gianturco had given this testimony in his
direct examination, whereas in fact the testimony was given at a
pretrial hearing.  This isolated lapse is not "sufficiently egregious
and prejudicial," Murray v. Carrier, 477 U.S. 478, 496 (1986) (cita-
tions omitted), to be "of constitutional dimension." United States v.
DiTommaso, 817 F.2d 201, 216 (2d Cir. 1987). Attorneys not infrequent-
ly elicit unfavorable testimony on cross-examination and, in this case,
any resulting prejudice was ameliorated by the District Court's
curative instructions to the jury.  In addition, there was other
evidence that linked Garnes to the guns and drugs in the apartment,

- 2 -

U.S.A. v. Garnes
Docket No. 91-1041

GA    27

including Garnes' identification card, which listed the apartment's
address, and wiretapped conversations in which Garnes told Ayala of
plans to "come home." In sum, the conduct of Garnes' attorney did not
fall below an objectively reasonable standard, and the testimony
mistakenly elicited was unlikely to have changed the outcome of the
trial.

The judgment of the District Court is affirmed.

*Wilfred Feinberg*

Circuit Judges.

N.B. This summary order shall not
be published in the Federal Reporter
and should not be cited or otherwise
relied upon in unrelated cases
before this or any other court.

- 3 -

R. 110

Docket No. 99-1524

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

UNITED STATES OF AMERICA,

Appellee,

- against -

AMOS, C.O. #1535, LOUISE COLEMAN, CAROL CRAFT,
MARTHA CRAFT, CHAR T. DAVIS, MAN SING ENG,
HOWARD MASON, BRIAN GIBBS, CLAUDIA MASON, IDA NICHOLS,
JOANNE MCCLINTON NICHOLS, VIOLA NICHOLS, JOSEPH ROGERS,
KAROLYN TYSON, WILSON SKINNER, MARCIA NICHOLS WILLIAMS,
PARIS WILLIAMS,

Defendants,

MARK GARNES,

Defendant-Appellant.

_____

CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED THAT ALL PARTIES REQUIRED TO BE
SERVED HAVE BEEN SERVED COPIES OF THE BRIEF AND APPENDIX FOR THE
UNITED STATES BY MAIL ON APRIL 3, 2000.


MARK A. GARNES PRO SE
REG. NO. 24646-053
P.O. BOX 2000-3B
FCI-ALLENWOOD MED.
WHITE DEER, PA.  17887


_____
PETER A. NORLING
Chief, Appeals Division

R. 111

IN THE UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

---

NO. 99-1524

---

UNITED STATES OF AMERICA,

Appellee,

v.

MARK GARNES,

Appellant.

---

APPELANT'S REPLY BRIEF

---

APPEAL FROM  THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NEW YORK

---

Mark A. Garnes
Pro Se Litigant
Reg. No. 24646-053
P.O. Box 2000-3B
FCI Allenwood Med.
White Deer, Pa.
17887

## TABLE OF CONTENTS

Table of Authorities...................................ii

Cases.................................................ii

Statutes.............................................iii

Preliminary Statement.................................1

ARGUMENT..........................................2, 5, 10

     POINT ONE   -   APPELLANT'S CLAIMS ARE NOT
                  PROCEDURALLY BARRED AND ARE
                  WITH MERIT.......................2


     POINT TWO   -   APPELLANT'S CLAIMS OF
                  INEFFECTIVE ASSISTANCE OF
                  COUNSEL IS NOT PROCEDURALLY
                  BARRED AND IS WITH MERIT AND
                  SHOULD BE REVIEWED DE NOVO........5


     POINT THREE -   APPELLANT'S CHALLENGE TO HIS
                  CRIMINAL HISTORY CATEGORY IS
                  NOT PROCEDURALLY BARRED AND
                  IS WITH MERIT....................10


Conclusion...........................................11

## TABLE OF AUTHORITIES

### CASES

<u>Billy-Eko v. United States</u>, 8 F. 3d 111, 114-115
    (2d Cir. 1993)....................................6, 8

<u>Heflin v. United States</u>, 358 U.S. 415, 420 (1959).......6

<u>Kimmell v. Morrison</u>, 477 U.S. 365, 91 L. Ed.
    2d 305, 308 (1986)...............................10

<u>McMillan v. Pennsylvania</u>, 477 U.S. 79, 91 L. Ed.
    2d 67, 106 S. Ct. 2411 (1986)....................6

<u>Murray v. Carrier</u>, 91 L. Ed. 2d 405-406 (1986).........7

<u>Patterson v. New York</u>, 432 U.S. 197, 53 L. Ed.
    2d 281, 97 S. Ct. 2319 (1977)....................6

<u>Roberts v. United States</u>, 63 L. Ed. 2d 622, 445
    U.S. 552, 100 S. Ct. 1358 (1980).................9

<u>Sparman v. Edwards</u>, 26 F. S. 2d 450, 463-464
    (E.D.N.Y. 1997)..................................8

<u>United States v. Gilliam</u>, 987 F. 2d 1009, 1014
    (4th Cir. 1993)..................................8

<u>United States v. Jones</u>, 16 F. 3d 487, 493
    (2d Cir. 1994)...................................2, 4

<u>United States v. Onwubiko</u>, 969 F. 2d 1392, 1397
    (2d Cir. 1992)...................................11

<u>United States v. Ready</u>, 82 F. 3d 551, 555
    (2d Cir. 1996)...................................11

<u>United States v. Stinson</u>, 97 F. 3d 466, 469
    (11th Cir. 1996).................................3

<u>United States v. Tucker</u>, 404 U.S. 443, 92 S. Ct.
    589, 30 L. Ed. 2d 592 (1972).....................10

<u>United States v. Watts</u>, 136 L. Ed. 2d 554 (1997).......3

R. 114

# TABLE OF AUTHORITIES

## STATUTES

18 U.S.C. § 3006A(e)(1)................................8

18 U.S.C. § 3559(a)(9)................................10

18 U.S.C. § 3742(a)(2)................................11

28 U.S.C. § 2255................................3, 6, 8

U.S.S.G. § 1B1.9................................10

iii

R. 115

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

————————————————————X

Mark Garnes,                    :

      Appellant,              :

                           :

      v.                       :    99-1524

                           :

United States of America,       :

      Appellee.               :

————————————————————X

**PRELIMINARY STATEMENT**

     Appellant, Mark Garnes, here now replies to the
Appellee's Brief in Opposition of Appellant's Appeal Brief.

     Appellant received the Appellee's Brief of April 6,
2000, with the contentions that Appellant's claims are
meritless.   Appellant here illustrates that the appeal is
not meritless, in that, the claims are valid.   To which,
the narcotic offenses should be granted a new trial or
dismissed due to the firearm count being vacated by the
district court.   Appellant being denied effective assistance
of counsel impaired appellant's rights under the United States
Constitution during the trial and sentencing; and the one
point enhancement on the criminal history category should be
vacated accordingly.

     Appellant here shall establish that the claims are
valid and with merit, to which, the Court of Appeals for the
Second Circuit should grant Appellant's claims, vacating the
conviction and sentence, remanding to the district court to
develop a full factual finding, de novo to each claim.

1

## ARGUMENT

### POINT ONE

### APPELLANT'S CLAIMS ARE NOT
### PROCEDURALLY BARRED AND ARE
### WITH MERIT

The Appellee's contention is that Appellant did not raise the claim of 'prejudicial spillover' in his petition to the district court. The issue was raised in the argument, to which, Appellant notes in the Memorandum of Law in Support: "Should the firearm count be dismissed, counts one and two should be vacated on the grounds that "Retroactive Misjoinder" compels prejudicial spillover. **Appendix 2 - 3**

The Court of Appeals reversed in **United States v. Jones**, 16 F. 3d. 487, 493 (2d Cir. 1994, the government failed to prove the 'felon in possession' count, it would be unfair to allow the bank robbery convictions to stand . . . Prejudicial spillover from evidence used to obtain a conviction subsequently reversed on appeal may constitute compelling prejudice.

With great respect to the district court's jury instructions on the findings of guilty or not guilty to each count, here in the instant case, implies the law to be adhered in rendering the verdict. The instructions given are the law. Here today, the firearm count has been vacated, subjecting the verdict to scrutiny due to the instructions and the 'retroactive misjoinder' exposes the remaining counts to prejudicial spillover.

The firearm count was nullified by the district court on July 30, 1999.

2

There is no evidence to what the jury would consider regarding count three.  Considering strongly the jury adhered totally to the district court's jury instructions, appellant presumes a verdict of not guilty on the remaining counts.  The alternative is how to reconstruct the jury deliberations.

The Appellee further contends that the government, Hon. Korman, or counsel for appellant did not address the point earlier, therefore appellant waived the argument for direct appeal.  The Appellee's contentions are meritless.

Notwithstanding that the issues were not addressed on the record by the parties present at the resentencing on July 30, 1999, does not make the issues mute.  The issues are part of the 28 U.S.C. § 2255 that apprised the district court of Appellant's claims.  The claims should not be deemed as waived, but reviewed de novo.

A sentence is a package of sanctions that the district court utilizes to effectuate its sentencing intent consistent with the Sentencing Guidelines . . .  Under this holistic approach, when a criminal sentence is vacated, it becomes void in its entirety; the sentence--including any enhancements has been wholly nullified and the slate is wiped clean.  **United States v. Stinson**, 97 F. 3d 466, 469 (11th Cir. 1996).

Furthermore, a jury can not render a verdict on the evidence on a vacated count, nor may the government use such evidence therein a trial or re-trial.  Evidence on a vacated count may be used for sentencing purposes only.  **United States v. Watts**, 136 L. Ed. 554 (1997).  Therefore, appellant meets

3

R. 118

one principle of the **Rooney** test demonstrated by the Appellee.
The admissibility of firearms as evidence in narcotics
conspiracies is only to the extent as the underlying offense
or fruits from a search, not a vacated count, only as cited in
the Appellee's Brief, as an active count.  (Page 13)   The Court
of Appeals in **Jones**, reversed, stating, "In short, the evidence
that Jones is a felon was of the inflammatory sort that may
have swayed the jury to convict him of the other charges even
if the evidence had not supported the other charges." **id.** at 493

    The firearm count would be held as compelling evidence
on the drug counts at sentencing, not before a jury, the
latter would be prejudicial, as it stands here now companioned
with the vacated count.

    Secondly, the evidence on the remaining counts is only
overwhelming to the point that clarity is to be given to the
testimony of government witness, Ms. Viola Nichols.   To which,
there are 14 calls used during the trial attributed to Appellant.
Each call illustrates the amount of narcotics in question, no
calls discuss firearms, nor addressing crack cocaine, the
remaining evidence is profile evidence supportive of the
Appellee's case.   Absent the mention of firearms, the evidence
is characterizing Appellant as a drug dealer, however, the
agents, Robert Mallon from the LAX Airport seizure of the
currency, arresting agents, nor the jeweler mentions the
presence of a firearm.   Considering a large amount of cash is
possessed, with regard to Ms. Nichols stating I always carried a
gun.  The evidence being overwhelming is to be determine by the
Court of Appeals here.

4

R. 119

The Appellee's contentions are not valid, Appellant's claims may be adjudicated de novo to further develop a full factual finding on the issues.

## POINT TWO

### APPELLANT'S CLAIMS OF INEFFECTIVE
### ASSISTANCE OF COUNSEL IS NOT
### PROCEDURALLY BARRED AND IS WITH
### MERIT AND SHOULD BE REVIEWED DE NOVO

The Appellee's contention are that **Plitman's** argument upon counsel's trial strategy to waive confrontation rights are sound. The instant case evinces otherwise, counsel's trial strategy and/or tactic was unsound, nor was counsel's sentencing strategem sound.

Appellee's, plausibly, procured an analysis at some point in time thereafter the substances in counts one and two were seized, resulting from the fruits of a 'consensual' search. Appellee's notes that the substances became known as heroin and crack as soon as chemically tested, a short time after being found in 'Appellants's' apartment. (Page 16)

The existing record before the district court does not include a Lab Report Analysis Result at any point during the preliminary proceedings, trial, sentencing. The Lab Report was not included as evidence especially at the trial to confirm the stipulation and the extent to what the chemist was to testify. Counsel failed to clarify the substance being congruent with the stipulation. Counsel during sentencing did

R. 120

not produce the Lab Report Analysis to dispute the sentence to an unknown substance or validate the substance being 'unknown.'

It is well settled that a jury must find a defendant guilty beyond reasonable doubt based upon the preponderance of the evidence.    **Patterson v. New York**, 432 U.S. 197, 53 L. Ed. 281, 97 S. Ct. 2319 (1977).

Counsel at sentencing did not produce nor address the 'unknown' substance therein the PSR, the preponderance of evidence standard is extended for sentencing purposes, in that, such standard is the proper measure to determine the burden of proof.    **McMillan v. Pennsylvania**, 477 U.S. 79, 91 L. Ed. 2d 67, 106 S. Ct. 2411 (1986).

Appellant meets the requirements applied in **Billy-Eko**, in that, Appellant stated in his Reply to Respondent's Answer (28 U.S.C. § 2255), that none of the claims were raised on appeal, because [Appellant] was not familiar with the issues until some years later.    Furtherin, [Appellant] received his entire file from appeal counsel sometime after the appeal.    To which, the Antiterrorism and Death Penalty Act was not mandated until April 24, 1996, prior to this date, a 28 U.S.C. § 2255 could be submitted at any time.    **Heflin v. United States**, 358 U. S. 415, 420 (1959).    **Appendix 4**

Counsel's failure to submit the claims on appeal is unbeknownst to Appellant.    Appellant being unfamiliar with the issues was due to the unavailability of his case file.    "A layman will ordinarily be unable to recognize counsel's errors and to evaluate counsel's professional performances . . . consequently a criminal defendant will rarely know that he has not been

6

represented competently until after trial or appeal, usually
when he consults another lawyer about his case.   Indeed, an
accused will often not realize claim until he begins collateral
review proceedings. . ."   **id.** at 321    A competent and
skilled attorney perusing the transcripts and documents therein
an assigned case is believed to notice claims that a layman
would by-pass, such oversights constitutes a 'cause.'

Counsel's failure to raise the claims hereto were of
constitutional dimensions, in which, the skilled eye would
detect.  ". . . an attorney's error constitute cause because,
whereas tactical decision implies that counsel has, at worst,
'reasonably but incorrectly exercise[d] judgment,' ignorance
or oversight implies that counsel 'fail[ed] to exercise it at
all, in dereliction the duty to represent . . .   Thus, in order
to establish cause a federal habeas petitioner need only
satisfy the district court 'that the failure to object or to
appeal a claim was the product of his attorney's ignorance or
oversight, not a deliberate tactic."   The court here in
**Murray v. Carrier**, 91 L. Ed. 2d 397, at 405-406, went on to
state that the lack of testimony from Carrier's counsel which
might disclose a strategic reason for failing to appeal was
absent.   To which, it was rendered that the district court
resolve the matter upon taking further evidence.

Counsel's trial strategy and/or trial tactic was not
binding nor sound, the waiver of Appellant's confrontation
right was violated, counsel stipulation was unsupported by fact.

R. 122

Counsel conceded to the stipulation without consideration to
the Lab Report Analysis Result that posits the dispute of the
stipulation being set upon misleading facts, as noted in the
PSR, an 'unknown' substance.    Surely the Probation Officer
derived here conclusion that the substance was 'unknown' from
a reliable source of information.    Considering the substances
of counts one and two were in government custody for chemical
testing since the arrest of Appellant on August 11, 1988.

Appellant here asserts that counsel's trial strategy
and/or trial tactic was unsound.    In that, Appellant here meets
the limitation test in **Billy-Eko**, 8 F. 3d 111, 114-115.

Counsel's performances as illustrated here fell below an
objective standard of reasonableness, impinging upon Appellant's
rights to due process and confrontation of a witness.    **Sparman
v. Edwards**, 26 F. S. 2d 450, 463-464 (E.D.N.Y. 1997).    The
sentence was imposed on misleading facts, inaccurate and
groundless information, being unchallenged subjected the matter
to an adverse consequence.    However, it is recognized that the
burden is on the defendant to show the inaccuracy or
unreliability of the pre-sentence report.    **United States v.
Gilliam**, 987 F. 2d 1009, 1014 (4th Cir. 1993).    Counsel was
granted an additional opportunity to present a chemist to contest
the 'unknown' substance, provided by 18 U.S.C. § 3006A(e)(1),
accompanied with the Lab Report Analysis Result.    Appellant
received no benefit from the stipulation as the government states
in the Letter of Response to Appellant's 28 U.S.C. § 2255, the
adverse consequence is the sentence Appellant currently serves.

8

R. 123

Appellant was sentenced upon groundless information. Roberts v. United States, 63 L. Ed. 2d 622, 445 U.S 552, 100 S. Ct. 1358 (1980).    The Supreme Court here held, that the problem of drawing inferences from an ambiguous silence is troubling.    As a matter of due process, an offender may not be sentenced on the basis of mistaken facts or unfounded assumptions.    id. at 445 U.S. 563    In that the punishment should fit the offender not merely the crime, further noting that the sentencing court has a broad spectrum to extrapolate unlimited information.

The Supreme Court held in United States v. Tucker, 404 U.S. 443, 92 S. Ct. 589, 30 L. Ed. 2d 592 (1972), due process protects a defendant's right not to be sentenced on the basis of false and invalid information.

Furthermore, ineffectiveness claim are ordinarily inappropiate to raise on direct appeal because they require additional factfinding.    Kimmell v. Morrison, 477 U.S. 365, 91 L. Ed. 305, 308 (1986).

Appellant contends here that Appellee's arguments are invalid and record reflects with the nexus of Appellant's argument here now, that counsel's trial strategy and/or trial tactic was unsound.    Counsel waiving Appellant's right to confrontation on misleading facts caused errors of constitutional dimensions.    For the reasons here noted, Appellant's claims should be deemed de novo and not waived.

R. 124

## POINT THREE

### APPELLANT'S CHALLENGE TO
### HIS CRIMINAL HISTORY
### CATEGORY IS NOT
### PROCEDURALLY BARRED
### AND IS WITH MERIT

Appellant inquired to appellate counsel to the claim here being appealed, counsel informed Appellant that it was not riped for appeal. However, over the years, Appellant's research apprised him that the matter could have been appealed.

The claim here is not waived. "When a defendant elects to challenge one part of a sentencing "package" whose constituent parts are "truly interdependent," review of the entire sentencing package does not constitute a double jeopardy violation." <u>United States v. Mata</u>, 133 F. 3d 200, 201-202 (2d Cir. 1998), (Appellant is not arguing double jeopardy)

Here in the instant case, the claim herewith is opt to be challenged on its merits.

The Second Circuit has recognized that the payment of a twenty-five dollar fine is an infraction, when the sentence imposed is five days or less or a fine. As Appellant illustrates in his Appeal Brief. The United States Sentencing Guidelines, Section 1B1.9 confirms such; Congress mandates the facts here noted for support of Appellant's argument, 18 U.S. C. § 3559(a)(9). The violation does not constitute a term or imprisonment, therefore it is considered an infraction.

R. 125

Appellant contends that the claims here are`:'`  `.;.`
valid and the conviction and sentence should be reviewed de
novo due to the violations of law and the sentence imposed
as a result of an incorrect appplication of the sentencing
guidelines.  <u>United States v. Ready</u>, 82 F. 2d 551, 555 (2d
Cir. 1996), 18 U.S.C. § 3742(a)(1).

The claims here are with merit and should be reviewed
de novo.

Appellant here reiterates that he is a pro se litigant
and should be held to less stringent standards than an
accomplished attorney, in that, the withheld here should be
construe more liberally.  <u>United States v. Onwubiko</u>, 969 F.
2d 1392, 1397 (2d Cir. 1992).

### CONCLUSION

For the reasons hereto submitted, the claims here should
be reviewed on their merits and de novo, respectfully remanded
to the district court for full factual findings accordingly.

Respectfully submitted,

Mark A. Garnes - Pro Se
Reg. No. 24646-053
P.O. Box 2000-3B
FCI Allenwood Med.
White Deer, Pa.
17887

DATED: April 12th, 2000
White Deer, Pennsylvania

R. 126

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

————————————————————X
United States of America,                  :
           Appellee,                       :
                                           :    CERTIFICATE OF SERVICE
           v.                              :    99-1524
                                           :
Mark Garnes,                               :
           Appellant.                      :
————————————————————X

    I, Mark Garnes, pro se, hereby certify under the penalty
of perjury that on the 14th day of April 2000, I served by
United States Mail, certified, the original and ten (10)
copies of Appellant's Reply Brief and Appendix to the Deputy
Clerk of the Court of Appeals for the Second Circuit and one
copy to the Assistant United States Attorney, to the addresses
as follows:

MAILED TO:

Mrs. S. Washington-Goeloe          Mr. Andrew J. Frisch
Deputy Clerk                       Assistant United States
United States Court of Appeals     Attorney
For the Second Circuit             United States District
United States Courthouse           Court
40 Foley Square                    Eastern District of New
New York, New York      10007      York
                                   147 Pierrepont Street
                                   Brooklyn, New York  11201


DATED: April 14th, 2000            Mark A. Garnes - Pro Se
White Deer, Pennsylvania           Reg. No. 24646-053
                                   P.O. Box 2000-3B
                                   FCI Allenwood Med.
                                   White Deer, Pa.   17887

APPENDIX

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK



------------------------------------X
United States of America,
    Plaintiff,

 -against-      Docket No. 88 CR 496(S-14)
             (ERK)
Mark Garnes,
    Defendant.

------------------------------------X

    '30

## MEMORANDUM OF LAW IN SUPPORT
## OF MOTION PURSUANT TO 28 U.S.C.
## SECTION 2255

  As a matter of introduction, the petitioner respectfully
submits that the events which transpired in the instant case
constitute a right to effective assistance of counsel,
protected by the Sixth Amendment of the United States
Constitution; a sufficiency of the evidence to establish
guilt, proper Base Offense Level and Criminal History Category.

  In short, the petitioner respectfully request fact-
finding hearings based upon the noted matters herein.

### STATEMENT OF ISSUES UNDER CONSIDERATION

  The petitioner respectfully request that this Court
adjudicate the following issues of law, to wit:

  1. The petitioner should receive fact-finding
hearings to determine the ineffective assistance of counsel,
insufficiency of evidence to establish guilt, improperly
imposed enhancement for obstruction of justice by two
points to the Criminal History Category and a one point

R. 129

A-1

Government.   U.S. v. Amato,  15 F3d. 230, at 235  (2d.
Cir. 1994), and draw reasonable references in the Government's
favor.   Glasser v. U.S.,  315 U.S. 60, at 80, 86 L.Ed.2d.
680, 62 S.Ct. 457 (1942).   "The conviction must stand if
any rational trier of fact could have found the essential
elements of the crime established beyond a reasonable doubt."
Jackson v. Virginia,  443 U.S. 307, at 319, 61 L.Ed.2d. 560,
99 S.Ct. 2781 (1979).

Despite this strenuous burden of proof, this Court
has emphasized that juries must not be allowed to engage
in "false surmise and rank speculation", in arriving at
a guilty verdict.   U.S. v. Wiley,  846 F.2d. 150, at 155
(2d. Cir. 1988), citing U.S. v. Starr,  816 F.2d. 94, at
99 (2d. Cir. 1987).   A conviction may not be based upon
evidence that is "at least as consistent with innocence as
with guilt",  U.S. v. Mankani,  739 F.2d. 538, 547 (2d.
Cir. 1984), and "on inferences no more valid than others
equally supported by reason and experience",  U.S. v.
Bufalino,  285 F.2d. 408, at 419 (2d. Cir. 1960);  see also,
U.S. v. Redwine,  715 F.2d. 315, at 319 (7th Cir. 1983).

Applying these principles, the conviction on 'Count
Three' of the indictment should be vacated.   The only
witness to the point that the petitioner 'used or carried'
a weapon was Viola Nichols.   No evidence corroborated her
testimony, other than the presence of the guns, even there,
the witness does not give description notable to what is
in the governments's exhibits.  (Tr. 97, 111-113)

Due to the insufficiency of the evidence, this Court

R. 130

A-2

99-1524

IN THE UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

Docket No. 99-1524

---

UNITED STATES OF AMERICA,

Appellee,

v.

MARK GARNES,

Defendant-Appellant.

---

JOINT APPENDIX FOR
DEFENDANT-APPELLANT
MARK GARNES

---

Mark A. Garnes
Reg. No. 24646-053
P.O. Box 2000-3B
FCI-Allenwood Med.
White Deer, Pa.
17887

# <u>TABLE OF CONTENTS</u>

Docket Sheet, Page 1.....................................1

7-30-99    Judgment-Resentencing......................7

8-13-99    Notice of Appeal...........................11

10-31-89   Trial Transcripts, Page 97
           Viola Nichols...................14

11-2-89    Trial Transcripts, Page 439
           Stipulatins.....................22

11-2-89    Trial Transcripts, Page 544
           Jury Charge.....................28

1-4-91     Sentencing Transcripts, Page 1.............30

7-30-99    Re-sentencing Transcripts, Page 1..........37

11-30-89   Presentence Investigation
           Report (PSR), Page 4................49

1-10-90    Counsel's Letter of Objection
           To The PSR......................51

i

07BG    CLOSED

U.S. District Court
New York Eastern (Brooklyn)

CIVIL DOCKET FOR CASE #: 96-CV-4357

Garnes v. United States                        Filed: 09/04/96
Assigned to: Judge Edward R. Korman
Demand: $0,000                      Nature of Suit:  510
Lead Docket: None                   Jurisdiction: US Defendant
Dkt # in E.D.N.Y. : is 88-CR-496

Cause: 28:2255 Motion to Vacate Sentence

MARK A. GARNES                  Mark A. Garnes
       petitioner              [COR LD NTC] [PRO SE]
                                Reg. #24646-053
                                P.O. Box 2000
                                White Deer, Pa 17887


    v.


UNITED STATES OF AMERICA         Leslie Ragon Caldwell
       respondent               (718)330-7014
                                [COR LD NTC]
                                United States Attorney's Office
                                Criminal Division
                                225 Cadman Plaza East
                                Brooklyn, NY 11201
                                (718) 254-7000


Docket as of December 16, 1999 1:54 pm          Page 1          A01

R. 133

Proceedings include all events.
:96cv4357      Garnes v. United States

MARK A. GARNES

              petitioner

  v.

UNITED STATES OF AMERICA

              respondent

A02

roceedings include all events.                                    07BG
:96cv4357    Garnes v. United States                              CLOSED

/4/96    1       MOTION by Mark A. Gaines to vacate under 28 U.S.C. 2255,
(ml) [EOD 09/26/96]

/4/96    --      Magistrate Gold has been selected by random selection to
                 handle any matters that·may be referred in this case. (ml)
                 [EOD 09/26/96]

0/8/96   2       ORDER TO SHOW CAUSE: petitioner is granted leave to proceed
                 in forma pauperis; the U.S. Attorney for the Eastern
                 District of New York as attorney for the respondent, show
                 cause before this Court by filing of a return to the
                 petition why said motion should not be granted; within 60
                 days of receipt of this order, the U.S. Attorney for the
                 Eastern District of New York shall serve a copy of his
                 return upon the petitioner; petitioner, within 60 days of
                 receipt of a copy of the return shall file a reply, if any;
                 service of a copy of this Order to Show Cause shall be made
                 by the Clerk of this Court by forwarding a copy thereof,
                 together with a copy of the petition, to the AUSA Leslie
                 Caldwell and by mailing a copy of this order to the
                 petitioner. ( signed by Judge Edward R. Korman  dated
                 10/2/96 ) (ajl) [EOD 10/08/96]

2/24/96  3       LETTER    dated 12/17/96 from Mark Garnes  to Clerk of Court
                 requesting to know the status of his case. (ajl)
                 [EOD 12/24/96]

/19/97   4       LETTER    dated 3/13/97 from Mark Garnes  to Clerk of Court
                 requesting to be sent a copy of the docket sheet in this
                 matter. (ajl) [EOD 03/19/97]

/31/97   5       LETTER    dated 3/21/97 from Mark Garnes  to Victor Jong
                 requesting to know the status of his motion for the
                 judgment on the pleadings. (ajl) [EOD 03/31/97]

./28/97  6       LETTER    dated 4/21/97 from Mark Gaines  to Victor Joe
                 requesting to be sent a copy of the docket sheet. (ajl)
                 [EOD 04/28/97]

;/7/97   7       LETTER    dated 5/5/97 from Leslie Caldwell  to Judge Korman
                 requesting an extension until 5/30/97 for the Govt to
                 respond to Mr. Garnes' petition. (ajl) [EOD 05/07/97]

;/20/97  8       LETTER    dated 5/9/97 from Mark Garnes  to Judge Korman
                 requesting the Court to grant the motion for judgement on
                 the Pleadings. (ajl) [EOD 05/20/97]

;/20/97  9       LETTER dated 5/5/97 from AUSA Leslie R. Caldwell to ERK:
                 requesting an extension of time to respond to the petition
                 until 5/30. (jag) [EOD 05/20/97]

Docket as of December 16, 1999 1:54 pm                 Page 3      AO3

                                                                  R. 135

rQceedings include all events.                                    07BG
:96cv4357    Garnes v. United States                             CLOSED

/20/97  --    Endorsed order granting govt's request for extension of
              time and  resetting answer due for 5/30/97 for United
              States.  Copy of this order (on docuent #9) sent to both
              parties.  ( Signed by Judge Edward R. Korman, dated:
              5/7/97 ) (jag) [EOD 05/20/97]

;/2/97   10   LETTER   dated 5/27/97 from Mark Garnes  to Aliza Silber
              requesting to be sent a copy of a docket sheet. (ajl)
              [EOD 06/02/97]

;/5/97   11   MOTION by Mark A. Garnes for judgment on the pleadings,
              Motion hearing (ajl) [EOD 06/05/97]

;/5/97   --   Endorsed order denying [11-1] motion for judgment on the
              pleadings ( Signed by Judge Edward R. Korman  dated 5/29/97
              ) (ajl) [EOD 06/05/97]

;/18/97  12   LETTER   dated 6/16/97 from Mark Garnes  to Judge Korman
              requesting that the Court rule on the motion that is before
              the Court. (ajl) [EOD 06/18/97]

7/25/97  13   ORDER, endorsed on verified request for default, The motion
              is denied. ( signed by Judge Edward R. Korman dated 7/23/97
              ) (ajl) [EOD 07/25/97]

L0/24/97 14   . LETTER   dated 10/21/97 from Pltf  to Clerk;  requesting
              status on case and copy of docket sheet. (ld) [EOD 10/29/97]

L2/4/97  15   LETTER dated 11/25/97 from AUSA, Leslie Caldwell, to Judge
              Korman, stating that the 2255 petition should be dismissed.
              (mrm) [EOD 12/04/97]

L2/4/97  16   LETTER dated 11/29/97 from Mark A. Garnes, to Judge Korman,
              requesting an extension of time to reply to the
              Government's Response to the 2255 motion. (mrm)
              [EOD 12/09/97]

12/18/97 --   Endorsed order on Doc. No. 16 that petitioner may have
              until 3/1/98 to reply to the Government's response. (Signed
              by Judge Edward R. Korman, dated 12/11/97).  c/m (lgn)
              [EOD 12/18/97]

12/30/97 17   REPLY MEMORANDUM OF LAW by Mark A. Garnes to respondent's
              answer. (tdh) [EOD 01/06/98]

12/30/97 18   REPLY by Mark A. Garnes in opposition to Respondent's
              answer. (mrm) [EOD 02/04/98]

2/4/98   19   ORDER that the U.S. Attorney is directed to discuss the
              effect of U.S. v. Vasquez, 85F.3d59(2d Cir. 1996) as it
              relates to petitioner's challenge to his conviction on the
              924(c) count. A reply to this request is due within 15 days
              of the date of this order. ( signed by Judge Edward R.
              Korman, dated 1/29/98 ) c/m. (mrm) [EOD 02/04/98]

A04

R. 136

roceedings include all events.                          07BG
:96cv4357    Garnes v. United States                    CLOSED

/6/98    20    LETTER dated 2.2.98 from Mark A. Garnes to the Clerk of the
               Court requesting that a typo error be corrected in view of
               his reply to the govt's response to his 28 U.S.C. section
               2255 petition. (tdh) [EOD 02/09/98]

/19/98   21    LETTER dated 3/18/98 from Leslie R. Caldwell, AUSA, to
               Judge Korman stating that defendant Mark Garnes' conviction
               should be vacated. (tj) [EOD 03/19/98]

/26/98   22    ORDER that the petitioner's conviction for using or
               carrying a firearm is vacated, and the sentence imposed on
               the remaining counts is vacated for the purpose of
               resentencing only, and the Probation Dept. is directed to
               prepare an updated P.S.R. reflecting inter alia, an
               enhancement for possession of firearm, and the clerk is
               directed to assign counsel. (Signed by Judge Edward
               Korman, dtd. 3.18.98).  Copies mailed by Chambers.   (See
               copy of letter dtd. 3.18.98 to Judge Korman from AUSA,
               Leslie R. Caldwell). (tdh) [EOD 03/26/98]

/26/98   --    Case closed. (tdh) [EOD 03/26/98]

:/29/98  23    LETTER dated 4.27.98 from Mark A. Garnes to the Clerk of
               the Court asking whether counsel has been assigned and also
               whether an updated P.S.R. has been prepared. (tdh)
               [EOD 04/30/98]

;/7/98   24    LETTER dated 5.5.98 from PaulaMarie Susi to Mr. Garnes
               advising him that counsel has been appointed to represent
               him in resentencing and his counsel will advise Chambers
               when he is prepared to go forward with resentencing. (tdh)
               [EOD 05/07/98]

;/3/98   25    MOTION by Mark A. Garnes for a downward departure due to
               post-conviction rehabilitation. (mrm) [EOD 06/04/98]

7/2/98   26    MOTION by Mark A. Garnes "for an expansion of the record
               pursuant to Rule 7 of 28 U.S.C. section 2255". NoMotion
               hearing set. (tdh) [EOD 07/29/98]

8/13/98  28    LETTER   dated 8/4/98 from Mark A. Garnes  to Clerk of the
               Court,  requesting copy of docket sheet. (copy sent by pro
               se office) (ld) [EOD 08/13/98]

8/6/99   30    LETTER dated 8.3.99 from Mark A. Garnes to Judge Korman
               requesting a copy of the sentencing transcripts
               (re-sentencing) on 7.30.99. (tdh) [EOD 08/20/99]

8/13/99  29    LETTER dated 6/23/99 from AUSA, Andrew Frisch, to Judge
               Korman, in  partial opposition to plaintiff's applcation
               for a downward departure. (wa) [EOD 08/13/99]

Docket as of December 16, 1999 1:54 pm                  Page 5

A05

R. 137

roceedings include all events.                                    07BG
:96cv4357    Garnes v. United States                              CLOSED

/16/99  31    LETTER dated 8.18.99 from M. Cecelia Volk to Mark A. Garnes
              acknowledging receipt of his 8.3.99 letter and advising him
              that his transcript has been ordered. (tdh) [EOD 08/20/99]

0/28/99 32    LETTER dated 10.25.99 from Mark A. Garnes to Judge Korman
              requesting an extension of time and also requesting that
              Mr. Bradley D. Simon be removed as counsel. (tdh)
              [EOD 11/03/99]

0/28/99 33    LETTER dated 10.25.99 from Mark A. Garnes to Ms. Volk
              requesting a copy of the docket sheet for this case.  Pro
              Se sent docket sheet. (tdh) [EOD 11/03/99]

1/8/99  34    LETTER dated 11.3.99 from Mark A. Garnes to Mr. Simon
              advising him that he will be proceeding pro se with his
              filing brief. (tdh) [EOD 11/09/99]

1/10/99 --    Endorsed order on document #32 that this request should be
              made to the Court of Appeals. ( Signed by Judge Edward R.
              Korman , on 11/3/99) c/m. (mrm) [EOD 11/10/99]

A06

R. 138

(NOTE: Changes identified with CLERKS OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

U.S. DISTRICT COURT E.D. N.Y.

★ AUG 13 1999 ★

P.M. _____

UNITED STATES OF AMERICA

-vs-

____MARK GARNES____

AMENDED
JUDGMENT IN A CRIMINAL CASE

(FOR OFFENSES COMMITTED ON OR AFTER NOVEMBER 1, 1987)

CASE NO.: _CR-88-496_
COUNSEL: _BRADLEY SIMON_

DATE OF ORIGINAL JUDGMENT: _____JANUARY 4, 1991_____

X Direct Motion to District Court Pursuant to: X 28§2255. ___ 18§3559(c)(7). or ___ Modification of Restitution Order

THE DEFENDANT:

X   was found guilty on count(s) _1,3,4 OF SPSDG INDICTMENT (S-4)_
    after a plea of not guilty.

Accordingly, the defendant is adjudged guilty of such count(s), which involve the
following offenses:

| Title/Section | Nature of Offense | Date concluded | Count # |
|---|---|---|---|
| 21:846    * | CONSP TO DIST HEROIN | 8/11/88 | SS1 |
| 21:841 | POSSESS WITH INTENT TO DIST COCAINE BASE | 8/11/88 | SS3 |
| 18:924(c) * | USE OF FIREARM | 8/11/88 | SS4 |

*(**NOTE: Counts sss1 vacated for the purpose of resentencing; Count sss4
vacated pursuant to the 28§2255 ruling (See Bailey v. United States, 116 S. Ct.
501 (1995).)*

The deft is sentenced as provided in pgs. 2 through __4__ of this judgment. The sentence is imposed
pursuant to the Sentencing Reform Act of 1984.

___   The deft has been found not guilty on cts. _____ and
      is discharged as to such cts.
X    Count(s) _REMAINING_is/are dismissed on motion of A.U.S.A.

IT IS FURTHER ORDERED that the deft shall notify the U.S. attorney for this
district within 30 days of any change of name, residence, or mailing address
until all fines, restitution, costs, and special assessments imposed by this
judgment are fully paid.

Defts S.S. No. _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_

Defts D.O.B. _5/15/63_

Defts USM No: _UNK_

Defts residence address:

_CUSTODY_____

____JULY 30, 1999____
Date of imposition of sentence

_Edward R. Korman_
Signature of Judicial Officer

_EDWARD R. KORMAN,U.S.D.J._
Name/Title of Judicial Officer

A TRUE COPY ATTEST
DATED _August 16, 1999_
ROBERT C. HEINEMANN
CLERK
BY _Frances Pizar_
Deputy Clerk

R. 139

A07

(741)

Deft: __MARK GARNE___    Judgment -Page  2    4
Case Number: __CR-88-496___

### IMPRISONMENT

The defendant is hereby committed to the custody of the United
States Bureau of Prisons to be imprisoned for a term of:

___ THREE HUNDRED (300) MONTHS*

_____    The Court makes the following recommendations to the
          Bureau of Prisons:

X ___     The  defendant  is  remanded  to the  custody of  the
          U.S.Marshal.
_____    The defendant shall surrender to the U.S.Marshal for this
          district.
          ___ at _____ on _____.
          ___ as notified by the U.S. Marshal.

_____    The defendant shall surrender for service of sentence at
          the institution designated by the Bureau of Prisons:
          ___ by _____.
          ___ as notified by the U.S.Marshal.
          ___ as notified by the Probation Office.

### RETURN

I have executed this judgment as follows:_____
_____
_____
_____

          Defendant delivered on _____ to _____
at _____. with a certified copy of
this judgment.

                                        _____
                                        United States Marshal

                                        _____
                          By                    Deputy Marshal

**R. 140**



Deft: MARK GARNES     Judgment - Page  3  4
Case Number:    CR-88-496

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of ___FIVE (5) YEARS*___ .

## ADDITIONAL CONDITIONS:

The defendant shall report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state , or local crime.

The defendant shall not illegally possess a controlled substance.

For offenses committed on or after September 13, 1994:

  The defendant shall refrain from any unlawful use of a controlled substance.  The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as directed by the probation officer.

___ The above drug testing condition is suspended based on the court's determination that the defendant poses a low risk of future substance abuse.

X___ The defendant shall not possess a firearm as defined in 18 U.S.C. Section 921.

  If this judgment imposes a fine or a restitution obligation, it shall be a condition of supervised release that the defendant pay any such fine or restitution that remains unpaid at the commencement of the term of supervised release in accordance with the Schedule of Payments set forth above.
  The defendant shall comply with the standard conditions that have been adopted by this court(set forth below).  The defendant shall also comply with the additional conditions set forth above.

## STANDARD CONDITIONS OF SUPERVISION

1) the defendant shall not leave the judicial district without the permission of the court or probation officer;

2) the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;

3) the defendant shall answer truthfully all inquiries by the probation officer and follow the instruction of the probation officer;

4) the defendant shall support his or her dependents and meet other family responsibilities;

5) the defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or other acceptable reasons;

6) the defendant shall notify the probation officer ten days prior to any change in residence or employment;

7) the defendant shall refrain from excessive use of alcohol;

8) the defendant shall not frequent places where controlled substance are illegally sold, used, distributed, or administered;

9) the defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer;

10) the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer.

11) the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12) the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;

13) as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall  ermit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement

R. 141

A09

Deft: MARK GARNES    ●      Judgment -Page   4 ● 4
Case Number: _____ CR-88-496___

## STATEMENT OF REASONS

__X__   The Court adopts the factual findings and guideline application in the presentence report.
_____   The Court adopts the factual findings and guideline application in the presentence report except:

## Guideline Range Determined by the Court

Total Offense Level: _____38*_____     (Due to recalculation)

Criminal History Category: _____V____

Imprisonment Range: _____360-LIFE*_____

Supervised Release Range: _____5 YRS.____

Fine Range: $ _____25,000.00.____ to __4,000,000.00.____
    __X__ Fine is waived or is below the guideline range, because of the defendant's inability to pay.

    Total Amount of Restitution:$_____

    ___ Restitution is not ordered because the complication and prolongation of the sentencing process resulting from the fashioning of a restitution order outweighs the need to provide restitution to any victims, pursuant to 18 U.S.C. Section 3663(d).

    ___ For offenses that require the total amount of loss to be stated, pursuant to Chapters 109A, 110, 110A, and 113A of Title 18, restitution is not ordered because the economic circumstances of the defendant do not allow for the payment of any amount of a restitution order, and do not allow for the payment of any or some portion of a restitution order in the foreseeable future under any reasonable schedule of payments.

    ___ Partial restitution is ordered for the following reason(s):

The sentence departs from the guideline range:

_____ Upon motion of the government, as a result of defendant's substantial assistance.

__X__ For the following specific reason(s):

Increase per 2D1.1(b)(1) deleted because it would increase the defts sentence range compared to sentence imposed prior to the §2255 ruling.
The Court further departs for defts exhibited rehabilitation.

**R. 142**



UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF NEW YORK
————————————————————————X
Mark Garnes,                       :

       Plaintiff,          :

                    :

      v.                         :      Notice of Appeal

                    :      File No. 96-CV-4357(ERK)

United States of America,          :

       Defendant.          :
————————————————————————X

      Notice is hereby given that MARK GARNES, plaintiff,
hereby appeal to the United States Court of Appeals for the
Second Circuit for the final judgement entered in this action
on the 30th day of July, 1999.

                            _____
                            Mark A. Garnes - Pro Se
                            Reg. No. 24646-053
                            100 29th Strret
                            Brooklyn, New York
                                  11232

DATED:  August 3rd, 1999
Brooklyn, New York

                                      R. 143

                                      A11

## Certificate of Service

I, Mark Garnes, hereby certify under the penalty of perjury, pursuant to 28 U.S.C. 1786, that I have forwarded five (5) copies of the Notice of Appeal to the Clerk of the Court for the United State District Court, Eastern District of New York, 225 Cadman Plaza East, Brooklyn, New York 11201, by mailing said document to the Honorable Edward R. Korman, United States District Judge, of the same address.  The documents were placed in the mail-box (inmate) here at the Metropolitain Detention Center, 100 29th Street, Brooklyn, New York 11232, on August 4th, 1999.

Mark A. Garnes--Pro Se
Reg. No. 24646-053
100 29th Street
MDC-Brooklyn
Brooklyn, New York
                11232

DATED:  August 3rd, 1999
Brooklyn, New York

R. 144

A12

48

Martinez-cross-Jenks

1   properly when they were test fired in your presence?

2   A   Yes, ma'am.

3            MS. CALDWELL:  Your Honor, at this time the government

4   offers these exhibits subject to connection.

5            THE COURT:  All right.  They are admitted subject to

6   connection.  Could you read off the numbers on the first

7   group?  The last one was 7, 12, 9, 8.  The first?

8            THE WITNESS:  20 and 17.

9            THE COURT:  All right.

10           THE WITNESS:  Do you have the last?

11           THE COURT:  20 and 17.

12           (So marked in evidence.)

13           MS. CALDWELL:  Your Honor, I have no further questions

14   of this witness.

15           THE COURT:  Any questions, Mr. Jenks?

16           MR. JENKS:  Yes, Your Honor.

17           Just one moment, please.

18   CROSS-EXAMINATION

19   BY MR. JENKS:

20   Q   Agent Martinez, you are the agent in charge of this

21   investigation and this wiretap?

22   A   Yes, sir.

R. 145

23   Q   You supervised the operation of the other agents and the

24   police officers that were involved in this case?

25   A   To the standpoint of the wiretap, yes, sir.

A13

V. Nichols-direct-Caldwell

1  A    Because he brought some to my house once.

2  Q    When you say "he," who are you referring to?

3  A    Country brought to my house.

4  Q    Can you describe what happened when he brought crack to

5  your house?

6  A    He had came to pick up some heroin and he was at my kitchen

7  table and he had two -- two zip lock bags of crack and he had a

8  gun.  He took the gun.  Put it on the table.  And I asked him

9  what was he doing with the crack.  And he said because it's for

10 our spot and I have to take it home and put it.

11 Q    Can you describe what the crack that he had looked like?

12 A    It was in little plastic vials with little green tops on

13 them, bluish green tops.

14 Q    You say it was a zip lock bag.  Was it a see-through bag?

15 A    Yes.

16 Q    Like a baggy?

17 A    Yes.

18 Q    You say he had a gun.  Can you tell the jury what the gun

19 looked like?

20 A    Silver, with wood.  I don't know too much about guns.

21 Q    Can you hold up your hands and say about how long the gun

22 was?

R. 146

23 A    About like this.

24 Q    So about seven inches long, approximately?

25 A    I guess so, yes.

A14

V. Nichols-direct-Caldwell

1    took $33,000 from him.

2    Q    Do you know about when that was?

3    A    June or July.

4    Q    Did you ever have any conversations with Brian Gibbs about

5    that money that had been taken from Mark Garnes?

6    A    We did talk about it, yes.  But I can't remember the

7    conversation but we did talk about it.

8    Q    Now, you already testified that the time when you saw Mark

9    Garnes with crack at your house he had a gun.  Did you ever see

10    him with a gun on any other occasions?

11    A    Yes.

12    Q    What kind of gun did you see him with at other times?

13    A    I saw him with a longer one.  And he also brought guns to

14    my house, three.

15    Q    You said that during that time period he was coming to your

16    house on a pretty regular basis.

17         Did he usually have the gun with him or how often did

18    he have the gun with him?

19    A    Whenever he came.

20    Q    You said that he brought three guns or had three guns.

21    Tell us about that.                          R.  147

22    A    Mike Bones was having trouble with some of his -- the

23    people that was working on Lakewood Street about people was

24    coming robbing him of their drugs and their money and he needed

25    some guns, and Country brought the three guns to my house and

A15

112

V. Nichols-direct-Caldwell

1    he told me to tell Mike to make sure that he take care of one

2    particular gun because that was his personal gun.

3    Q    Did you see at that point which gun he was talking about?

4    A    Yes, I did.

5    Q    Which gun was that?

6    A    It was a longer one, longer one.  Longer than the one I

7    described to you before.

8    Q    How did that gun compare with the gun -- let me just

9    rephrase that.

10          The gun that you saw him with at the time that he had

11   the crack, was that the same or different from the gun that you

12   saw him with the other times?

13   A    It was different.

14   Q    It was different?

15   A    Yes.

16   Q    How did the gun that he said was his personal gun compare

17   with the one that you usually saw him with?

18   A    I think it had like -- it was gold I think.  Like gold

19   plated or something like that instead of silver.

20   Q    Was the personal gun, the one he said was his personal gun

21   the same gun or different gun than the one you usually saw him

22   with?

R. 148

23   A    It was a different gun.

24   Q    Now, did you have have any conversation with Mark Garnes

25   about why he carried a gun?

A16

GR          OCR          CSR          CM

113

V. Nichols-direct-Caldwell

1  A   He said he always carries his gun with him.

2  Q   The three guns that he brought to your house that one time,

3  what happened to those?

4  A   I gave them back to him the next day.

5       THE COURT:  I think the question was, did he ever tell

6  you why he carried the guns?

7       THE WITNESS:  Excuse me.

8       THE COURT:  Did Mark Garnes ever tell you why he

9  carried the guns?

10      THE WITNESS:  To protect himself.

11 Q   Did you see him with a gun when he also had drugs with him?

12 A   Yes.

13      He had a gun every time he came to my house.

14 Q   All right.  Backing up a second.  You said that he came and

15 picked up the three guns that he had dropped off.

16      Had anyone else come and gotten those guns in the

17 meantime?

18 A   No.

19 Q   You testified that you talked on the phone with Brian Gibbs

20 and Mark Garnes.  Did you ever talk with them in any unusual

21 way, other than in normal English?

22 A   Yes.

23 Q   Can you tell the jury exactly how you talked to them?

24 A   In Pig Latin.                          R. 149

25 Q   Can you give the jury an example, for example, how you

CR          OCR     CSR     CM

A17

20

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - -   X

UNITED STATES OF AMERICA,   :       CR-88-00496(S-4)

    Plaintiff,   :

     -against-   :
                                    United States Courthouse
                                    Brooklyn, New York
MARK GARNES,
a/k/a "Country",   :
                                    November 1, 1989
    Defendant.   :       2:00 o'clock p.m.

- - - - - - - - - -   X


TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE EDWARD R. KORMAN
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:          ANDREW J. MALONEY
                             United States Attorney
                             BY:  LESLIE R. CALDWELL
                             Assistant United States Attorney
                             225 Cadman Plaza East
                             Brooklyn, New York


For the Defendant:           EDWARD P. JENKS, ESQ.



Court Reporter:              Gene Rudolph
                             225 Cadman Plaza East
                             Brooklyn, New York
                             718-330-7687


Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

A10

R. 150

342

Vaughn-cross-Jenks

1   A   No, I don't.

2   Q   When they searched -- the agents searched him in your

3   presence, correct?

4        The agents that arrested him, after you placed him

5   under arrest, he was searched right there on the street, was he

6   not?

7   A   Yes.

8   Q   And that was in your presence, right?

9   A   Yes.

10  Q   Did they find any handguns on --

11  A   No.

12  Q   Did they find any knives?

13  A   No.

14  Q   Did they find any drugs?

15  A   No.

16  Q   Did they find any large sums of currency on Mr. Garnes?

17  A   No.

18        MR. JENKS:  All right.  I have nothing further.

19        MS. CALDWELL:  Nothing further.

20        THE COURT:  Thank you.

21        (Witness excused.)

22        THE COURT:  Next.

23        MS. CALDWELL:  The government calls Special Agent

24  Charles Gianturco.                    R. 151

25        THE COURT:  Raise your right hand.

GR          OCR      CSR      CM

A29

1      UNITED STATES DISTRICT COURT
2      EASTERN DISTRICT OF NEW YORK

3 - - - - - - - - - - -  X

4 UNITED STATES OF AMERICA, :  CR-88-00496(S-4)

5   Plaintiff,    :

6    -against-   :

              United States Courthouse
7               Brooklyn, New York
  MARK GARNES,
8  a/k/a "Country",   :

              November 2, 1989
9   Defendant.    :  10:15 o'clock p.m.

10 - - - - - - - - - - -  X

11

12        TRANSCRIPT OF TRIAL
     BEFORE THE HONORABLE EDWARD R. KORMAN
13    UNITED STATES DISTRICT JUDGE, and a jury.

  APPEARANCES:
14

15 For the Government:    ANDREW J. MALONEY
             United States Attorney
             BY:  LESLIE R. CALDWELL
16            Assistant United States Attorney
             225 Cadman Plaza East
17           Brooklyn, New York

18 For the Defendant:    EDWARD P. JENKS, ESQ.

19

20

  Court Reporter:     Gene Rudolph
21            225 Cadman Plaza East
             Brooklyn, New York
22           718-330-7687

                 R. 152
23

24 Proceedings recorded by mechanical stenography, transcript
  produced by computer-aided transcription.
25

A30

Henehan-direct-Caldwell

1    A    No, it wasn't.

2    Q    Do you know the nature of the charges in that arrest

3    warrant?

4    A    As I recall, there were charges against an individual

5    related to a sale of narcotics.

6    Q    Who was the person who you were executing the arrest

7    warrant for that morning?

8    A    Mark Garnes.

9    Q    Was that arrest warrant to be executed at 2727 Surf Avenue,

10   apartment 528 in Brooklyn, New York?

11   A    Yes, it was.

12   Q    When you got to that location, did you gain access to to

13   the apartment?

14   A    Yes.

15            THE COURT:  Will you come up?

16            (Side bar follows.)

17            THE COURT:  What is this witness going to testify to?

18            MS. CALDWELL:  That he searched the bedroom and found

19   the guns.

20            THE COURT:  All right.

21            (In open court.)

22            THE COURT:  Read back the last question and answer.

23            (Record read.)                    R.  153

24            THE COURT:  Did you have an occasion to search that

25   apartment?



439

1        THE COURT:  Obviously it is not irrelevant.

2        MS. CALDWELL:  It is not cumulative.

3        THE COURT: It is not necessary.

4        MS. CALDWELL:  What is Your Honor's ruling?

5        THE COURT:  I am not allowing any of it.  Let's go.

6        (In open court.)

7        MS. CALDWELL:  Your Honor, in light of your ruling, we

8   have just some stipulations to read into the record.

9        THE COURT:  Go ahead.

10        MS. CALDWELL:  The first one is marked as Government

11   Exhibit 92.  Government Exhibit 92 reads as follows:

12        It is hereby stipulated and agreed by and among the

13   undersigned counsel for all parties that if Any Siegel were

14   called to testify at the trial of this case, she would testify

15   as follows:

16        She is employed as sales coordinator of the MobileComm

17   Company, a company which leases beepers and other paging

18   devices.  As sales coordinator, Ms. Siegel is a custodian of

19   records of the MobileComm Company.

20        She's examined the records of the MobileComm Company

21   relating to subscriber information for beeper number

22   (212) 277-5689.  Those records include Government Exhibit 91

23   and are kept in the course of the MobileComm Company's

24   regularly conducted business and it is the regular practice of

25   the MobileComm Company to keep those records.

A22

1          Those business records marked as Government Exhibit 91

2    reflect the following.

3          Between June 3, 1988 and October 18, 1988, the beeper

4    corresponding to telephone number (212) 277-5689 was leased to

5    Tony Garnes, 2727 West 28th Street, Brooklyn, New York.

6          The government offers Exhibits 91 and 92 in evidence.

7          MR. JENKS:  No objection.

8          THE COURT:  91 and 92 are in evidence.

9          (So marked.)

10          MS. CALDWELL:  The next stipulation reads as follows:

11          It is hereby stipulated and agreed by and among the

12    undersigned counsel for all parties that if Maryann Garner were

13    called to testify at the trial of above case she would testify

14    as follows:

15          She is employed in the Security Department of the New

16    York Telephone Company and is a custodian of records of the New

17    York Telephone Company.

18          She has examined records of the New York Telephone

19    Company relating to subscriber information for telephone

20    numbers (718) 265-2008, (718) 265-3026, (718) 827-8244 and

21    (718) 322-5127.

22          Those records are kept in the course of the New York

23    Telephone Company's regularly conducted business and it is the

24    regular practice of the New York Telephone Company to keep

25    those records.

A23

441

1          Those business records reflect the following.

2          During the period of February through June, 1988,

3    telephone number (718) 265-2008, was subscribed to Carmen

4    Ayala, 2727 Surf Avenue, apartment 528, Brooklyn, New York.

5          During the period June through August, 1988, telephone

6    number (718) 265-3026 was subscribed to Carmen Ayala, 2727 Surf

7    Avenue, apartment 528, Brooklyn, New York.

8          During the period February through August, 1988,

9    telephone number (718) 827-8244 was subscribed to G. Barfield

10   and billed to D. Gibbs, both at 1266 Sutter Avenue, apartment

11   4-B, Brooklyn, New York.

12         During the period February through August, 1988,

13   telephone number (718) 322-5127 was subscribed to Miriam

14   Rodway, 111-32  146th Street, Jamaica, Queens, New York.

15         Your Honor, I offer Government Exhibit 93 at this

16   time.

17         MR. JENKS:  No objection.

18         THE COURT:  93 in evidence.

19         (So marked.)

20         MS. CALDWELL:  The next stipulation relates to the

21   narcotics and reads as follows:

22         It is hereby stipulated and agreed by and among the

23   undersigned counsel for all parties that if Mohini Motwani were

24   called to testify at the trial of the above case she would

25   testify as follows.

A24

R. 156

442

1        She's a chemist with the New York City Police

2   Department laboratory.

3        On or about August 25, 1988, she performed laboratory

4   analyses of the contents of Government Exhibits 1, 2, 3, 4, 5

5   and 6.  Based on her analyses, Ms. Motwani reached the

6   following conclusions.

7        Government Exhibit 1 consists of eight hundred vials,

8   each of which contains cocaine base, also known as crack.

9        The net weight of Government Exhibit 1 is two and a

10  half ounces, plus 16 grains.

11       Government Exhibit 2 consists of 526 vials, each of

12  which contains cocaine base, also known as crack.  The net

13  weight of Government Exhibit 2 is 1 and 5/8 ounces plus 18

14  grains.

15       Government Exhibit 3 consists of one bag, which

16  contains cocaine base, also known as crack.  Net weight of

17  Government Exhibit 3 is one ounce plus 51 grains.

18       Government Exhibit 4 consists of 31 vials, each of

19  which contains cocaine base, also known as crack.  The net

20  weight of Government Exhibit 4 is 52 grains.

21       Government Exhibit 5 consists of 201 vials, each of

22  which contains cocaine base, also known as crack.  The net

23  weight of Government Exhibit 5 is 5/8 of an ounce plus 20

24  grains.                                    R. 157

25       Government Exhibit 6 consists of two hundred

A25

443

1    envelopes, each of which contains heroin.  The net weight of

2    Government Exhibit 6 is 1/8 ounce plus 5 grains.

3           And finally, Government Exhibit 13 consists of 120

4    envelopes packed in rice.  The 120 envelopes contain heroin.

5    Net weight is the -- excuse me, is the weight of the substance

6    analyzed exclusive of the packaging.

7           The government rests.

8           I will offer, I'm sorry, I will offer 94 into

9    evidence.

10          MR. JENKS:  No objection.

11          THE COURT:  94 in evidence.

12          (So marked.)

13          MR. JENKS:  May we approach, Your Honor?

14          THE COURT:  Yes.

15          (Side bar follows.)

16          MR. JENKS:  Your Honor, it might be a good point at

17   this time to take a quick two minute recess.  I am going to

18   call one short witness and that should be it.

19          Also, with respect to the last count against Garnes in

20   the indictment, I'd ask for a Rule 29 judgment of acquittal on

21   using the gun during and in relation to a narcotic trafficking

22   crime.

23          The only testimony we've had about a gun anywhere has

24   been from Viola Nichols.                        R. 158

25          THE COURT:  What does that mean?  I don't understand.

A26

1   If the jury -- am I supposed to conclude that her testimony is

2   inherently incredible?  That's for the jury to decide.

3          MR. JENKS:  I make the motion anyway.

4          THE COURT:  I assume it's also directed to all the

5   other counts of the indictment as well?

6          MR. JENKS:  Yes.

7          THE COURT:  Denied.

8          MR. JENKS:  Can we just take a two minute recess?

9          THE COURT:  All right.

10          (In open court.)

11          THE COURT:  All right.  Ladies and gentlemen, we are

12   going to take a short recess.  The defense will put on one

13   witness.

14          (The following occurred in the absence of the jury.)

15          THE COURT:  All right.

16          (Recess taken.)

17          (Continued on the next page.)

18

19

20

21

22

23

24

25

R. 159

GR          OCR        CSR        CM

Charge of the Court

1      On the other hand, if you are not satisfied beyond a

2  reasonable doubt that on or about the date alleged in the

3  indictment, Mark Garnes did knowingly and intentionally ~~possess~~

4  ~~possess~~ with the intent to distribute it or that he aided,

5  abetted, counseled, commanded, induced or procured the offense

6  of the crime of ~~possession of cocaine~~ with the intent to

7  distribute it, you should find him not guilty of Count Two.

8      The third and final count of the indictment reads as

9  follows.

10      From in or about March, 1988 and continuing until on

11  or about August 11, 1988, both dates being approximate and

12  inclusive, within the Eastern District of New York, the

13  defendant Mark Garnes, also known as "Country," did knowingly

14  and intentionally use and carry a firearm during and in

15  relation to a drug trafficking crime, to wit, the violations

16  set forth in Counts One and Two of this indictment.

17      Count Three of the indictment charges that from March

18  of 1988 until August 11, within the Eastern District of New

19  York, Mark Garnes did knowingly and willfully use and carry a

20  firearm during and in relation to a drug trafficking crime,

21  namely, the crimes that are charged in Counts One and Two of

22  the indictment.  You should consider Count Three only if you

23  have decided to convict Mark Garnes on Count One and Count Two

24  or both.  If you find the defendant Mark Garnes is not guilty

25  of Count One and Count Two, you must acquit him of Count

545

Charge of the Court

1   Three.

2           On the other hand, even if you find that he is guilty

3   of either Count One or Count Two, you must nevertheless satisfy

4   yourself that all of the elements that the government is

5   required to prove in order to warrant a finding of guilty have

6   been proven beyond a reasonable doubt here.

7           To convict the defendant of Count Three, you must find

8   that the government has proven first that on one or more

9   occasions during the period between March and August of 1988,

10  that is, March to August 11, 1988, Mark Garnes used or carried

11  a firearm.

12          Second, that Mark Garnes knew that he was using or

13  carrying a firearm.

14          And third, that Mark Garnes carried or used the

15  firearm during and in relation to the commission of a drug

16  trafficking crime for which he might be prosecuted in a court

17  of the United States.

18          The first element that the government must proof

19  beyond a reasonable doubt is that Mark Garnes used or carried a

20  firearm on one or more occasions during the period March

21  through August 11, 1988.  A firearm means any weapon which will

22  or is designed to or may readily be converted to expel a

23  projectile by the action of an explosive.         R. 161

24          You should note that in order for the government to

25  prove that Mark Garnes used a firearm, it does not have to

GR        OCR        CSR        CM

A29

1         UNITED STATES DISTRICT COURT
          EASTERN DISTRICT OF NEW YORK
2

3    - - - - - - - - - - -    X

4    UNITED STATES OF AMERICA,    :      CR-88-496

5         Plaintiff,              :

6         -against-              :
                                         United States Courthouse
7                                        Brooklyn, New York
     MARK GARNES,                 :
8                                        January 4, 1991
          Defendant.             :       10:30 o'clock a.m.
9
     - - - - - - - - - - -    X
10

11                   TRANSCRIPT OF SENTENCING
            BEFORE THE HONORABLE EDWARD R. KORMAN
12               UNITED STATES DISTRICT JUDGE

13   APPEARANCES:

14   For the Government:          ANDREW J. MALONEY
                                  United States Attorney
15                                BY:  LESLIE CALDWELL
                                  Assistant United States Attorney
16                                225 Cadman Plaza East
                                  Brooklyn, New York
17

18   For the Defendant:          RICHARD LEVITT, ESQ.

19

20

21   Court Reporter:             Gene Rudolph
                                  225 Cadman Plaza East
22                                Brooklyn, New York          R. 162
                                  718-330-7687
23

24   Proceedings recorded by mechanical stenography, transcript
     produced by computer-aided transcription.
25

              GR         OCR      CSR      CM

A30

1    THE CLERK:  United States versus Mark Garnes.

2    MR. LEVITT:  Good morning, Your Honor.

3    THE DEFENDANT:  Good morning.

4    THE COURT:  All right.  Mr. Garnes, you have gone over

5    the presentence report with your lawyer?

6    THE DEFENDANT:  Yes, I have.

7    THE COURT:  Okay.  You have read it?

8    THE DEFENDANT:  Yes.

9    MR. LEVITT:  Judge, we have nothing further

10   specifically with respect to the presentence report, except for

11   those statements made in our letter of October 30 concerning

12   the criminal history category and the possible impact of the

13   government's claims of Mr. Garnes' knowing involvement in two

14   other crimes.

15   I understand, and --

16   THE COURT:  My inclination, subject to hearing you, is

17   to leave the criminal history where it stands in the

18   presentence report.

19   MR. LEVITT:  All right.  The --

20   THE COURT:  I think --

21   MR. LEVITT:  I have nothing further to add.

22   THE COURT:  I think the sentence that will be

23   authorized under the guidelines plus the five year add-on is

24   sufficient, provides me with sufficient discretion and I

25   don't -- at least in terms of an upward.  I don't intend to go

GR        OCR        CSR        CM

A32

1    up.   I don't intend to go down.

2          MR. LEVITT:   All right.   That having been said, then I

3    won't further address the arguments that I made in the October

4    30 letter.

5          With the Court's permission, I guess we can proceed to

6    the sentencing phase.

7          THE COURT:   Okay.

8          MR. LEVITT:   What's the appropriate order here,

9    Judge?  Does the government --

10         THE COURT:   Usually the defendant goes first.

11         MR. LEVITT:   This is -- it's an excruciating sentence

12   from both the defendant's standpoint and also I guess to a -- a

13   lesser degree from the defense lawyer's standpoint.  I have

14   come to know Mr. Garnes over the last many months and

15   without -- without question, the person who -- who is depicted

16   in this case, I should say, the depiction of him in the case,

17   in the trial, in the presentence report and I am not referring

18   to anything specifically that's unfair or bad in the report,

19   but the picture that emerges from these things is not a total

20   picture.

21         Mr. Garnes, as the report states, was the child of a

22   broken home.  He obviously had extraordinarily difficult

23   problems growing up, including having been shuffled around from

24   one family to the next and periods of running away.

25         He strikes me as a bright person.  My relationship

*A32*

1   with him has been excellent.  He has been very cooperative in

2   every way and it's obviously unfortunate that it's come to what

3   it has come to.

4       I suppose you can say that certain persons with

5   Mr. Garnes' intelligence, notwithstanding the tragedies and the

6   difficulties of their personal background, don't go on to

7   commit the crime that Mr. Garnes has been convicted of.

8       At the same time, I -- unfortunately a lot of people

9   do get trapped into circumstances and I suppose somewhere there

10  is a large amount of personal responsibility and at least there

11  is some room for understanding.  I -- I appeal to the Court's

12  evenhandedness in trying to balance the two.

13      The sentence which Mr. Garnes will receive if the

14  Court stays within the guidelines even at its lowest point is

15  extraordinarily long.  It's 292 months, plus five years

16  consecutive for the gun.

17      Since the Court has already stated its intention

18  apparently not to deviate from that range, all I can do is

19  appeal to the Court to come in at the bottom and frankly, there

20  is not too much more I can say.

21      THE COURT:  Mr. Garnes, do you wish to speak before I

22  impose sentence?

23      THE DEFENDANT:  Your Honor, I have nothing further to

24  say other than what my attorney already said.  I just like to

25  thank you for your patience, that's all.

*A33*

GR      OCR      CSR      CM

MS. CALDWELL:  I have nothing to add, Your Honor.

THE COURT:  This is an unfortunate case, Mr. Garnes, for a variety of reasons.  But in particular because I think you are a very bright and intelligent person. You probably could have made something better of your life than you did.  I am going to impose the minimum sentence under the guidelines, which is nonetheless a staggering sentence.  I am going to sentence the defendant on Count One to 120 months and five years supervised release.  On Count Three, to 292 months and five years of supervised release, to run concurrently with the sentence on Count One.

On Count Four, I impose a period of five years which under the law must run consecutive to the sentence imposed on Counts One and Three.

So that the total sentence is 352 months.  I impose a period of supervised release of three years concurrent to the five year supervised release on Counts One and Three.

So that the total period of supervised release is five years.

MR. LEVITT:  Thank you, Your Honor.

MS. CALDWELL:  Also the special assessment, Your Honor.

THE COURT:  Yes.  Special assessment of $150.

THE CLERK:  Remaining counts?

MS. CALDWELL:  Not against him.

*A34*

1          THE CLERK:  Any underlying indictments?

2          MS. CALDWELL:  No.

3          MR. LEVITT:  No.

4          THE COURT:  All right.

5          MR. LEVITT:  Thank you.

6          I'm sorry.  Mr. Garnes, you understand you have a

7    right to an appeal.

8          THE DEFENDANT:  Yes, I understand.

9          THE COURT:  And we --

10         MR. LEVITT:  We will file it.

11         THE COURT:  If you can't afford to pay the filing fee,

12   I will have -- I will allow it to be filed without the payment

13   of a filing fee.

14         THE DEFENDANT:  Could I ask you one thing?  This fine,

15   this has to be paid within a certain amount of time?

16         THE COURT:  The special assessment, it is not a fine.

17         THE DEFENDANT:  All right.

18         MR. LEVITT:  You've about 30 years to pay it.

19         THE COURT:  I don't know how they are collected.

20         THE DEFENDANT:  Okay.  I understand.  All right.  I

21   will discuss it with Mr. Levitt.

22         MR. LEVITT:  I am not sure what the government's vig

23   is on that.

24         THE DEFENDANT:  Okay.

25         MR. LEVITT:  I will talk to you.

*A35*

GR          OCR      CSR      CM          R. 167

1          MS. CALDWELL:   I will move to dismiss the original

2    indictment against Mr. Garnes.

3          THE COURT:   Granted.

4          (Whereupon this matter was concluded for this date.)

I hereby certify that the foregoing is
a true and accurate transcript from my
stenographic notes in this proceeding.

Official Court Reporter
U. S. District Court

A36

GR          OCR          CSR          CM

R. 168

1    UNITED STATES DISTRICT COURT
2    EASTERN DISTRICT OF NEW YORK

3    ----------------------------X
                                :
4    UNITED STATES OF AMERICA    :
                                :    88-CR-496
5             v.                :
                                :    July 30, 1999
6                               :    Brooklyn, New York
     MARK GARNES,               :
7                               :
              Defendant.        :
8    ----------------------------X
9

10        TRANSCRIPT OF CRIMINAL CAUSE FOR RE-SENTENCING
            BEFORE THE HONORABLE EDWARD R. KORMAN
11              UNITED STATES DISTRICT JUDGE

12   APPEARANCES:

13
     For the Government:            ZACHARY W. CARTER, ESQ.
14                                  UNITED STATES ATTORNEY
                                    BY:  ANDREW FRISCH, ESQ.
15                                  ASSISTANT U.S. ATTORNEY
                                    225 Cadman Plaza East
16                                  Brooklyn, New York  11201

17   For the Defendant:             BRADLEY SIMON, ESQ.

18

19
     Audio Operator:                BENARDETTE INFANTAS
20
     Court Transcriber:             LINDA FERRARA
21                                  TypeWrite Word Processing Service
                                    356 Eltingville Boulevard
22                                  Staten Island, New York 10312

23

24

25

     Proceedings recorded by electronic sound recording,
     transcript produced by transcription service

A37

R. 169

2

```
 1          THE CLERK:  United States v. Garnes.  Your
 2  appearances, counsel?
 3          MR. FRISCH:  Your Honor, good morning, for the
 4  United States, Andrew Frisch.
 5          MR. SIMON:  Good morning, Your Honor, Brad Simon on
 6  behalf of the defendant, Mark Garnes.
 7          THE COURT:  Good morning.
 8                   [Pause in proceedings.]
 9          THE COURT:  Just wait one second.  I was going over
10  the file yesterday and it was not in the regular pile.
11                   [Pause in proceedings.]
12          THE COURT:  All right.
13                   [Pause in proceedings.]
14          THE COURT:  Mr. Garnes, have you had an opportunity
15  to read the presentence report and the supplemental
16  presentence report that's prepared.
17          THE DEFENDANT:  Yes, Your Honor, I have.
18          THE COURT:  All right.
19          MR. SIMON:  Your Honor, if I may just for a moment,
20  I submitted a memorandum on June 17th which I see the Court
21  has.
22          THE COURT:  Right.
23          MR. SIMON:  I would just like to be brief but to
24  reiterate what I stated in that memorandum which is this is,
25  in my opinion, one of the most remarkable sort of
```

A38

R. 170

3

1 | rehabilitation situations that I have ever witnessed. Mr.

2 | Garnes, since the time he was sentenced by you ten years ago

3 | or almost ten years ago, has made a remarkable transformation

4 | and I would submit to the Court that the letters that were

5 | written by officials at the institutions where Mr. Garnes was

6 | incarcerated or in my view, are rather unprecedented.

7 | And just the entire picture, the extent that Mr.

8 | Garnes has not only rehabilitated himself but has taken upon

9 | himself to counsel other inmates and to lend his services to

10 | the institutions and the various functions and by counseling

11 | inmates and help prison officials in various capacities and I

12 | believe that if there is ever a case that cries out for a

13 | departure under -- for rehabilitation purposes, it is this

14 | one.

15 | And I would just remind the Court that Mr. Garnes

16 | has been incarcerated for eleven years and I would submit to

17 | the Court that that is an extremely long time and I really see

18 | no purpose in where I would ask the Court to consider that

19 | fact in evaluating our motion for a downward departure.

20 | Eleven years is a long time and Mr. Garnes has made good use

21 | of that time and has completely turned his life around. And I

22 | would ask the Court to evaluate that and to consider a

23 | downward departure and which would entail a sentence of time

24 | served.

25 | Oh, by the -- also, I would like to briefly address

*A39*

4

1  the -- I submitted a letter a few days ago addressing the

2  Government's submission of a few weeks ago and I would just

3  point out to the Court that almost all of the so-called

4  infractions that the Government is referring to occurred prior

5  to sentencing and my -- the whole point of my departure motion

6  is that since the time of sentencing, eight and a half years

7  ago, Mr. Garnes has basically had an exemplary record and two

8  infractions over eight and a half years, I submit, is really

9  remarkable.

10         That it is -- I would submit to the Court that it is

11  impossible to -- virtually impossible for an inmate to exist

12  in the -- in an incarcerated situation without, you know, some

13  sort of an infraction over a decade and the fact that there

14  are only two and one simply involved possession of an

15  unauthorized item, I think, if anything, his record regarding

16  infractions supports my position that his rehabilitation has

17  been extraordinary.  And based on this submission that I

18  prepared for the Court, I would ask the Court to consider the

19  downward departure motion.

20                    [Pause in proceedings.]

21         THE COURT:  Do you wish to speak, Mr. Garnes?

22         THE DEFENDANT:  Yes, Your Honor.  When this case

23  initially started, Your Honor, I was somewhat -- what was

24  outlined in the PSR was, I was somewhat dysfunctional,

25  disoriented in regards to life about my values for life were

*A40*

R. 172

6

1   there for me to do in my life?  I mean, for me to go back into
2   the prison system, I mean, yes, I could continue on doing what
3   I've been doing.  At one time, I didn't know whether I was
4   going to come home at thirty-one or fifty-one or somewhere in
5   between there but I said I might as well prepare myself and
6   gain as much information to prepare myself for employment.
7   And this is what this information, this education has did for
8   me through the course of the years.

9           MR. FRISCH:  Your Honor, I will rely on the
10  Government's letter of June 23rd, while Mr. Garnes's conduct
11  to some extent and what he says today is commendable, it is
12  simply not remarkable or extraordinary within the meaning of
13  the case law which I have set forth in the letter.

14          Also, notwithstanding Mr. Garnes's remarks today,
15  this is a very, very serious criminal conduct and even today,
16  and even given the time that he has been in New York awaiting
17  resentencing, there still has not been an expression of
18  acceptance of responsibility for what he did, any remorse for
19  the serious criminal conduct that he committed and while that
20  may be present somewhere in Mr. Garnes, one would think in a
21  motion of this type and given Mr. Garnes's opportunity to
22  speak to the Court directly today, it would have been
23  forthcoming up until this moment.  It hasn't and that is
24  somewhat troubling.

25          But to even put that aside, however commendable Mr.

R. 173



1  Garnes's efforts are, the cases talk about heartland

2  rehabilitation and the facts don't justify that what we have

3  here is anything other than heartland rehabilitation.  I might

4  add, Your Honor, that the Government does not oppose an eighth

5  month downward departure so that he is resentence to the same

6  sentence which Your Honor previously imposed because of the

7  vacation of sentence he now faces a higher sentence than the

8  one you initially imposed.  The Government does not oppose a

9  downward departure to get him back to square one, that is the

10  sentence originally imposed.

11          MR. SIMON:  Your Honor, I would disagree with the

12  Government's assessment -- evaluation of the cases on this --

13  in this area.  I would submit to the Court that as cited in my

14  memorandum, Mr. Garnes's rehabilitation is more extraordinary

15  than the cases in core and the other often cited

16  rehabilitation cases.  The Court's in those cases downwardly

17  departed under extraordinary circumstances, under facts that

18  were -- that in my opinion, were far less compelling than we

19  have here.

20          [Pause in proceedings.]

21          MR. SIMON:  And again, I would remind the Court that

22  Mr. Garnes has already served an extraordinary long sentence.

23          [Pause in proceedings.]

24          MR. SIMON:  Your Honor, Mr. Garnes's fiancee and son

25  are in the Courtroom and they would like an opportunity to

R. 174

A43

8

1    address the Court if that is okay with Your Honor.

2            THE COURT:  Okay.

3            THE CLERK:  State your name for the record, ma'am.

4            MS. KRISHNAF:  Good morning, Doctor -- Judge Korman.

5    I am Camille Krishnaf and I've been in Mark's company for

6    quite some time now and I must tell you, since Mark's

7    relocation to Brooklyn, I have been able to be in touch with

8    him on a more frequent basis and it is somewhat of a

9    metamorphosis in terms of his outlook on life, you know, in

10   terms of understanding that yes, he did wrong and really

11   understanding what it takes to correct those wrongs and

12   continue to contribute to our community, our society, and

13   really there -- Judge Korman, I am requesting that really you

14   show some mercy to Mark.  He has truly rehabilitated himself

15   over the eleven years that he has been incarcerated.

16           THE COURT:  All right, who wants to speak?

17           MR. SIMON:  Mr. Garnes's son is also here and he

18   would like to say a few words, Your Honor.

19           THE CLERK:  State your name for the record.

20           MR. WESTER:  Saquer Wester.  All right, what I have

21   to say about my father is you know, he guided me through my

22   whole life.  He still is there even though, you know, he was

23   put away but he got me through my whole life and even though

24   my mother -- she didn't push me, you know, enough in school

25   and stuff, she didn't really push me to, you know, strive real

R. 175

A44

1  high, it was my father because, you know, he always taught me

2  right from wrong.  And he always taught me how to get jobs and

3  everything, you know?  And he been there for me, you know,

4  still.  You know, he always find a way to keep in contact with

5  me and everything.  He never lost me, you know?

6          And so, I think that if he was out, you know, it

7  even be better for me but because of him, I never been

8  arrested, never been suspended from school, you know, never.

9  I've never been in a precinct or anything, you know?  I'm a

10  senior now in high school and I'm planning on graduating, you

11  know, all because of him because he the one that pushed me up

12  there, you know?  Let me know that I had to learn from his

13  mistakes and go on and that is what I am doing right now.

14                    [Pause in proceedings.]

15          THE COURT:  All right, first I am going to begin the

16  -- I am going to depart first to the 352 months.  I mean,

17  that's where we start in terms of what the guidelines are

18  because I don't think he should be in any worse position now

19  than he was before he made -- successfully made his motion to

20  vacate the sentence.

21          I am going to downwardly depart and sentence the

22  defendant to the custody of the Attorney General for a period

23  of three hundred months, a period of five years supervised --

24  what supervised release did I give the last time?

25          MR. FRISCH:  I think it is five years, Judge.

R. 176



10

1          THE COURT:  Five years supervised release and the

2   special assessment is what?

3          MR. FRISCH:  It is a total of $100.00.

4          THE COURT:  $100.00.  I think you've made progress

5   in jail and sometimes jail helps people find themselves who

6   have engaged in lawless conduct but even when there is a

7   ground for a downward departure, I still have to take into

8   account where we are starting from.  In a sense, we're

9   starting from a guideline range here really of 360 months to

10  life.  That is what the sentencing commission thought was an

11  appropriate sentence and even where there is a basis for a

12  downward departure, a Judge still has to take into account the

13  seriousness of the offense as reflected -- as the guidelines

14  reflect them and the need to impose a sentence that will

15  operate to deter others and is reasonably just under the

16  circumstances.

17         Now, I know I have -- I have always been troubled by

18  whether the fluke that you're able to be here for resentencing

19  that has occurred here should, I think -- it's almost --

20  although I have the power, it almost undermines the purpose of

21  the guidelines just because of the fluke, the purpose for

22  uniformity in sentencing, because of the fluke that results in

23  why you are here to begin with.

24         Nevertheless, because I think you've shown some

25  effort at rehabilitation that you are entitled to some

R. 177



11

1  downward departure from what the guidelines would otherwise be

2  and so, I am going down to three hundred months for that

3  reason.  I think it takes into account your -- the efforts

4  that you've made but also takes into account the other factors

5  that I think a Judge has to take into account in sentencing.

6         All right, you have a right to an appeal.  If I have

7  made any legal error in imposing sentence and if you can't

8  afford to pay the filing fee, I would allow you file the

9  notice of appeal without doing so.

10         MR. SIMON:  Thank you.

11         MR. FRISCH:  Your Honor, if I could ask you to sign

12  the writ for the Marshals?

13                    * * * * * *

14

15

16

17

18

19

20

21

22

23

24

25

R. 178

A47

12

* * * * *

1       I certify that the foregoing is a court transcript from

2

3 an electronic sound recording of the proceedings in the above-

4 entitled matter.

5

6 *Linda Ferrara*

7           LINDA FERRARA

8 Dated:  August 29, 1999

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

R. 179

A48

FOR THE    STERN DISTRICT OF NEW YORK

NITED STATES OF AMERICA)
                       )
          v.           )          Docket No. 88-CR-496-(S-4)-1
                       )
ARK GARNES             )
                       )

———————————————

PRESENTENCE REPORT

epared for:        The Honorable Edward R. Korman
                   U. S. District Judge

epared by:         Eileen Kelly
                   U. S. Probation Officer

ntencing Date:     January 25, 1990

fense:             21 USC 846, Conspiracy to Distribute Heroin, a Class C
                   Felony. 21 USC 841(a)(1), Possession with Intent to Distribute
                   in excess of 50 grams of Cocaine Base, a Class A Felony.
                   18 USC 924(c)(1), Use of a Firearm During and in Relation to
                   Drug Trafficking, a Class D Felony.

lease Status:      In custody since August 11, 1988.

ntifying Data:

e of Birth:        5/15/63 (age 26)
ial Security Number:  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
ress:              1355 Pacific Street
                   Brooklyn, New York  11216

ainers:            None

efendants:         Brian Gibbs - 88-CR-496(S-9)-001

                                                            R. 180
istant U.S. Attorney:                    Defense Attorney

lie Caldwell, Esq.                       Edward P. Jenks, Esq.
                                         297 Mineola Blvd.
                                         Mineola, New York  11501
                                         (516) 741-2920

 original report prepared:  December 4, 1989          JAN 1 0 9
sed (XXX/NO) Date:
ndum (YES/XXX) Date: January 11, 1990     PET.'S Ex. 2

SITION:       Ct. 1 – CAG 120 mo. 5 yr Sup Rel
              Ct. 3 – CAG 292 mo. 5 yr Sup Rel
              Ct. 4 – CAG – 5 yrs to run Consecutive to Cts 1+3 plus 5 yrs to run
                                                              concurrently

4.

11. Agents have reported that based upon intercepted wire communications, Gibbs' sub-organization distributed approximately 3 - 4 oz. of heroin per week during a six month period (2/88 - 8/88), a total of 2.2 kilograms by conservative estimates. Gibbs purchased these drugs from Lorenzo Nichols' organization, as Nichols was his only supplier. Reportedly, he would purchase the drugs or receive them as his salary, cut them with cutting agents, have them packaged by Viola Nichols, and then have them distributed. The two main people who reportedly worked for Gibbs as lieutenants in his operation, were Herman Brothers, a fugitive, and the defendant Mark Garnes, his step-brother.

12. Upon a search of Gibbs' apartment, agents seized drug records, numerous empty crack vials and 1 starter pistol. At the apartment of Mark Garnes (whom agents describe as a subordinate to Gibbs in the organization), agents seized a number of items which included two (2) .44 caliber pistols, two (2) .357 magnums, two (2) 9mm pistols, ammunition for all of these weapons, 1326 vials containing an unknown substance, 40 small plastic bags containing an unknown subtance and 232 vials containing crack. The total amount of cocaine base seized was 166.1 grams, which is equivalent to 3,220 grams of heroin. Hence, the total weight of heroin, conversions, is 5,420 kilograms.

13. Informant information reveals that Mark Garnes regularly carried guns, and, in fact, during the commission of this offense, on May 12, 1988, was arrested in possession of a .45 caliber automatic. Based on the finding that the car in which he was stopped and arrested, was stopped without cause, this case was subsequently dismissed.

14. Informant information depicts Garnes as a distributor of heroin and crack, working under co-defendant Brian Gibbs, his step-brother. It has further been reported that he and Herman Brothers would cut down all of the Gibbs' organization's heroin and crack have Viola Nichols package it, pay her accordingly, and then distribute it through street workers.

15. Informant information has also revealed that Mark Garnes was the driver of the car in an incident related to the shooting of two individuals, namely Regina Brown, and Myrtle Horshan (AKA "Myersha"). Horshan died as a result of the shooting. This incident reportedly occurred on December 20, 1987, in Myrtle Horshan's car. Lorenzo Nichols has recently pleaded guilty to this murder, as it was he who ordered his former girlfriend Horshan's death, as a result of her shorting him money. This killing, and the wounding of Regina Brown, who has recovered, took place in front of Myrtle Horshan and Lorenzo Nichols' two year old child, "T.C.".

A50

**EDWARD P. JENKS**

ATTORNEY AT LAW

**297 MINEOLA BOULEVARD**

**MINEOLA, NEW YORK 11501**

**516-741-2920**

January 2, 1990

Ms. Eileen Kelly
United States Probation Officer
75 Clinton Street, Room 412
Brooklyn, New York 11201-4201

      Re:  U.S.A. vs. Mark Garnes
          88-CR-496 (S-4)

Dear Ms. Kelly:

    Pursuant to local rule and guidelines 6A1.2 and 6A 1.3 of the Sentencing Guideline Manual, enclosed in order of the presentence report are defendant Garnes' exceptions and objections to the report. Please excuse any delay since the report did not arrive in my office until December 21, 1989, two holidays intervened, and the defendant is housed in Otisville which made discussion of this report difficult.

## PART A.  THE OFFENSE

    Under paragraph 11 on page 4 of the report, defendant Garnes takes exception to his being called a "lieutenant" under co-defendant Brian Gibbs.

    Under paragraph 13 on page 4 of the report, defendant Garnes denies he regularly carried guns. In fact, it should be reported that the only testimony at trial showing that defendant Garnes regularly carried guns was from Viola Nichols, a cooperating convicted felon.   Further, the arrest of May 12, 1988 in the State Court, Kings County, charged the defendant with the crime of criminal possession of a weapon in the third degree, a Class D Felony. Upon review of that file, defendant Garnes never had physical possession of the weapon recovered from the gypsy cab. The hand gun was found under the seat.  No weapon was found on Garnes or his co-defendant in that case.

    Pursuant to paragraph  14 on page 4 of the report, defendant Garnes denies "cutting down" any heroin for the Gibbs' organization.

**A51**

Ms. Eileen Kelly                    January 2, 1990
Page -2-

Pursuant to paragraph 15 on page 4 of the report, defendant Garnes vehemently denies being involved in the shootings of Regina Brown, and Myrtle Horshan. Defendant Garnes was not involved in this incident and has no knowledge of the facts.

Pursuant to paragraph 16 on page 5 of the report, defendant Garnes denies attempting to "obstruct justice" and denies offering Brian Gibbs money to change his testimony. Any letter writing in this instance by defendant Garnes was not designed to obstruct justice.

Pursuant to paragraph 17 on page 5 of the report, Mark Garnes did not testify; he has the right to remain silent since the Burden of Proof rests on the government Further, the defendant contends that Carmen Ayala did not perjure herself at trial.

Defendant objects to paragraph 18 on page 5.

While defendant does not except to the base offense level of 34 for Count 1 and Count 3, the defendant excepts to paragraph 24 on page 5 adding a +2 for an obstruction of justice for reasons cited earlier. The defendant objects and excepts to an adjusted offense level in paragraph 25 on page 6 of 36.

PART B. THE DEFENDANT'S CRIMINAL HISTORY

Pursuant to paragraph 42 on page 7 of the report, the defendant Mark Garnes cannot properly except or object to a criminal history score of 10 placing him in category 5. Counsel must investigate the defendant's prior criminal history status, and therefore, reserves with the Court the right to make further objections.

Pursuant to paragraph 43 on page 8 of the report, Mark Garnes denies involvement or knowledge. Paragraph 44 on page 8 has been addressed earlier in this letter.

R. 183

A5a

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

## S U M M A R Y   O R D E R

**THIS SUMMARY ORDER WILL NOT BE PUBLISHED IN THE FEDERAL REPORTER AND MAY NOT BE CITED AS PRECEDENTIAL AUTHORITY TO THIS OR ANY OTHER COURT, BUT MAY BE CALLED TO THE ATTENTION OF THIS OR ANY OTHER COURT IN A SUBSEQUENT STAGE OF THIS CASE, IN A RELATED CASE, OR IN ANY CASE FOR PURPOSES OF COLLATERAL ESTOPPEL OR RES JUDICATA.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the United States Courthouse, Foley Square, in the City of New York, on the    29th    day of June , two thousand.

Present:   HONORABLE RALPH K. WINTER,

Chief Judge,

HONORABLE AMALYA L. KEARSE,

HONORABLE ROSEMARY S. POOLER,

Circuit Judges.



- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA,

Appellee,

- v. -                    No. 99-1524

AMOS, C.O. #1535, LOUISE COLEMAN, CAROL CRAFT, MARTHA CRAFT, CHAR T. DAVIS, MAN SING ENG, HOWARD MASON, BRIAN GIBBS, CLAUDIA MASON, IDA NICHOLS, JOANNE MCCLINTON NICHOLS, VIOLA NICHOLS, JOSEPH ROGERS, KAROLYN TYSON, WILSON SKINNER, MARCIA NICHOLS WILLIAMS, PARIS WILLIAMS,

Defendants,

MARK GARNES,

Defendant-Appellant.

R. 184

Docket No. 99-1524
Page 2 of 5

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Appearing for Appellant:          Mark A. Garnes, <u>pro se</u>, White Deer,
                                  Pennsylvania.

Appearing for Appellee:           Loretta E. Lynch, United States
                                  Attorney, Eastern District of New
                                  York (Emily Berger, Andrew Frisch,
                                  Assistant United States Attorneys,
                                  of counsel), Brooklyn, New York.

     On Appeal from the Eastern District of New York (Korman,
<u>Judge</u>).

     UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED AND
DECREED that the judgment of the District Court is hereby
AFFIRMED.

     Mark Garnes appeals from an amended judgment entered by

Judge Korman granting in part and denying in part appellant's

petition for a writ of habeas corpus under 28 U.S.C. § 2255.

Appellant was originally convicted after a jury trial of

conspiracy to distribute heroin in violation of 21 U.S.C. § 846,

possession of cocaine base with intent to distribute in violation

of 21 U.S.C. § 841(a)(1), and a firearms offense in violation of

18 U.S.C. § 924(c). The district court granted appellant's

habeas corpus petition in part and vacated the firearms

conviction. Appellant argues that his conviction for the drug

offenses was tainted by spillover prejudice from the evidence

introduced on the invalidated firearms count, that he was denied

effective assistance of counsel at trial and sentencing, and that

the district court erred in calculating his criminal history

category at resentencing. We affirm.

     "In evaluating a claim of prejudicial spillover of evidence

Docket No. 99-1524
Page 3 of 5

from an invalidated count, . . . . [we] routine[ly] . . . look to

the strength of the government's case on the counts in question."

<u>United States v. Rooney</u>, 37 F.3d 847, 855-56 (2d Cir. 1994).  In

the instant case, the jury heard direct testimony and 34

intercepted phone calls implicating appellant and had before it a

large amount of drugs and cash seized from his person at the

airport.  In light of the volume of evidence establishing

appellant's guilt on the drug counts, there is no likelihood that

the jury's convictions on those counts was caused by spillover

prejudice from the evidence on the firearms count.

Appellant also claims that his trial counsel was ineffective

in agreeing to factual stipulations and that his counsel at

sentencing was ineffective in failing to object to the quantity

of drugs involved.  To the extent that appellant's first claim

challenges the merits of his trial counsel's decision to agree to

stipulations, his claim is procedurally barred because he was

represented by new counsel on direct appeal and this claim can be

evaluated solely on the record.  <u>See Billy-Eko v. United States</u>,

8 F.3d 111, 114-16 (2d Cir. 1993), <u>superseded by statute on other</u>

<u>grounds as recognized in Triestman v. United States</u>, 124 F.3d

361, 369 n.8 (2d Cir. 1997).  However, appellant alleges in part

that he never gave informed consent to his counsel to agree to

the stipulations, a claim that requires evidentiary support

beyond the record.  But appellant has produced no evidence -- not

even his own affidavit -- to support his claim.  Moreover,

nothing in the record suggests that the decision by appellant's

Docket No. 99-1524
Page 4 of 5

counsel to make the factual stipulations at issue in any way
prejudiced his case.  Appellant has thus failed to meet his
burden under both prongs of the <u>Strickland</u> test.  <u>See Strickland</u>
<u>v. Washington</u>, 466 U.S. 668, 687 (1984) (holding that finding of
ineffective assistance requires proof that counsel's
representation fell below objective standard of reasonableness
and prejudiced defense); <u>cf. United States v. Plitman</u>, 194 F.3d
59, 64 (2d Cir. 1999) ("[D]efense counsel may waive a defendant's
Sixth Amendment right to confrontation where the decision is one
of trial tactics or strategy that might be considered sound.").

Appellant's second claim of ineffective assistance also
fails under both prongs of <u>Strickland</u>.  <u>See Strickland</u>, 466 U.S.
at 687.  Appellant argues that his counsel at sentencing should
have challenged the quantity of drugs seized.  However, the
government had in its custody 1326 vials of crack and 40 bags of
heroin, so counsel's failure to object was objectively reasonable
and could not have prejudiced the defense.

Finally, appellant claims that his criminal history category
should not have been enhanced because of his prior fine for
possessing marijuana.  The criminal history point was correctly
added, however, because the fine constitutes a "prior sentence"
under Guideline Sections 4A1.1(c) and 4A1.2(a)(1), and marijuana
possession is not one of the petty offenses listed as exempt from
criminal history point calculations under Guideline Section
4A1.2(c).  <u>See U.S. Sentencing Guidelines Manual</u>, §§ 4A1.1(c),
4A1.2(a)(1), 4A1.2(c).

R. 187

Docket No. 99-1524
Page 5 of 5

    We therefore affirm.

                FOR THE COURT:
                ROSEANN B. MacKECHNIE, Clerk

                *Richard Alcantore*    6/29/00
                By:                        Date

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

MARK GARNES,                    :
            Plaintiff       :
                    :
          v.          :      Civil No. 1:CV-00-0700
                    :      (Caldwell, J.)
JANET RENO, et al.,             :
            Defendants      :

### CERTIFICATE OF SERVICE BY MAIL

        The undersigned hereby certifies that she is an employee in the Office of the United States Attorney for the Middle District of Pennsylvania and is a person of such age and discretion as to be competent to serve papers.

        That on May 29, 2001, she served a copy of the attached

**RECORD TO BRIEF IN SUPPORT OF THE DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

by placing said copy in a postpaid envelope addressed to the person hereinafter named, at the place and address stated below, which is the last known address, and by depositing said envelope and contents in the United States Mail at Harrisburg, Pennsylvania.

Addressee:

Mark Garnes
Reg. No. 24646-053
FCI Ft. Dix West
P.O. Box 7000
Unit 5811
Ft. Dix, N.J. 08640

_____
SHELLEY L. GRANT
Paralegal Specialist